**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | **:** | **Chapter 11 Case No.** |
| **REPUBLIC AIRWAYS HOLDINGS INC.,** *et al.,* | **:** | **16 -_____ (___)** |
| **Debtors.** [1] | **:** | **(Joint Administration Pending)** |

---------------------------------------------------------------------x

## DECLARATION OF BRYAN K. BEDFORD
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

I, Bryan K. Bedford, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the President and Chief Executive Officer of Republic Airways

Holdings Inc. ("RAH") and its wholly-owned direct and indirect debtor subsidiaries identified

below (collectively with RAH, "Republic" or the "Debtors"), having served in such capacity

since 1999.  I have also served as Chairman of the RAH Board of Directors since 2001.  I have

more than twenty-eight years of experience in the airline industry and am a licensed pilot and a

certified public accountant.  I am knowledgeable about, and familiar with, the business and

financial affairs of Republic and the airline industry and am authorized to submit this declaration

on behalf of each of the Debtors.  If called upon to testify, I would testify competently to the

facts set forth in this declaration.

### Preliminary Statement

2.      RAH, a holding company incorporated in 1996, provides scheduled

regional passenger services through its wholly-owned operating air carrier subsidiaries, Shuttle

---

1.   The Debtors in these chapter 11 cases are the following entities: Republic Airways Services, Inc.; Shuttle America Corporation; Republic Airline Inc.; Republic Airways Holdings Inc.; Midwest Air Group, Inc.; Midwest Airlines, Inc.; and Skyway Airlines, Inc.  The employer tax identification numbers and addresses for the Debtors are set forth in the Debtors' respective chapter 11 petitions.

America Corporation ("Shuttle America") and Republic Airline Inc. ("Republic Airline").

Republic offers approximately 1,000 flights daily to 105 cities in 38 states, Canada, the

Caribbean, and the Bahamas through Republic's fixed-fee code-share agreements with United

Continental Holdings, Inc. ("United"), Delta Air Lines, Inc. ("Delta"), and American Airlines

Group, Inc. ("American," and collectively with United and Delta, the "Codeshare Partners"),

operating under the designations of United Express, Delta Connection, and American Eagle,

including service out of the Codeshare Partners' respective hubs and focus cities.  Republic's

operation is concentrated in key markets in the Northeast, Mid-Atlantic, and Midwest regions of

the U.S.  Republic exclusively operates approximately 40 non-stop routes, most of which

connect smaller cities to major cities (e.g. New York area, Washington D.C., and other major

hubs in Miami and Detroit).  Republic provides just under 3.5% of the total domestic industry

seats with higher concentrations in the Northeast, Mid-Atlantic, and Midwest regions as

presented in the following graphic:



Source:  Seabury APG, June 2015

2

3.      Republic operates through fixed-fee code-share agreements with each of the Codeshare Partners.  These agreements require Republic to maintain specified performance levels and provide for minimum aircraft utilization at fixed rates.  Each of the Codeshare Partners' two-letter flight designator codes is used to identify Republic's flights and fares in its respective computer reservation system.  In addition, Republic is authorized to paint its aircraft in the style of the Codeshare Partners, to use the Codeshare Partners' service marks, and to market itself as a carrier for the Codeshare Partners.  Republic's passengers participate in frequent-flyer programs of the Codeshare Partners and the Codeshare Partners provide additional services such as reservations, ticket issuance, ground support services, commuter slot rights, and airport facilities.  The fixed-fee agreements historically have limited Republic's exposure to fluctuations in fuel prices, fare competition, and passenger volumes.  The Codeshare Partners control the revenue, pricing, and scheduling of the aircraft and obtain the full value of ancillary passenger charges and revenues.   Republic's development of relationships with multiple major airlines has enabled it to reduce its dependence on any single airline, allocate its overhead more efficiently among the Codeshare Partners, and control the cost of its services to the Codeshare Partners.

4.      As I more fully describe below, there is a growing, national shortage of qualified pilots in the United States.  This shortage is making it increasingly difficult to maintain the necessary pilot staffing levels to sustain reliable performance requirements under the agreements with the Codeshare Partners.  As a result of the pilot shortage, Republic has been forced to ground operating aircraft and reduce scheduled flying for each of the Codeshare Partners, which has adversely affected Republic's financial position and cash flows from operations.  Although a new three-year collective bargaining agreement reached with its pilots in

late 2015 has enabled Republic to stem the rate of attrition and significantly increase new pilot

hiring, Republic needs time to be able to train new pilots, return more of its idled aircraft to

revenue service, and restore higher levels of scheduled service for the Codeshare Partners.

5.      There is an acute national shortage of qualified regional airline pilots. This

shortage is primarily a result of Congressional legislation enacted in 2010, which became

effective in August 2013 and January 2014.  The new law imposed (a) more restrictive "time and

duty rest" requirements and (b) a six-fold increase in the minimum flight hour requirements for

new pilots (from 250 hours to 1,500 hours) before new pilots could be considered as "qualified"

for employment as regional airline first officers.  The new "time and duty rest" requirements

have increased by approximately 5%-7% the number of pilots that Republic historically needed

to operate its schedules, thereby exacerbating an already acute labor shortage.  The new

minimum flight hour requirements have dramatically decreased the pool of qualified and

competent new pilots available for hire by Republic (and other regional airlines) to meet its

increased pilot needs in order to sustain its level of operations.

6.      This shortage has been further exacerbated by the aging population of

experienced pilots employed at mainline carriers, who in order to address their own increased

pilot needs due to the mandatory retirement of pilots at age 65, have heavily recruited pilots from

Republic and other regional carriers by offering substantially higher pay and the prospect of

greater opportunities for career advancement.

7.      Concurrently with these changes, Republic was in negotiations with the

International Brotherhood of Teamsters ("IBT Local 357" or the "IBT"), the union which

represents Republic's pilots.  Republic's collective bargaining agreement had become amendable

in October 2007, just as the country was heading into a deep recession and financial crisis.

These negotiations were protracted, very difficult, at times acrimonious, and ultimately extended over a period of eight years. Over the course of the eight years of bargaining, Republic's pilot labor agreement had fallen behind its peer group within the regional airline industry.

8.      During the height of the labor dispute and largely because of Republic's inferior pilot labor agreement, Republic experienced unprecedented pilot attrition and severely challenged new pilot hiring. These factors adversely affected Republic's ability to operate its flight schedule and required Republic to reduce its level of operations. Republic kept its Codeshare Partners informed of the status of the labor negotiations and worked proactively with the Codeshare Partners to equitably allocate staffing shortfalls due to the ongoing labor dispute and the national pilot shortage.

9.      In late October 2015 Republic and the IBT ratified a new three-year pilot labor agreement under which Republic's pilot labor costs have significantly increased. Republic's dialogue with its Codeshare Partners also began to address recovery of the additional costs resulting from the new pilot labor agreement which were understood to be essential to restore operations and achieve normalized levels of flying.

10.     For the past several months, Republic has engaged in extensive discussions and negotiations with the Codeshare Partners and other key stakeholders to secure compensation for the higher labor costs, address its costs for idle aircraft, and to improve its liquidity position. While there has been substantial progress, including the resolution of the eight-year labor dispute with the pilots, it has recently become apparent that Republic will not be able to reach agreement with all the necessary parties within a reasonable period of time. Although Republic had hoped to achieve these goals through consensual out-of-court agreements with each of these parties, because of the loss of revenues during the past several quarters and the

decline in its liquidity, Republic believes the Debtors, their employees, their creditors, shareholders, and other stakeholders (including the many communities served by Republic), their Codeshare Partners, and their passengers, will all be better served by completing a restructuring under the protections of chapter 11 of title 11, United States Code (the "Bankruptcy Code").

11.     This declaration is submitted pursuant to Local Bankruptcy Rule 1007-2 for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these chapter 11 cases and in support of Republic's chapter 11 petitions and the "first-day" motions and applications Republic has filed contemporaneously herewith (the "First-Day Pleadings").  Section I describes the nature of Republic's business.  Section II describes Republic's current capital structure.  Section III describes the circumstances that compelled the commencement of the chapter 11 cases and Republic's need for chapter 11 relief.  Section IV contains a summary of the First-Day Pleadings.  Section V identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

12.     Except as otherwise indicated herein, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by my employees and advisors working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the operations of Republic and the airline industry.  Unless otherwise indicated, the financial information contained herein, and in the schedules attached hereto, is unaudited and provided on a consolidated basis for the Debtors.

## I.

## Republic's Business

13.     On the date hereof (the "Commencement Date"), RAH and its wholly-owned direct and indirect Debtor subsidiaries, Republic Airways Services, Inc.; Republic Airline Inc.; Shuttle America Corporation; Midwest Air Group, Inc.; Midwest Airlines, Inc.; and

Skyway Airlines, Inc. each commenced in this Court a voluntary case under chapter 11 of the

Bankruptcy Code.[2]

14.     The New York City metropolitan area represents Republic's single largest

market, with more than 360 arrivals and departures daily (including more than 100 flights in and

out of LaGuardia Airport alone), more than 830 New York area-based pilots and flight

attendants, and more than 80 maintenance and material service (i.e., parts) personnel.  Republic's

operational fleet consists of approximately 230 aircraft, of which roughly 10% are overnighted at

the New York area airports on any weekday.

15.     Republic's fixed-fee code-share agreements with each of its Codeshare

Partners require Republic to maintain specified performance levels.  Pursuant to the code-share

agreements, which provide for minimum aircraft utilization at fixed rates, each of the Codeshare

Partners' two-letter flight designator codes is used to identify Republic's flights and fares in the

Codeshare Partners' computer reservation systems, Republic is authorized to paint its aircraft in

the style of the Codeshare Partners, to use the Codeshare Partners' service marks, and to market

itself as a carrier for the Codeshare Partners.  In addition, Republic's passengers participate in

frequent-flyer programs of the Codeshare Partners and the Codeshare Partners provide additional

services, such as reservations, ticket issuance, ground support services, commuter slot rights, and

airport facilities.  The fixed-fee agreements historically have limited Republic's exposure to

fluctuations in fuel prices, fare competition, and passenger volumes.  The Codeshare Partners

control the revenue, pricing, and scheduling of the aircraft and obtain the full value of ancillary

passenger charges and revenues.   Republic's development of relationships with multiple major

---

2.   Based on information and belief, venue for Republic's chapter 11 cases is proper before this Court pursuant to
     28 U.S.C. §§ 1408 and 1409, as, among other things, Republic Airways Services, Inc., f/k/a Bestcare Holdings,
     which has an executive office at 80 Broad Street, New York, NY 10004, is a New York State corporation
     formed in 2008.

airlines has enabled it to reduce its dependence on any single airline, allocate its overhead more efficiently among the Codeshare Partners, and reduce the cost of its service to the Codeshare Partners.

16.    Debtor Republic Airways Services, Inc. ("Republic Services"), a wholly-owned subsidiary of RAH that was incorporated in New York in 2008, is the owner of building leasehold improvements, along with maintenance and station ground equipment, vehicles, and office equipment used in Republic's operations throughout the country, including in the New York area.  Republic Services is a guarantor under Republic's two revolving credit facilities.  It has an executive office within this district located at 80 Broad Street, New York, N.Y. 10004.

17.    Debtor Midwest Air Group, Inc., a wholly-owned subsidiary of RAH, is itself a holding company.  Its wholly-owned direct subsidiary, Debtor Midwest Airlines, Inc., and indirect subsidiary, Debtor Skyway Airlines, Inc., constructed, and are the lessees of, two hangars and maintenance facilities located at General Mitchell International Airport in Milwaukee, Wisconsin, which premises, in turn, are licensed (in part) to third parties.

### A.    Republic's Employees

18.    Collectively, Republic employs approximately 5,980 employees as of January 31, 2016, substantially all on a full-time basis, as follows:

| Description | # of Employees | Active | Leave |
|---|---|---|---|
| Union (Pilots, Flight Attendants & Dispatchers) | 4,238 | 3,936 | 302 |
| Salaried - Full Time | 621 | 617 | 4 |
| Salaried - Part Time | 1 | - | 1 |
| Salaried | 622 | 617 | 5 |
| Hourly - Full Time | 1,117 | 1,089 | 28 |
| Hourly - Part Time | 3 | 3 | - |
| Hourly | 1,120 | 1,092 | 28 |
| **Total Employees** | **5,980** | **5,645** | **335** |

19.    Approximately 71% of Republic's workforce is employed under collective

bargaining agreements, as follows:

| Employee Group | # of Full-Time Equivalent Employees (as of 1/31/16) | Representing Union | Amendable Date[3] |
|---|---|---|---|
| Pilots | 2,077 | International Brotherhood of Teamsters Airline Division Local 357 | October 2018 |
| Flight Attendants | 2,074 | International Brotherhood of Teamsters Airline Division Local 135 | July 2018 |
| Dispatchers | 87 | Transport Workers Union of America Local 540 | August 2018 |
| Total Union Employees | 4,238 | | |

20.    As described in Section III below, Republic was in a protracted, eight-year

labor dispute with the IBT, which represents all of Republic's pilots.  Following collective

bargaining negotiations supervised by the National Mediation Board (the "NMB"), on September

27, 2015, Republic and the IBT reached a tentative agreement on the terms of a new three-year

contract, which was ratified by Republic's pilots on October 27, 2015.

**B.    Republic's Operations**

21.    *Government Regulation.*   The current national pilot shortage noted above

is the result of two primary factors: an aging pilot population and new government regulations

that increase new-pilot qualification requirements.[4]  These factors have created greater demand

at mainline, low cost and cargo carriers, which recruit from the regional airlines and offer higher

---

3.    The amendable date of a contract under the Railway Labor Act, which governs airline labor relations, is generally the date on which the provisions of a collective bargaining agreement are capable of being changed. Under the Railway Labor Act, collective bargaining agreements do not automatically expire.

4.    As an interstate air carrier, Republic is subject to regulation by the Department of Transportation ("DOT"), the Federal Aviation Administration (the "FAA"), the Transportation Safety Administration (the "TSA"), and other governmental agencies.  Regulations promulgated by the DOT relate primarily to economic aspects of air service, those of the TSA to security, and those of the FAA to operations and safety.

salaries and more extensive benefit programs than regional carriers are able to offer, and have

made it more difficult for regional airlines, such as Republic, to retain sufficient pilots.

22.     On August 1, 2013, the congressionally-mandated pilot experience

qualifications contained in the Airline Safety and FAA Extension Act of 2010 became effective.

As a result of this legislation, the age and training requirements for Republic's first officer pilots

generally increased to 23 years and 1,500 hours of flight time.  Military pilots are subject to

somewhat lower standards, but as the wind-down of the U.S. involvement in conflicts in Iraq and

Afghanistan has substantially concluded, there are fewer military-trained pilots entering the

workforce.  In addition, the FAA has implemented a new regulation that increases the flight crew

duty, flight, and rest requirements for pilots.  This update changed the length of time a pilot may

be on duty and how much she or he may fly in a day, month, and year.  These new limitations,

together with the new, more restrictive certification and qualification requirements, have resulted

in a growing scarcity of qualified new entrants and have contributed to the current severe

nationwide pilot shortage.

23.     On December 13, 2007, the Fair Treatment of Experienced Pilots Act was

signed into law.  The law postponed the mandatory retirement age for pilots from 60 to 65.  This

resulted in fewer pilot retirements from 2007 to 2012, but since 2012, however, there have been

a growing number of retirements due to the age 65 mandatory retirements.  Consequently, there

has been an even greater increased demand from mainline, low cost and cargo airlines on the

regional airlines to supply replacement pilots.  This trend is anticipated to continue and

accelerate, resulting in a severe increase in attrition of pilots at the regional airlines in the near

term.  As a consequence of there being fewer qualified pilots entering the work force, combined

with increased attrition at the regional airlines to replace retirements at mainline, low cost and

cargo airlines, the regional airline fleets are now underutilized and those aircraft that do operate

do so with reduced schedules due to the reduced number of hours pilots can fly under the new

regulations. Accordingly, Republic (and the regional airline industry generally) is experiencing

declining revenue and higher costs.

24.     *Code-Share Agreements*.    The two types of code-share agreements in the

regional airline industry are (i) pro-rate agreements, which are revenue-sharing arrangements

under which ticket revenues are distributed according to a negotiated proration formula and the

regional airline incurs all costs relating to the flights it operates and is responsible for pricing,

scheduling, ticketing, and seat inventory and (ii) capacity purchase agreements, which are fixed-

fee arrangements under which (a) the regional airline's seat capacity is purchased by a major

airline partner, which provides ground support and gate access, incurs operating expenses

relating to fuel, navigation, airport use, and terminal handling, and determines pricing,

scheduling, ticketing, and seat inventory, (b) the regional airline is responsible for the costs of

labor, aircraft maintenance, safety and compliance oversight, and aircraft financing and

(c) annual escalation provisions tied to the consumer price index excluding fuel and food are

applied to the reimbursement amounts, which historically have been highly correlated to actual

changes in regional airline costs. Both types of code-share agreements are generally long-term

but do vary based on the Codeshare Partners' requirements.

25.     All of Republic's code-share agreements are fixed-fee capacity purchase

agreements. Unlike pro-rate agreements, under which the regional airline bears the risk, but may

realize a benefit, from changes in aircraft fuel prices, passenger loads, and ticket prices,

Republic's capacity purchase agreements insulate it from those fluctuations. Since the financial

crisis of 2008, however, the consumer price index has become a woefully inadequate means to adjust reimbursement rates to compensate Republic for actual changes in operating costs.

26.     The regional airlines, including Republic, are subject to a highly competitive process in order to win flying from the Codeshare Partners.  The "request for proposal" process is comprehensive and all of the details of the prospective code-share agreement, including the financial compensation elements, are vigorously negotiated typically over several months before the Codeshare Partner determines which regional airline will be awarded the flying.

27.     As of January 31, 2016, Republic was providing approximately 285 flights per day as US Airways Express and approximately 225 flights per day as American Eagle,[5] approximately 240 flights per day as Delta Connection, and approximately 280 flights per day as United Express.

**C.     Republic's Restructuring Plan**

28.     Having achieved a new collective bargaining agreement with its pilots, Republic has been and will continue to pursue the following restructuring plan:

- *Obtain modified agreements from our Codeshare Partners to reimburse the increased costs from the new collective bargaining agreement with its pilots and allow an orderly restoration of service.*

- *Agree to an early return/settlement of claims relating to out of favor aircraft (Q400 and ERJ-145).*

- *Streamline our operations by operating a single aircraft type (E170/175) and under a single operating certificate.*

- *Secure additional liquidity to fund future operations and growth.*

---

5.   On December 9, 2013, US Airways Group, Inc. became a wholly owned subsidiary of American Airlines Group, Inc., f/k/a AMR Corporation, and thereafter, the FAA granted a single operating certificate for both carriers.  Republic Airline continues to operate under the code-share agreements with both entities independently, however, as the agreements have not yet been assigned to the merged organization.

29.     In furtherance of Republic's plan to simplify its business by operating fewer fleet types on fewer certificates, on January 1, 2015, Republic completed the consolidation of the operations of its 50-seat regional jet platform, Chautauqua Airlines, into the Shuttle America operating certificate.  All operating aircraft and related employees were transferred to Shuttle America's operations as Chautauqua was merged into Shuttle America.  Consistent with its business plan, and through the chapter 11 process, Republic expects to sell its remaining related assets and complete the wind down of its smaller regional jet and turboprop aircraft.

## II.

## Capital Structure

30.     RAH is a public reporting company under section 12(g) of the Securities Exchange Act of 1934.  RAH's shares of common stock, par value $.001, are traded on the NASDAQ under the symbol "RJET."  By law and pursuant to DOT regulations, Republic must be controlled by United States citizens.  In this regard, Republic's President and at least two-thirds of its Board of Directors must be United States citizens and not more than 25% of Republic's voting stock may be owned or controlled by foreign nationals, although with DOT approval, the percentage of foreign economic ownership may be as high as 49%.

31.     RAH, a Delaware corporation, is the direct parent company of the following Debtors: Republic Services, Republic Airline, Shuttle America, and Midwest Air Group, Inc.  RAH is the indirect parent of the remaining Debtors: Midwest Airlines, Inc. and Skyway Airlines Inc.

32.     In 2015, Republic carried 21,900,000 passengers an average of 479 miles per passenger, with a passenger load factor of 79.2%.  For the year ended December 31, 2015, on

a consolidated basis, Republic had operating revenue of $1,343,900,000, operating expenses of

$1,259,200,000, and net loss of $27,117,000.

33.     As of January 31, 2016, on a consolidated basis, Republic had assets and

liabilities of $3,561,000,000 and $2,971,000,000, respectively, unrestricted cash and short-term

investments of $132,300,000, and stockholders' equity of $590,000,000.  Republic's restricted

cash of $4,788,000 consists of amounts segregated for certain debt and lease payment obligations

during the upcoming year, and certificates of deposit that secure certain letters of credit issued

for workers' compensation claim reserves and certain airport authorities.  The following sets

forth an overview of Republic's indebtedness:

34.     *Credit Facilities.*  Republic is party to that certain Credit and Guarantee

Agreement, dated April 7, 2015, as amended (the "DB Facility"), among Republic Airline, as

borrower, DB AG New York Branch, as administrative agent, revolving lender, and revolving

facility issuing lender, Key Bank National Association and Morgan Stanley Bank, N.A., as

revolving lenders, and RAH, Shuttle America, and Republic Services, as guarantors, providing

for (i) a revolving credit facility in the aggregate amount of $60 million and (ii) up to $10 million

in letters of credit.  As of the Commencement Date, Republic has $60 million in borrowings

outstanding and $8.8 million in issued and outstanding letters of credit.  Republic's obligations

under the DB Facility are secured by certain spare parts and spare engines.

35.     Republic also is party to that certain Credit and Guaranty Agreement,

dated as of April 24, 2015 (the "Citi Facility"), among Republic Airline, as borrower, Citibank,

N.A., as administrative agent, the lenders party thereto, RAH, as parent and guarantor, and

Republic Services and Shuttle America, as guarantors, providing for a revolving credit facility in

the aggregate amount of $25 million.  As of the Commencement Date, Republic has $23 million

in borrowings outstanding.  Republic's obligations under the Citi Facility are secured by certain aircraft and engines.

36.    *Financed Aircraft and Equipment-Related Obligations.*    Republic is party to numerous arrangements that provide for the financing of its aircraft and equipment.  These financing arrangements include (as of December 31, 2015):

(a)    Approximately $2.318 billion in principal amount of notes amortized through 2027, bearing interest at fixed rates ranging from 2.04% to 8.49%, secured by aircraft;

(b)    Approximately $56.7 million in principal amount of notes amortized through 2022, bearing interest at fixed rates ranging from 5.13% to 8.38%, secured by spare parts and equipment; and

(c)    Approximately $1.7 million in principal amount of notes amortized through 2017, bearing interest at variable rates based on LIBOR plus a margin ranging from 3.18% to 3.66%, secured by spare parts and equipment.

37.    With respect to new aircraft commitments, as of December 31, 2015, Republic has firm orders to purchase 40 CS300 aircraft from Bombardier that are contracted to be delivered starting in the second quarter of 2015 (which deliveries have not yet commenced), with scheduled delivery dates continuing through the third quarter of 2017.  Republic also has commitments with Embraer for 24 E175 aircraft under the United brand that have scheduled delivery dates between the third quarter of 2016 and the fourth quarter of 2017.  In addition, Republic has commitments with Pratt & Whitney and GE Engines Services for a total of a minimum of 15 spare engines to be delivered in 2016 and 2017.

38.    As of December 31, 2015, Republic's financed aircraft obligations, including the foregoing commitments, aggregate approximately $3.461 billion, payable (assuming delivery dates as projected) as follows: $1.211 billion in 2016, $1.471 billion in 2017, and $778.4 million in 2018    Republic has entered into commitments for secured debt financing

15

arrangements for its new 24 E175 aircraft commitments, as contemplated therein. In regard to the CS300 commitments, due to the manufacturer's delivery delays and general uncertainty no financing commitments have been entered into.

39.    *Operating Leases*. Republic also has significant obligations for aircraft and engines that are classified as operating leases and not reflected on its balance sheet. Republic's aircraft operating leases expire between 2016 and 2023. The estimated minimum rental payments on these leases for the next year are approximately $97.3 million. Republic's other operating leases are for engines, terminal space, operating facilities, office space, and office equipment, and expire from 2016 through 2033. Republic's estimated minimum rental payments on these leases for the next year are approximately $15.9 million.

40.    *Consignment*. RAH is party to a Master Consignment Agreement, dated May 19, 2015, with Diversified Aero Services Inc. ("DASI"), pursuant to which DASI advances payment to RAH for surplus aircraft and engine parts consigned by RAH. As the surplus parts are sold, the balance of RAH's advance is reduced. As of the Commencement Date, Republic has an outstanding advance balance of approximately $1.5 million owed to DASI. DASI currently has approximately $8 million of consignment parts.

41.    *The Milwaukee Bonds*. In 1998 and 2001, the City of Milwaukee, Wisconsin issued variable rate industrial development bonds in an aggregate principal amount of $15.3 million, and pursuant to loan agreements, loaned the proceeds to Debtors Midwest Airlines, Inc. ("Midwest Airlines") and Skyway Airlines Inc. ("Skyway") (or their predecessors in interest) to fund construction of two hangars and maintenance facilities at General Mitchell International Airport in Milwaukee, Wisconsin for use in their former Midwest Airlines and subsequently Frontier Airline operations out of Milwaukee. In connection therewith, Midwest

Airlines and Skyway entered into long-term leases of the property with Milwaukee County,

Wisconsin and constructed the facilities.

42.     The Milwaukee facilities and related liabilities were excluded from the

Frontier sale transaction in 2013.  Accordingly, Midwest Airlines and Skyway are obligated to

the bond indenture trustee for principal and interest under the loan documents.  Those obligations

are secured by letters of credit issued by U.S. Bank National Association.  Pursuant to a credit

assistance agreement, the Debtors' letter of credit obligations are guaranteed by Milwaukee

County.  That guarantee is secured by mortgages on the property and an assignment of leases and

rents.  Republic's annual obligations in respect of the Milwaukee facilities aggregate

approximately $1.1 million.

43.     *Unsecured Debt.*  Apart from any unsecured deficiency claims that may

exist with respect to financed aircraft and equipment or the credit facilities, Republic does not

have any unsecured indebtedness for borrowed money.  As of February 16, 2016, its unsecured

trade payables aggregated $25.7 million.

## III.

### The Need for Chapter 11 Relief and the Events
### <u>Leading Up to the Commencement of These Chapter 11 Cases</u>

44.     In October 2007, Republic's collective bargaining agreement with the IBT

became amendable.  Over the pendency of the amendable period, pilot wages under that

agreement deteriorated significantly below industry standard, pilot attrition increased, and with

the subsequent heightened requirements for non-military-trained pilots and a decreasing number

of new entrant pilots who could satisfy the higher experience qualifications, Republic's ability to

attract qualified candidates was frustrated.  Accordingly, over the eight years since its collective

bargaining agreement with the IBT became amendable, Republic endeavored to negotiate

17

increased compensation and improved benefits and work rules that might help Republic to retain

its existing pilots and better position it to attract new pilots.  At the same time, to address its pilot

shortage, Republic, at times, provided premium pay for pilots when they agreed to perform

additional unassigned flying on their scheduled days off and offered signing bonuses to

prospective new-hires as an incentive to accept its employment offers.

      45.    Negotiations with the IBT were protracted.[6]  Republic, however, worked

resolutely toward a consensual resolution for its pilots.  Though Republic and the collective

bargaining representative for the pilots, IBT Local 747, opened negotiations in 2007 and had

reached tentative agreements on several sections of a new collective bargaining agreement over

the next two years, in 2009 the IBT placed its original Local (747) into trusteeship following

complaints that Local 747 had failed to maintain proper financial controls.  The trustee then

withdrew Local 747's agreement to the tentative agreements the parties had reached in the prior

two years of bargaining.  Negotiations began anew the following year with the newly-established

IBT Local 357.  In July 2011, after being unable to reach an agreement, the parties began to

engage in collective bargaining negotiations supervised by the NMB, and thereafter in November

2013, under the auspices of a private mediator.  Though the parties reached a tentative agreement

three months later in February 2014, it was not ratified by the union membership, and the parties

returned to contract negotiations under the auspices of the NMB.  Over the course of the next

year, the parties passed over 100 proposals on at least 18 sections of the contract and by May 1,

2015, had reached tentative agreements on 19 out of 30 sections of the contract.  However,

---

6.   During the latter stages of negotiations, on July 9, 2015, the IBT filed a complaint against RAH, Shuttle
    America, and Republic Airline in the Southern District of Indiana, (Teamsters Local Union No. 357 v. Republic
    Airline Inc., et al., Civ. No. 15-cv-1066), alleging that the company unilaterally increased compensation for
    pilots and new hires in violation of the Railway Labor Act, which further affected Republic's ability to hire new
    pilots.  Disputing the merits of the complaint, on July 30, 2015 Republic filed a motion to dismiss.  This case
    was ultimately dismissed with prejudice upon the ratification of the collective bargaining agreement on October
    27, 2015.

progress stalled thereafter on the issue of compensation.  Ultimately, after a series of proposals, on September 28, 2015 Republic and the IBT reached a tentative agreement on the terms of a new three-year contract, which Republic believes respects the role of its pilots in its long-term success and puts its pilots at the forefront of the regional airline industry.  The IBT recommended the tentative agreement to its members, and at the conclusion of voting on October 27, 2015, it was ratified.

46.     Though the tentative agreement with the IBT has been ratified, ratification does not provide an immediate resolution and panacea for all of the issues facing Republic.  The length and intensity of negotiations with the IBT has had a severe impact on operations: pilot attrition doubled, recruiting efforts suffered severely, and Republic was forced to ground significant portions of its operating fleet due to lack of qualified pilots, generating losses in revenue, higher costs, diminished cash flows, and an inability to meet minimum flying levels under its fixed-fee agreements.  Moreover, new hires are subject to a mandatory minimum three-month training program.  Accordingly, Republic's staffing assumptions for months in the future, as well as its ability to agree to flight plans and scheduling with its Codeshare Partners, have been impacted significantly.  Recovery and growth will require time and achieving new agreements with key stakeholders.

47.     Over the course of the disputes and negotiations with its pilots, Republic kept all of the Codeshare Partners informed and worked proactively with each of them to minimize any disruption in service levels and to allocate equitably any required reduction in flying caused by pilot attrition.  Republic also engaged in dialogue with each of them regarding an increase in payments under the fixed-fee code sharing agreements to compensate Republic for its significant increase in pilot labor costs.  Each of the Codeshare Partners has expressed a

willingness to address Republic's increased costs and to modify its agreement in order to

accommodate Republic's rebuilding its levels of operations as it recruited and trained new pilots.

However, each party's willingness to participate has been conditioned on Republic's ability to

achieve new agreements with all of the Codeshare Partners and other key stakeholders. Despite

extensive negotiations, such agreements have proven elusive.

48.    On October 5, 2015, Delta chose abruptly to cease further negotiations

with Republic and instead filed litigation against Republic alleging breach of the fixed-fee

agreements. Republic disputed Delta's allegations, and for approximately six weeks there was

no further engagement on modifications to their agreements. Although there was no merit to

Delta's lawsuit, unfortunately, the existence of the litigation and the uncertainty of its resolution

became an impediment to reaching resolutions with the other Codeshare Partners. After weeks

of preliminary litigation and as a result of outreach by representatives of Republic, Delta and

Republic have recently reengaged in extensive negotiations and on January 30, 2015, a non-

binding letter of intent was signed, and the litigation was stayed.

49.    Republic has continued to engage in extensive negotiations with all of its

major stakeholders, including its Codeshare Partners, OEM counterparties (such as Embraer,

Pratt & Whitney, Rolls Royce, and Bombardier), and aircraft and equipment financing partners

(such as GECAS, NAC, and RESIDCO), to address the necessary modifications to its

agreements that will enable Republic to restructure and return to reliable and profitable

operations. Although all Republic's stakeholders have expressed their support, and a willingness

to participate in these efforts, no binding agreements have been reached. Republic can no longer

afford to bear the substantial costs of unproductive assets and unprofitable agreements while it

seeks consensual agreements with its stakeholders. Republic believes that the protections

afforded to debtors by chapter 11 will help stem these costs and losses and afford Republic the necessary time to reach agreements with its key stakeholders.

50.     Republic is optimistic about its long-term prospects as it stabilizes its business and continues to operate during these chapter 11 cases.  Through the chapter 11 process, Republic intends to continue to work with its constituents to grow back its business by restructuring its flight schedules, divesting itself of burdensome, underutilized aircraft and equipment, and simplifying its operational fleet by transitioning to a single, larger regional jet fleet and a single operating certificate and assuring sufficient liquidity to support its operations and future growth.  These chapter 11 cases present the opportunity for Republic to accomplish these goals on a consensual basis for the benefit of all stakeholders.

## IV.

### First-Day Pleadings

51.     Republic is filing the First-Day pleadings contemporaneously herewith to ensure that its business continues on an uninterrupted basis during these chapter 11 cases.[7]  For the reasons set forth therein and below, I submit that the relief requested in the First-Day Pleadings is necessary to enable the Debtors to operate with minimal disruption to Republic, the Codeshare Partners, and the traveling public during the pendency of their chapter 11 cases and that approval of the First-Day Pleadings is appropriate and warranted under the circumstances.

**Debtors' Motion Pursuant to Fed. R. Bankr. P. 1015(b) for
Entry of Order Directing Joint Administration of Chapter 11 Cases**

52.     Republic requests entry of an order directing joint administration of these chapter 11 cases for procedural purposes only pursuant to rule 1015(b) of the Federal Rules of

---

7.   Capitalized terms used in this section of this declaration and not defined herein shall have the meanings ascribed to them in the relevant First-Day Pleading.

Bankruptcy Procedure.  Specifically, Republic requests that the Court maintain one file and one

docket for all of the chapter 11 cases under the lead case, Republic Airways Holdings Inc.

Further, Republic requests that an entry be made on the docket of each of the chapter 11 cases of

the Debtors to indicate the joint administration of the chapter 11 cases.

53.     I believe the joint administration of the chapter 11 cases will provide

significant administrative convenience without harming the substantive rights of any party in

interest.  The requests for relief, hearings, and orders in these cases will almost certainly affect

each of the Debtors.  The joint administration of the chapter 11 cases will avoid the costs

attendant to duplicative filings and will allow all parties in interest to monitor the cases with

greater ease and efficiency.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 342(a), 521 & 105(a), Fed. R. Bankr.
P. 1007(a), 1007(c), 2002, 2015.3 & 9006(b), and Local Bankruptcy Rule 1007-1
for Entry of Order (i) Extending Time to File Schedules of Assets and Liabilities,
Schedules of Executory Contracts and Unexpired Leases, and Statements of
Financial Affairs, (ii) Granting Additional Time to File 2015.3 Report, (iii) Waiving
Requirement to File List of Creditors, and (iv) Waiving Requirement to File
<u>an Equity List and Modifying the Provision of Notice to Equity Security Holders</u>**

54.     Republic requests entry of an order granting additional time to file its

schedules and statements of financial affairs (collectively, the "<u>Schedules</u>") for an additional

thirty days (without prejudice to further extensions).  Republic also requests an extension of the

time to file its initial report of financial information with respect to non-Debtor entities in which

Republic holds a controlling or substantial interest (the "<u>2015.3 Reports</u>") until thirty days after

the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code or to file a

motion with the Court seeking a modification of such reporting requirements for cause.  The

Debtors have approximately $3.59 billion in assets, approximately $2.95 billion in liabilities, and

more than 10,000 creditors.  To prepare the Schedules, Republic must compile information from

books, records, and other documents relating to thousands of transactions, claims, assets, and

22

contracts.  Given the size, complexity, and geographic diversity of Republic's business

operations, and the number of creditors, I submit that the large amount of information that must

be assembled to prepare the Schedules and the number of employee and professional hours

required to complete the Schedules, as well as the preparation of the 2015.3 Reports, would be

an unnecessary distraction to Republic in the initial weeks of the cases as it seeks to focus its

efforts on stabilizing its business.

55.     Republic also requests a waiver of the requirements to file a list of

creditors on the Commencement Date.  Republic has filed, or will soon be filing, a motion to

retain and employ Prime Clerk LLC ("Prime Clerk") as claims and noticing agent in these

chapter 11 cases.  Given that Prime Clerk will receive a list of creditors and will use the list to

furnish the notice of commencement to creditors, I submit that filing a list of creditors will serve

no useful purpose.

56.     Republic also requests a waiver of the requirement to file a list of equity

security holders and a modification of the requirement to provide notice to equity security

holders.  Preparing the list of equity security holders with last-known addresses and sending

notices to all equity security holders is unnecessary at this time and would create an additional

expense without a concomitant benefit to the estates.  Republic proposes, instead, to cause notice

to be provided to the record holders of RAH's common stock.  Republic submits that to the

extent equity security holders are entitled to distributions or entitled to vote on a chapter 11 plan,

those parties can nevertheless be provided with the appropriate bar date or plan-related notices

and then have an opportunity to assert their interests.  Thus, equity security holders will not be

prejudiced.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c),
364(a), 503(b) & 507(a) and Fed. R. Bankr. P. 6003 & 6004 for Entry of
Interim and Final Orders (i) Authorizing Debtors to (a) Continue Using
Existing Cash Management System, (b) Honor Certain Prepetition Obligations
Related to the Use Thereof, (c) Provide Postpetition Intercompany Claims
Administrative Expense Priority, and (d) Maintain Existing Bank Accounts
and Business Forms and (ii) Waiving the Requirements of 11 U.S.C. § 345(b)**

57.     Republic requests entry of an order (i) authorizing it to (a) continue to operate its existing cash management system with respect to intercompany cash management and obligations, including the maintenance of existing bank accounts (the "Bank Accounts") at its existing banks and other financial institutions (collectively, the "Banks") and the continuation of its cash investments in accordance with its Investment Policy (as defined in the motion) consistent with its prepetition practices (the "Cash Management System"), (b) honor certain prepetition obligations related to the Cash Management System, (c) provide postpetition intercompany claims with an administrative expense priority, and (d) maintain existing business forms and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Bank Accounts.

58.     In the ordinary course of its business, Republic utilizes a company-wide Cash Management System that allows the company to efficiently collect, concentrate, disburse, and invest funds generated by the Debtors' operations.  It also enables Republic to perform cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over intercompany obligations and the administration of the company's Bank Accounts.  In broad terms, Republic's Cash Management System is similar to the systems used by other major corporate enterprises.

59.     The Cash Management System is overseen primarily by the personnel in Republic's finance department and is comprised of approximately 32 Bank Accounts maintained

at various Banks in the United States (30) and Canada (2). The U.S. Banks at which the Bank Accounts are maintained are designated as "authorized depositories" by the Office of the United States Trustee for the Southern District of New York pursuant to its Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "UST Guidelines"). The Canadian Banks at which two accounts are maintained are Canadian branches of U.S. banks that are authorized depositories.

60.     To enable Republic to obtain a return on its money, on a regular basis, funds in excess of approximately $25 million (in the aggregate) are swept into an investment clearing account maintained by RAH at JPMorgan Chase Bank, N.A., where the cash is invested in highly-liquid short-term investments (typically money-market funds) in accordance with Republic's Investment Policy. Republic requests that the Court waive, to the extent applicable, the requirements of section 345(b) of the Bankruptcy Code, and permit Republic to continue investing its cash in accordance with the Investment Policy in order to protect capital, minimize risk, maintain liquidity, and maximize its return.

61.     As part of the Cash Management System, the affiliated Debtors engage in intercompany transactions which result in receivables and payables (the "Intercompany Claims").[8] At any given time there may be Intercompany Claims by one Debtor against another. Republic maintains records of all intercompany transfers, which generally are reconciled on a monthly basis, and therefore, is able to ascertain, trace, and account for all intercompany transfers. To ensure that each Debtor will not fund, at the expense of its creditors, obligations of another Debtor, Republic requests that all Intercompany Claims arising on or after the

---

8.    Republic does not make any intercompany transfers between a Debtor and a non-Debtor affiliate.

Commence Date as a result of intercompany transfers through the Cash Management System be accorded administrative expense status.

62.     Additionally, in the ordinary course of business, Republic uses various check types and a variety of correspondence and business forms, including but not limited to, purchase orders, invoices, checks, and other business forms.  Republic believes that its continued use of such forms as they existed prepetition (subject to Republic's reasonable efforts to include a reference to its status as a debtor in possession) will minimize the expense to Republic's estates associated with developing or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors.

63.     The Cash Management System constitutes an ordinary course and essential business practice of Republic.  It provides significant benefits to Republic including, among other things, the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, and  reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  The use of a centralized Cash Management System has historically reduced expenses by enabling Republic to optimally use and allocate funds within the system.

64.     Republic believes that its transition to chapter 11 will be more orderly, with a minimum of harm to operations, if all Bank Accounts are continued following the Commencement Date with the same account numbers.  By preserving the business continuity and avoiding the disruption and delay that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees and vendors, will be best served.  The benefit to Republic, its business operations, and all parties in interest

will be considerable, while the confusion that would result absent the relief requested would ill-serve the company's rehabilitative efforts.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) & 105(a) for Entry of Interim and Final Orders (i) Authorizing (a) Payment of Prepetition Wages, Salaries, and Other Compensation and Benefits and (b) Maintenance of Employee Benefits Programs and Payment of Related Administrative Obligations and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers**

65.     Republic seeks entry of interim and final orders authorizing it to (i) pay, in its sole discretion, all prepetition amounts owed with respect to Wages, Independent Contractor Obligations, Incentive Program Obligations, Reimbursement Obligations, Withholding Obligations, Payroll Maintenance Fees, Severance Obligations, Relocation Obligations, Leave Obligations,  Employee Benefit Obligations, and Other Employee Programs (collectively with any related fees, costs, and expenses, the "Prepetition Employee Obligations") and (ii) continue its prepetition practices, programs, and policies for its Employees, as those practices, programs, and policies were in effect as of the Commencement Date and as those practices, programs, and policies may be modified, amended, or supplemented from time-to-time in the ordinary course of Republic's business, and to honor and pay any related fees, costs, and expenses.  Further, Republic requests that the Court authorize and direct the banks and other financial institutions at which Republic maintains payroll or disbursement accounts to honor and process related checks and transfers.

66.     Republic collectively employs approximately 5,980 full- and part-time Employees[9] on both an hourly and salaried basis, including pilots, flight attendants, dispatchers, mechanics, aviation maintenance support personnel, supervisors, managers, administrative

---

9.   Approximately 335 of Republic's employees are on furlough, long-term disability, military leave, some form of personal leave or otherwise in an inactive status.  While such employees are not receiving wages, some may be receiving other benefits, such as disability payments from health and welfare benefit plans, severance benefits, continuation of medical benefits, or free or reduced rate travel benefits, depending on the type of leave or years of service.

support staff, and other personnel.  Approximately 71% of Republic's workforce is represented

by unions and subject to collective bargaining agreements with Republic, including:

approximately 2,077 pilots, approximately 2,074 flight attendants, and approximately 87

unionized dispatchers.  In addition to the Employees, from time-to-time, Republic uses the

services of Independent Contractors to provide aircraft maintenance support and assistance with

administrative services.  As of the Commencement Date, four individuals perform such services.

67.    Republic estimates that its Prepetition Employee Obligations total

approximately $11 million, excluding obligations that will be honored or paid over time in the

ordinary course of Republic's business or may not require cash payments.[10]  Of this amount,

approximately $9.8 million is proposed to be paid during the first thirty days of the case.

68.    The Employees are vital to the continued operation of Republic's business

and to its successful reorganization.  Any delay in payment of Republic's Prepetition Employee

Obligations will undoubtedly adversely affect Employee morale, dedication, confidence, and

cooperation.  Republic cannot sustain the damage to its business that would inevitably follow.

Moreover, absent an order granting the relief requested, Employees may suffer undue hardship,

and in many instances, serious financial difficulties.  Without the relief requested, Republic's

restructuring efforts will be severely undermined when otherwise loyal Employees seek

alternative employment opportunities, potentially crippling Republic's ability to meet the

obligations necessary to sustain its business.

69.    Republic does not seek to alter its compensation, vacation, or other benefit

programs or policies.  Rather, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, it

seeks authority to honor and pay the Prepetition Employee Obligations as and when they come

---

10.  This amount does not include Vacation Obligations and Sick Leave Obligations, each as defined in the
     Employee Motion.

due in the ordinary course of business, and to continue at this time its practices, programs, and

policies for its Employees, as those practices, programs, and policies were in effect as of the

Commencement Date.

70.     Further, Republic is not seeking authority to pay any individual Employee

or Independent Contractor in an amount greater than the $12,475 priority cap imposed by section

507(a)(4) of the Bankruptcy Code on account of prepetition Wages.  Republic will not make any

bonus payments to senior executives and will not satisfy any Severance Program payments to

any "insider," as defined in section 101(31) of the Bankruptcy Code, in each case without first

requesting separate authority from the Court.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b) & 503(b)(9) for Entry
of Interim and Final Orders (i) Authorizing, But Not Directing, Debtors to Pay
Prepetition Obligations of Critical Vendors and (ii) Authorizing and
<u>Directing Financial Institutions to Honor and Process Related Checks and Transfers</u>**

71.     Pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy

Code, Republic seeks (i) authority, but not direction, to pay some or all of the prepetition claims

of certain vendors, suppliers, service providers, and other similar entities that are essential to

maintaining the going concern value of Republic's enterprise (the "<u>Critical Vendors</u>" whose

prepetition claims shall be defined as the "<u>Critical Vendor Claims</u>"), subject to the conditions

described in the Motion and (ii) approval of the procedures and conditions set forth in the

Motion.  Republic also seeks entry of an order authorizing and directing the banks and other

financial institutions at which Republic maintains disbursement accounts, at Republic's

direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all

checks drawn or electronic fund transfers requested or to be requested by Republic relating to the

Critical Vendor Claims.  Further, Republic seeks authority to issue new postpetition checks, or

effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any

prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of Republic's chapter 11 case.

72.     Republic operates in a highly specialized, highly regulated, and highly competitive industry.  The uniqueness and competitiveness of the airline industry leaves Republic with few options with respect to certain vendors and service providers.  Republic also purchases goods and services from certain vendors which are sole- or limited-source suppliers without which the company could not operate.  Unlike vendors that may be easily and timely replaceable, these suppliers are, by definition, irreplaceable absent extraordinary expense or extensive delay.  I believe it is in the best interest of Republic's estates and creditors to pay some or all of the Critical Vendor Claims.  In most instances, these payments would be contingent on agreements that the Critical Vendors continue to sell their goods or services at the same or reduced prices and on terms at least as favorable as those in effect before the Commencement Date.  If, however, Republic is unable to reach agreement with a particular Critical Vendor to continue business on customary trade terms, Republic seeks authority to pay, in its discretion, all or a portion of any such Critical Vendor's prepetition claims.

73.     The Critical Vendors are all important to Republic's passenger airline business and, accordingly, a delay in their services could cause irreparable harm to Republic's revenue, goodwill, and market share.  In identifying the Critical Vendors that it is seeking authority to pay for goods delivered or services provided during the period before the Commencement Date, Republic excluded vendors which are party to executory contracts and therefore precluded from unilaterally ceasing to comply with terms of their contracts.  In general, the Critical Vendors fall into eight categories: (i) safety and security providers, (ii) maintenance service providers, (iii) flight training providers, (iv) customer amenity providers, (v) passenger

and cargo handling and ground support service providers, (vi) fuel providers, (vii) crew services providers, and (viii) information technology suppliers and service providers.[11]

74.     Pursuant to this motion, Republic is not seeking to pay all prepetition claims of the Critical Vendors.  Instead, Republic seeks to pay such undisputed amounts in the ordinary course of Republic's business and on terms consistent with Republic's prepetition practices that Republic determines, in its business judgment, are in the best interests of Republic's business.  Republic proposes specific procedures, as set forth in the Motion, as a condition for paying Critical Vendors' claims.  I understand that the aggregate amount owed to Critical Vendors for goods delivered or services provided during the period before the commencement date does not exceed $310,000 and that of this amount, Republic requests to pay up to $155,000 prior to a final hearing.  Finally, to ensure that Republic's liquidity is preserved as it transitions into chapter 11, payments to Critical Vendors will be contingent on the Critical Vendors agreeing to continue to sell their goods or services on terms at least as favorable as those in effect before the Commencement Date.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b), 105(a) & 503(b)(9) for Entry of Interim and Final Orders (i) Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations Owed to Foreign Creditors and (ii) Authorizing and <u>Directing Financial Institutions to Honor and Process Related Checks and Transfers</u>**

75.     Pursuant to sections 363(b), 105(a), and 503(b)(9) of the Bankruptcy Code, Republic seeks (i) authority, but not direction, to pay, in its sole discretion in the ordinary course of business, prepetition obligations (the "<u>Foreign Claims</u>") to foreign vendors, suppliers, service providers, independent contractors as well as to various governmental and quasi-governmental authorities (the "<u>Foreign Creditors</u>") and (ii) an order authorizing and directing

---

11.  These categories generally describe the major categories of goods and services provided by the Critical Vendors and are not intended to be exclusive.

Republic's banks to receive, process, honor, and pay, to the extent of funds on deposit, checks or electronic transfers used by Republic to pay the Foreign Claims without further order of the Court.  Republic is not seeking to pay all prepetition claims of Foreign Creditors.  Instead, Republic seeks to pay such undisputed amounts in the ordinary course of Republic's business and on terms consistent with Republic's prepetition practices.

76.   Due to the limitations of the enforceability of the automatic stay, the risk of foreign creditors' exercising remedial rights, and the critical nature of goods and services provided by foreign creditors, I believe that the relief requested in this motion is warranted. Moreover, payment of the Foreign Claims as proposed will assure the orderly operation of Republic's business and avoid costly disruptions and the significant loss of value and irreparable harm arising therefrom.

77.   I understand that the aggregate amount of Republic's prepetition obligations to Foreign Creditors is approximately $500,000, of which approximately $250,000 is due within thirty days of the Commencement Date.  In light of the potential for serious and potentially irreparable consequences if the Foreign Creditors do not continue to make uninterrupted and timely deliveries—and the lack of any enforcement mechanism against them—I submit that payment of the Foreign Claims is essential to avoid costly disruptions to Republic's operations.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b), 105(a), 363(b), 503(b) & 507(a) for Entry of Interim and Final Orders (i) Authorizing, But Not Directing, Debtors to Pay Certain Prepetition (a) Charges for Shippers, Warehousemen, and Other Lien Claimants and (b) Customs Duties, (ii) Granting Administrative Expense Status for Certain Goods Delivered Postpetition, and (iii) Authorizing and Directing <u>Financial Institutions to Honor and Process Related Checks and Transfers</u>**

78.   Republic requests authority to (i) pay certain prepetition amounts owed to parties that may be able to assert liens against Republic and its property (the "<u>Lien Claimants</u>")

32

that Republic determines, in the exercise of its business judgment, to be necessary or appropriate to obtain the release of supplies, merchandise, goods, tools, equipment, components, materials, or other items (collectively, the "Goods") held by any Lien Claimants and (ii) pay prepetition custom duties and such other related prepetition import expenses and charges (the "Customs Duties") as Republic determines, in the exercise of its business judgment, to be necessary or appropriate to obtain Goods in transit and to satisfy any related liens. Republic further requests authority to condition payment of prepetition amounts owed to any Lien Claimant on written verification that such Lien Claimant will abide by certain conditions, including that the Lien Claimant will continue performing on favorable terms and that the Lien Claimant will not cancel on less than ninety days' notice. Republic also requests that the court (i) grant administrative priority status to all undisputed obligations of Republic owing to third-party vendors and suppliers arising from the postpetition delivery of Goods ordered prior to the Commencement Date and (ii) authorize Republic to pay such obligations in the ordinary course of business. Finally, Republic requests that the Court authorize and direct all banks and other financial institutions on which checks are drawn or electronic funds are transferred for the payment of any charges to Lien Claimants and Customs Duties to receive, process, honor, and pay all checks and electronic transfers, whether they were issued before or after the Commencement Date.

79.     In operating its business, Republic uses and makes payments to a number of critical Lien Claimants, including, without limitation, service technicians, building contractors, materialmen, and other service providers. It is imperative that Republic be authorized to pay the claims of the Lien Claimants, including claims of shippers and warehousemen, whether such claims arose prior to or after the Commencement Date, if Republic determines payment is necessary to ensure the uninterrupted shipment and delivery of Goods.

80.    Republic is also involved with the importation and exportation of Goods necessary to its business, the facilitation of which involves payments of Customs Duties.  If Customs Duties are not timely paid, U.S. and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions, including by asserting liens against imported or exported Goods.  Republic's customs brokers may also, in some instances, be able to assert liens against any imported or exported Goods.

81.    I understand that the aggregate amount of approximately $3,590,000 is owed (i) to Lien Claimants for Goods in their possession or control and (ii) for Customs Duties, all of which is due within thirty days after the Commencement Date.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b) & 365(a) for Entry of Interim and Final Orders (i) Authorizing Debtors (a) to Assume Clearinghouse Agreements** *Nunc Pro Tunc* **to the Commencement Date and (B) Immediately Satisfy Certain Related Prepetition Settlement Obligations, (ii) Modifying the Automatic Stay, and (iii) Authorizing and Directing** <u>**Financial Institutions to Honor and Process Related Checks and Transfers**</u>

82.    The airline industry is interdependent and relies on a network of agreements that govern virtually all aspects of air travel and airline operations, facilitating cooperation among airlines with respect to transactions for essential services and parts.  The Clearinghouse Agreements to which Republic is a party provide for the settlement of the resulting obligations that are owed among the airline participants (the "<u>Airline Clearing Transactions</u>") as well as with nonairline third-party participants (the "<u>Third Party Participants</u>").

83.    The Clearinghouse Agreements and Airline Clearing Transactions are essential to the preservation of Republic's business as a going concern.  Any interruption in, or cessation of, Republic's ability to make and receive payments with respect to Airline Clearing Transactions through the Clearinghouses could precipitate a disruption in performance under Republic's other agreements, including its code-share agreements, resulting in irreparable harm

34

to Republic's business. Accordingly, Republic seeks authorization to assume the Clearinghouse

Agreements, and pending the Court's determination of such assumptions following a final

hearing, Republic seeks authorization to honor its prepetition obligations under the

Clearinghouse Agreements solely with respect to Airline Clearing Transactions and to continue

performing and exercising its rights and obligations under the Clearinghouse Agreements

(whether prepetition or postpetition) in the ordinary course of business.

84.     I believe that the interim relief requested is essential to Republic's ability

to continue to operate its business in the ordinary course and is in the best interests of its estates

and creditors.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 362(d), 363(b) & 503(b) for
Entry of Orders (i) Authorizing Debtors to Continue Their Insurance Programs
and Satisfy Insurance Obligations, (ii) Modifying the Automatic Stay with Respect
to the Workers' Compensation Claims, and (iii) Authorizing and Directing
Financial Institutions to Honor and Process Related Checks and Fund Transfers**

85.     Pursuant to sections 105(a), 362(d), 363(b), and 503(b) of the Bankruptcy

Code, Republic seeks entry of an order (i) authorizing, but not directing, Republic to (a) continue

its insurance programs (collectively, the "Insurance Programs" and all premiums and other

obligations related thereto, including any deductibles, taxes, and broker or other fees,

collectively, the "Insurance Obligations"), in its discretion and (b) satisfy all Insurance

Obligations, including, without limitation, premiums, deductibles, and fees, whether arising

prepetition or postpetition and (ii) to the extent any of Republic's employees hold valid claims

under the Workers' Compensation Programs (as defined in the Insurance Motion), modifying the

automatic stay under section 362 of the Bankruptcy Code to the extent necessary to permit these

employees to proceed with such claims.

86.     The Insurance Programs include coverage for, among other things, workers' compensation, commercial property, crime, aviation war and hijacking, officers and directors, aviation hull, and various other property-related and general liabilities.[12]  As of the Commencement Date, Republic believes that it owes approximately $3.4 million with respect to prepetition Insurance Obligations, all of which Republic proposes to pay during the first thirty days of these cases.

87.     The Insurance Programs are critical to the ongoing operation of Republic's business.  In many cases, the coverage under such policies is required by various regulations, laws, and contracts that govern Republic's conduct and Republic must maintain its Insurance Programs in order to comply with the guidelines of the Office of the United States Trustee.  The inability to pay any Insurance Obligations could result in one or more Insurance Carriers declining to renew.  If Republic's Insurance Programs lapse without renewal, Republic could be exposed to substantial liability to the detriment of all parties in interest.   I understand that as part of the effort to obtain comprehensive insurance coverage for Republic's operations in the most cost effective manner, Republic has maintained a relationship with insurance brokers, JLT Aerospace (North America), Inc. and JLT Aeropace Insurance Services, which assist in procuring and negotiating favorable policies and premiums for Republic.  The continuation of the Insurance Programs and the authority to pay, in Republic's discretion, all Insurance Obligations as they come due in the ordinary course of business, including any unpaid broker fees (which are included in the premiums paid), is essential to preserve Republic's business and the value of the estates for all parties in interest.

---

12.  Republic also maintains a "key man" life insurance policy in the amount of $5 million for the Chief Executive Officer.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 366 & 105(a) for Entry of Interim and
Final Orders (i) Approving Debtors' Proposed Form of Adequate Assurance of
Payment to Utilities, (ii) Establishing Procedures for Resolving Objections by Utility
Companies, and (iii) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service**

88.     To ensure the uninterrupted supply of water, electricity, natural gas, waste

management, telephone, and other utility services (collectively, the "Utility Services"), which are

critical to the operations of Republic's business, Republic seeks entry of an interim order

(a) approving Republic's proposed form of adequate assurance of payment for postpetition

Utility Services, (b) establishing procedures for resolving objections by utility companies

relating to the adequacy of the proposed adequate assurance, and (c) prohibiting the utility

companies from altering, refusing, or discontinuing service to, or discriminating against,

Republic because of the commencement of these chapter 11 cases or a debt that is owed by

Republic for Utility Services rendered prior to the Commencement Date.

89.     To operate its business and manage its properties, Republic relies upon the

uninterrupted provision of Utility Services at each of the airport terminals, maintenance hangar

facilities, and offices from which it operates.  Any interruption in Utility Services, even for a

brief period of time, would disrupt Republic's operations, including Republic Airlines'

operations under its code-share agreements and could cause a decline in Republic's revenues and

profits.  Such a result could, in turn, seriously jeopardize Republic's reorganization efforts, and

ultimately, the value of the estates and creditor recoveries.  It is, therefore, critical that utility

services continue uninterrupted during these chapter 11 cases.

90.     In addition to Republic's timely payment history with its utility providers

and its ability to pay for future Utility Services in the ordinary course of business, to provide

adequate assurance of payment to the utility companies, Republic proposes to deposit into a

segregated interest-bearing account, within twenty days from the Commencement Date, an

amount equal to Republic's cost of two weeks of Utility Services ($122,000), calculated based on the historical average of Republic's utility expenses ("Proposed Adequate Assurance").  In the event Republic subsequently identifies a utility company not included on the Utility Services list, that company will be deemed added and Republic will increase the deposit by an amount equal to the cost of two weeks of Utility Services by the newly-identified company.  The motion also proposes certain procedures under which any utility company that is not satisfied with the Proposed Adequate Assurance may request additional assurance of payment and provides for a resolution period for negotiations between Republic and the utility company.

91.     I believe that the proposed Adequate Assurance and related procedures are necessary and appropriate in these chapter 11 cases.  Absent approval, Republic could be forced to address multiple simultaneous adequate assurance requests by Utility Companies in a disorganized manner at a time when Republic's efforts are more productively focused on stabilizing its operations and working towards a successful restructuring.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8) & 541 for Entry of Interim and Final Orders (i) Authorizing, But Not Directing, Debtors to Pay Prepetition Taxes and Assessments and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers**

92.     Republic requests authority to pay certain sales and use, fuel, franchise, property, and other taxes, as well as certain other annual fees that accrued or arose in the ordinary course of Republic's business prior to the Commencement Date (the "Prepetition Taxes and Assessments").  Republic also requests that the Court authorize and direct the banks and other financial institutions at which Republic maintains disbursement accounts to receive, process, honor, and pay any and all checks drawn or electronic fund transfers requested related to payment of the Prepetition Taxes and Assessments.

93.     I understand that Republic is generally current with respect to its tax

obligations, but that approximately $4.3 million in Prepetition Taxes and Assessments collected,

withheld, or incurred before the Commencement Date have not yet become due and payable, and

therefore, have not yet been paid or remitted to the applicable Governmental Authorities.  I

understand that some of these amounts may constitute "trust fund" taxes and are not property of

Republic's estates.  Republic must continue to pay the Prepetition Taxes and Assessments to

continue operating in certain jurisdictions and to avoid potential penalties and distractions during

the chapter 11 cases.  Specifically, it is my understanding that Republic's failure to pay the

Prepetition Taxes and Assessments could adversely affect Republic's business operations

because governmental authorities could assert liens on Republic's property, assert penalties or

interest on past-due taxes, or possibly bring personal liability actions against directors, officers,

and other employees in connection with non-payment of the Prepetition Taxes and Assessments,

all to the detriment of Republic's reorganization efforts, its estate, its employees, and other

parties in interest.

**Debtors' Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105 & 546(c) Establishing and Implementing Exclusive and Global Procedures for Treatment of Reclamation Claims**

94.     Republic seeks entry of an order, pursuant to sections 105(a) and 546(c) of

the Bankruptcy Code, (i) establishing exclusive procedures (the "Reclamation Procedures") for

the treatment of all unpaid claims seeking reclamation of goods pursuant to section 546(c) of the

Bankruptcy Code (the "Reclamation Claims") that may be asserted against the Debtors and (ii)

prohibiting any Seller from taking any other remedial action with respect to its Goods, including

any effort to reclaim the same.

95.     Prior to the Commencement Date and in the ordinary course of its

business, Republic purchased on credit a variety of aircraft parts, consumable materials, and

other goods used in its operations (collectively, the "Goods"). As of the Commencement Date, Republic was in possession of certain Goods that had been delivered to it, but for which it had not yet been invoiced or made payment to the suppliers. As a result of the commencement of these chapter 11 cases, I understand that Republic may receive Reclamation Claims from various vendors or other parties (collectively, the "Sellers") with respect to the Goods.

96.     To avoid piecemeal litigation that would interfere with Republic's efforts to preserve enterprise value and successfully reorganize, Republic seeks to establish the Reclamation Procedures to provide for the orderly reconciliation of Reclamation Claims. The proposed Reclamation Procedures require a Seller asserting a Reclamation Claim to submit a written demand asserting such Reclamation Claim (a "Reclamation Demand"). Unless a Reclamation Demand is made to Republic within forty-five (45) days prior to the Commencement Date, it must be received on or before twenty (20) calendar days after the Commencement Date by Republic and its attorneys. Under the proposed Reclamation Procedures, Republic will file with the Court, no later than 120 days after entry of the order granting the motion, a notice (the "Reclamation Notice") listing the timely submitted Reclamation Claims and the amount (if any) of each such Reclamation Claim that Republic determines to be valid. The Reclamation Procedures further provide that any Reclamation Claim listed in the Reclamation Notice for which no objection is timely filed and served shall be deemed allowed by the Court.

97.     I believe that the Reclamation Procedures will effectively and efficiently streamline the process of resolving Reclamation Claims for the benefit of Republic's estates and all parties in interest.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 503(b)(9) & 105(a) for Entry of Order
(i) Establishing Deadline and Approving Procedures for the Assertion, Resolution,
and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) and
(ii) Prohibiting Vendors from Pursuing Such Claims Outside the Procedures**

98.    Republic seeks entry of an order (i) approving procedures for the assertion

of unpaid claims pursuant to section 503(b)(9) of the Bankruptcy Code ("503(b)(9) Claims") and

the resolution, allowance, and satisfaction thereof and (ii) prohibiting vendors from pursuing

503(b)(9) Claims outside the proposed procedures.

99.    Prior to the Commencement Date, in the ordinary course of business,

Republic purchased on credit aircraft parts, consumable materials, and other goods used in its

operations (collectively, the "Goods").  As of the Commencement Date, Republic was in

possession of certain Goods that had been delivered to it by various vendors or other parties

within the twenty days prior to the Commencement Date, but for which Republic had not yet

made payment.  I have been informed that claims related to these Goods may be entitled to

administrative expense status under section 503(b)(9) of the Bankruptcy Code.  Republic

believes that there will be some uncertainty among vendors over the procedures and methods

they must undertake to properly assert 503(b)(9) Claims.  This uncertainty could result in

numerous inquiries and demands on Republic's employees and professionals or the initiation of

piecemeal litigation, both of which would divert the attention of Republic and its professionals

from the more pressing task of administering the chapter 11 cases.

100.    The proposed procedures require a party asserting a 503(b)(9) Claim to

submit a proof of claim no later than the seventy-fifth (75th) day after the Commencement Date

and Republic may file any objections on or before the the seventy-fifth (75th) day thereafter.

Under the proposed procedures, if a 503(b)(9) Claim is allowed, it will be satisfied pursuant to

and as set forth in the chapter 11 plan confirmed by the Court, any agreement between Republic

and the holder of the 503(b)(9) Claim, or as otherwise ordered by the Court after notice and an

opportunity for a hearing.

101.     I believe that that approval of the procedures outlined in this motion will

avoid the distraction, delay, and expense that may ensue as a result of uncertainty regarding

503(b)(9) claims.

**Debtors' Motion for the Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 362 & 365 of the Bankruptcy Code Enforcing and Restating Automatic Stay and Ipso Facto Provisions**

102.     Republic's business operations are conducted internationally.  Republic

facilitates its international operations by, among other things, leasing space in international

airports and contracting with foreign vendors for repair services, equipment and aircraft

inspections and to supply airline crews with lodging and transportation.  Republic also contracts

with foreign aircraft manufacturers and equipment providers in Europe and South America to

obtain their aircraft, engines, and necessary parts.  As a result, Republic's property is often

outside of the United States and in the possession of Republic's foreign creditors.

103.     Many of these creditors may be unfamiliar with the scope of a debtor in

possession's authority to conduct its business, the operation of the automatic stay, and other

provisions of the Bankruptcy Code.  Some may decline to provide goods or services, or to allow

access to foreign airports, unless their claims are paid in full.  Others may attempt to terminate

their leases or contracts with Republic pursuant to ipso facto provisions in contravention of

section 365 of the Bankruptcy Code.

104.     Republic seeks entry of an order, pursuant to sections 105(a), 362, and 365

of the Bankruptcy Code, enforcing and restating the automatic stay and ipso facto provisions of

the Bankruptcy Code.  I believe that a specific order from this Court will help to protect Republic

and its assets from improper actions, particularly by parties in foreign jurisdictions who are not

familiar with the Bankruptcy Code or its protections and who might otherwise violate those sections.

**Debtors' Motion Pursuant to 11 U.S.C. §§ 362 & 105(a) for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against and Interests in the Debtors**

105.    Republic requests that the Court enter an order enforcing the automatic stay by establishing notification procedures and restrictions on the transfer of equity interests in and claims against Republic.  Republic has certain tax attributes for U.S. federal income tax purposes, including, as of December 31, 2015, approximately $1.4 billion in estimated, consolidated net operating loss carryforwards ("NOLs").  The NOLs are a valuable asset of the estate that may prove crucial to the financial health of the reorganized Debtors.  Consistent with the automatic stay and to protect the value of the NOLs, Republic needs the ability to preclude certain transfers and to monitor other changes in the ownership of equity interests in the Debtors.  In addition, Republic may need the ability to require creditors who have increased their positions after the Commencement Date to sell down to reestablish the status quo among creditors.  Without this relief, Republic may experience an ownership change under the Tax Code during the chapter 11 proceeding that would severely limit its ability to use the NOLs.

**Debtors' Application Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Bankruptcy Rule 5075-1 For an Order Appointing Prime Clerk LLC as Claims and Noticing Agent *Nunc Pro Tunc* to the Commencement Date**

106.    Republic requests authority to appoint Prime Clerk as claims and noticing agent ("Claims and Noticing Agent") in accordance with the terms and conditions of that certain Engagement Agreement dated September 3, 2015, by and between Republic and Prime Clerk (the "Engagement Agreement"), effective *nunc pro tunc* to the Commencement Date.  Prime Clerk's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases.  I

believe Republic's selection of Prime Clerk to serve as its Claims and Noticing Agent has

satisfied the Court's Protocol for the Employment of Claims and Noticing Agents Under 28

U.S.C. § 156(c).  Specifically, Republic has solicited and reviewed engagement proposals from

at least two other Court-approved claims and noticing agents to ensure selection through a

competitive process.

107.   I believe that Prime Clerk's rates are competitive and reasonable given

Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set

forth in the Engagement Agreement attached to the application.  Appointing Prime Clerk as its

Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the

processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the

administrative burden of claims processing in these large cases.

**Debtors' Motion Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m) &
9007 for Entry of Order Implementing Certain Notice and Case Management Procedures**

108.   Republic seeks entry of an order approving and implementing certain

notice, case management, and administrative procedures (collectively, the "Case Management

Procedures").  Given the size and scope of these cases, the Case Management Procedures will

facilitate service of notices, motions, applications, declarations, objections, responses,

memoranda, briefs, supporting documents, and other papers filed in these chapter 11 cases that

will be less burdensome and costly than serving such documents on every potentially interested

party.  This, in turn, will maximize the efficiency and orderly administration of these chapter 11

cases, while at the same time ensuring that appropriate notice is provided.

***Ex Parte* Motion of Debtors Pursuant to Fed. R. Bankr. P. 9006(c) and
Local Bankruptcy Rule 9006-1(b) and 9077-1(b) to Shorten Notice Period
With Respect to Debtors' Motion for an Order (i) Authorizing, But Not
Directing, Debtors to Pay Prepayment Obligations to PK AirFinance US,
Inc. Under a Certain Aircraft Loan Agreement and (ii) Directing PK
AirFinance US, Inc. and Wells Fargo Bank Northwest, N.A., as Security
<u>Trustee, To Take All Steps Necessary To Release Related Aircraft Collateral</u>**

109.    Shuttle is party to a Credit Agreement among Shuttle, PK AirFinance US, Inc. ("<u>PK AirFinance</u>"), and Wells Fargo Bank Northwest, N.A. (the "<u>Security Trustee</u>").  The current outstanding principal under the loan is approximately $4,600,000.  To secure the Loan, Shuttle granted a first-priority lien (the "<u>Lien</u>") on certain aircraft and aircraft engines (collectively, the "<u>PK Aircraft</u>").  The PK Aircraft is currently valued at over $10 million.

110.    As the value of the PK Aircraft is more than twice the current loan balance, Republic determined to pay down the Loan so the PK Aircraft would be available to be included in collateral to secure debtor-in-possession financing for these chapter 11 cases. Accordingly, on February 10, 2016, Shuttle delivered an irrevocable notice advising PK AirFinance that it intends to pay the Loan in full (the "<u>Prepayment Amount</u>") on March 1, 2016. Under the loan documents, PK AirFinance and the Security Trustee agree to release the Lien upon payment of the Prepayment Amount.  Accordingly, Republic filed a motion seeking entry of an order (i) authorizing, but not directing, Shuttle to pay the prepayment amount to PK AirFinance and (ii) directing the Security Trustee and PK AirFinance, upon payment of the prepayment amount, to take all steps necessary to release related collateral (the "<u>Loan Prepayment Motion</u>").

111.    Pursuant to the Credit Agreement, non-payment of the prepayment obligation constitutes an "Event of Default" if it continues unremedied for a period of five calendar days.  Accordingly, Shuttle may be in default on Monday, March 7, 2016 if it does not

pay the Prepayment Amount by Friday, March 4, 2016.  To preclude the possibility of PK

AirFinance asserting additional claims and or penalties based on a late payment to the detriment

of the Debtors' estates and creditors, Republic requests that the Court shorten the objection

deadline to two days, such that any objections will be due by March 3, 2016 at 12:00 p.m., and

schedule a hearing, if necessary, on the Loan Prepayment Motion on an expedited basis on or

before March 8, 2016.  Republic further requests, that in the event no objections are timely filed,

the Court enter an order approving the Loan Prepayment Motion without a hearing.

## V.

## Information Required by Local Bankruptcy Rule 1007-2

112.    Local Bankruptcy Rule 1007-2 requires certain information related to the

Debtors, which is set forth below.

113.    The information requested in Local Bankruptcy Rule 1007-2(a)(1) is set

forth in Parts I and III above.

114.    Pursuant to Local Bankruptcy Rule 1007-(2)(a)(3), Schedule 1 attached

hereto lists any committee organized prior to the Commencement Date.

115.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2 attached

hereto lists the holders of the forty (40) largest unsecured claims against the Debtors on a

consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101, including: the

name, the address (including the number, street, apartment or suite number, and zip code, if not

included in the post office address), the telephone number, the name(s) of person(s) familiar with

the debtor's account, the nature of the claim, and an indication of whether the claim is contingent,

unliquidated, disputed, or partially secured.

116.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 attached

hereto provides the following information with respect to each of the holders of the ten (10)

largest secured claims against the Debtors on a consolidated basis: the creditor's name and

mailing address, the amount of the claim, a brief description of the collateral securing the claim,

an estimate of the value of the collateral, and whether the claim or lien is disputed.

117.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 attached

hereto provides a summary of the Debtors' assets and liabilities.

118.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Schedule 5 attached

hereto lists the number and classes of shares of stock, debentures, or other securities of the

Debtors that are publicly held, and the number of holders thereof, listing separately those held by

each of the Debtors' officers and directors and the amounts so held.

119.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedule 6 attached

hereto lists all of the Debtors' property in the possession or custody of any custodian, public

officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

120.    Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedule 7 attached

hereto lists the premises owned, leased, or held under other arrangement from which the Debtors

operate their business.

121.    Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedule 8 attached

hereto provides the location of the Debtors' substantial assets, the location of their books and

records, and the nature, location, and value of any assets held by the Debtors outside the

territorial limits of the United States.

122.    Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 9 attached

hereto lists the nature and present status of each action or proceeding, pending or threatened,

against the Debtors or their property where a judgment against the Debtor or a seizure of its property may be imminent.

123.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedule 10 attached hereto lists the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

124.     Pursuant to Local Bankruptcy Rules 1007-2(b)(1), (b)(2)(A) & (b)(2)(C), Schedule 11 attached hereto provides the estimated amount of the weekly payroll, on a consolidated basis, to the Debtors' employees (not including officers, directors, and stockholders), and the estimated amount to be paid to officers, directors, and stockholders for the thirty (30) day period following the Commencement Date.

125.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 attached hereto provides, for the thirty (30) day period following the Commencement Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

# VI.

## Conclusion

126.    The foregoing illustrates the factors that have precipitated the commencement of the chapter 11 cases and the critical need for Republic to restructure its financial affairs and operations.  The provisions of chapter 11 will assist in enabling Republic to achieve its objective of reestablishing itself as a market leader for the benefit of its economic stakeholders, employees, and the public it serves.  Republic's agreements with its Codeshare Partners represent Republic's most valuable assets, and the viability of its business depends upon its ability to maintain operational levels consistent with Republic's obligations to its Codeshare Partners.  I firmly believe that a restructuring under the protections of the Bankruptcy Code will best afford Republic the ability to continue to meet those objectives and restore its profitability and cash flows from operations.

I declare under penalty of perjury that, to the best of my knowledge, information, and belief, and after reasonable inquiry, the foregoing is true and correct.

Dated: New York, New York
February 25 , 2016

Bryan K. Bedford
President and Chief Executive Officer

## Schedule 1

**Prepetition Committees**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committee has been organized prior to the Commencement Date.

## Schedule 2

### Consolidated List of Creditors Holding 40 Largest Unsecured Claims

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following lists the holders of the forty (40) largest unsecured claims against the Debtors on a consolidated basis, as of February 24, 2016, excluding claims of insiders as defined in 11 U.S.C. § 101.  The information herein shall not constitute an admission of liability of, and shall not be binding on, the Debtors.

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim: If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | GE ENGINE SERVICES, LLC,  1 NEUMANN WAY CINCINNATI, OH 45215 | Jim Zyck: Jim.zyck@ge.com | Trade | | | | 20,612,355 |
| 2 | NAC AVIATION 21 Ltd.,  5th Floor, Bedford Place, Henry St, Limerick Ireland | Tom Turley: +353(86) 816-5666; ttu@nac.dk | Contract | Contingent | | | Unliquidated |
| 3 | NAC AVIATION 23 Ltd.,  5th Floor, Bedford Place, Henry St, Limerick Ireland | Tom Turley: +353(86) 816-5666; ttu@nac.dk | Contract | Contingent | | | Unliquidated |
| 4 | GE Capital Aviation Services,  901 Main Avenue Norwalk, CT 06851 | Jim Steckert: 203-842-5224; jim.steckart@gecas.com | Contract | Contingent | | | Unliquidated |
| 5 | RESIDCO,  70 W Madison, Suite 2340 Chicago, IL 60602 | Glenn Davis: 312-635-3161; davis@residco.com | Contract | Contingent | | | Unliquidated |
| 6 | CitiBank NA,  2 Court Square 7th Floor Long Island City, NY 11101 | Joseph Shanahan: 212-816-5426; joseph.b.shanahan@citi.com | Bank Loan | Continent | | Unknown | Unliquidated |

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 7 | Embraer Aircraft Customer Services, Inc.,  276 SW 34th Street Fort Lauderdale, FL 33315 | Paolo Caser de Souza e Silva: pcssilva@embraer.com.br | Trade | | | | 10,058,816 |
| 8 | EAMS-Embraer Aircraft Maintenance Services, Inc.,  10 Airways Blvd. Nashville, TN 37217 | John Linn: 954-359-3818;  954-328-6095 jlinn@embraer.com | Trade | | | | 6,345,766 |
| 9 | Emery Air, Inc.,  46 Airport Drive, Rockford, IL 61109 | Robert Pike: 815-986-2178; 312-543-2126; bpike@emeryair.com | Trade | | | | 2,731,718 |
| 10 | Meggitt Aircraft Braking Systems, 1204 Massillon Road Akron, OH 44306 | Bob Fredenburg: 330-796-7179; 330-666-7199 Bob.Fredenburg@meggitt.com | Trade | | | | 1,737,591 |
| 11 | Honeywell International Inc., 2111 N 19th Ave Phoenix, AZ 85027 | John Ashton: 480-592-4683; 480-619-1194 john.ashton@honeywell.com | Trade | | | | 1,710,819 |
| 12 | Pratt & Whitney Component Solutions, Inc.,  4905 Stariha Drive Muskegon, MI 49441 | Dan Silverman: 450-647-2251; dan.silverman@pwc.ca | Trade | | | | 1,619,326 |
| 13 | Flight Safety Internationl,  Marine Air Terminal LaGuardia Airport, Flushing, NY 11371-1061 | Terry Hibler: 201-218-1079; terry.hibler@flightsafety.com | Trade | | | | 1,601,830 |

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 14 | Honeywell International Inc., Aerospace Electronic Systems, 21111 N. 19th Avenue, Phoenix, AZ 85027-2701 | John Ashton: 480-592-4683; 480-619-1194 john.ashton@honeywell.com | Trade | | | | 1,300,000 |
| 15 | Rolls-Royce Corporation, 1875 Explorer Street, Suite 200 Reston, VA 20190 | Mike Tuohy: mike.tuohy@rolls-royce.com; 317-230-8408 | Trade | | | | 1,192,795 |
| 16 | Hamilton Sundstrand, One Hamilton Road Windsor Locks, CT 06096-1010 | Karl Johanson: 858-627-6545; 619-548-0435; karl.johanson@hs.utc.com | Trade | | | | 982,184 |
| 17 | Bombardier - Learjet Inc., 7761 West Kellogg Wichita, KS 67209 | Elaine Kato: 416-375-4016; 416-317-0446; elaine.kato@aero.bombardier.com | Trade | | | | 866,197 |
| 18 | Parker, 14300 Alton Parkway Irvine, CA 92618-1898 | Mark Mourani: 949-809-8310; 949-981-0606; mmourani@parker.com | Trade | | | | 595,038 |
| 19 | MTU Maintenance Canada Ltd., 6020 Russ Baker Way Richmond, BC Canada V7B-1B4 | Les Cronin: 678-352-4740 678-756-4975 Les.CRONIN@mtu.de | Trade | | | | 517,862 |

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 20 | Timothy Dooley, 8727 Lancaster Road, Indpls, IN  46260 | Tim Dooley:  317-710-4622; timdooley317@gmail.com | Former Employee | Contingent | | | Unliquidated |
| 21 | C&D Zodiac Inc., 11240 Warland Dr. Cypress, CA 90630 | Mike Levine: 714-934-0000 X228; 714-305-5320; mike.levine@zodiacaerospace.com | Trade | | | | 382,662 |
| 22 | Zodiac Seats California, | James Finn: 714-756-0142; 714-756-0142; James.Finn@zodiacaerospace.com | Trade | | | | 318,596 |
| 23 | Aircelle,   Route du Pont VIII BP 91 Gonfreville l'Orcher France 76700 | Nicolas Bohn: ; 703-980-4287; nicolas.bohn@aircelle.com | Trade | | | | 260,532 |
| 24 | Wayne Heller,   10534 Iron Horse Lane, Carmel, IN  46032 | Wayne Heller: 317-710-4504; wch903@aol.com | Former Employee | Contingent | | | Unliquidated |
| 25 | Allen Group, PO Box 1605, Indianapolis, IN 46206 | Matt Henry:  316-208-8006; 316-945-2575; mhenry@appearancegroup.com | Trade | | | | 250,000 |
| 26 | Skyservice 6120 Midfield Road, Mississauga, Ontario, L5P 1B1 | Mark Rinaldi: 905-678-5844; mark_rinaldi@skyservicebas.com | Trade | | | | 240,000 |
| 27 | PlaneTechs,1520 Kingston Road, Ste 311 Oak Brook, IL 60523 | Mike Shally:  630-468-1685; mikeshally@planetechs.com | Trade | | | | 240,000 |

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 28 | Jeppesen Sanderson Inc.,   55 Inverness Drive East, Englewood, CO 80112-5498 | Todd Duval:  303-328-4224; Todd.duval@jeppesen.com | Trade | | | | 238,086 |
| 29 | Sabre, 3150 Sabre Drive, South Lake, TX 76092 | Greg Hilliard:  682-605-1780; greg.hilliard@sabre.com | Trade | | | | 230,000 |
| 30 | Goodrich Aircraft Wheels and Brakes, 7100 Intermodal Drive Suite G Louisville, KY 40258-2882 | Jim Patrick:  704-483-3490; james.patrick@hs.utc.com | Trade | | | | 227,876 |
| 31 | Leading Edge Aviation Services, 3132 Airway Ave Costa Mesa, CA 92626 | Dave Patterson: ; 949-633-4656; dave@leascorp.com | Trade | | | | 193,923 |
| 32 | Ultimate Software, 2000 Ultimate Way Weston, FL 33326 | Mark Thompson: 614-367-6740; mark_thompson@ultimatesoftware.com | Trade | | | | 188,232 |
| 33 | Crowne Plaza Newark Int'l Airpoort,   901 Spring Street Elizabeth, NJ 07201 | (908) 527-1600; reservations@cpnewarkairport.com | Trade | | | | 173,218 |
| 34 | KLX Inc.,   1300 Corporate Center Way Wellington, FL 33414 | Tinalee Smallhorne: 305-716-6912; 214-693-6111; tinalee.smallhorne@klx.com | Trade | | | | 172,084 |

| Rank | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 35 | JettPro Line Maintenance, 3400 Inner Loop Rd, Suite 100-B Atlanta, GA 30354 | Danny Smith: 317-727-6267; dsmith@jettpro.aero | Trade | | | | 163,958 |
| 36 | FedEx Freight, 1070 Fleet Lane Indepence, KY 41051 | Jack Duckworth: 612-716-6158; jeduckworth@fedex.com | Trade | | | | 150,456 |
| 37 | Piedmont Aviation Component Services, 1031 E Mountain St, Bldg 320 Kernersville, NC 27284 | Chap Berrier: 336-776-6381; 336-407-4310; Chap.Berrier@piedmontaviation.com | Trade | | | | 120,004 |
| 38 | Ramco Aviation, 3150 Brunswick Pike, Ste 206, Lawrenceville, NJ 08648 | Manoj Singh: 972-834-0422; mks@ramco.com | Trade | | | | 115,000 |
| 39 | Subsidiary of Eastman Chemical Company, 575 Maryville centre Drive Saint Louis, MO 63141 | Sharon Dunn: 314-674-1149; ; sbdunn@eastman.com | Trade | | | | 97,406 |
| 40 | Louisville Regional Airport Authority, PO Box 9129 Louisville, KY 40209-0129 | Skip Miller: 502-363-8501; Skip.Miller@flylouisville.com | Trade | | | | 92,675 |

## Schedule 3

**Consolidated List of Creditors Holding 10 Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following lists the holders of the ten (10) largest secured claims against the Debtors on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.  The information herein shall not constitute an admission of liability of, and shall not be binding on, the Debtors.

| Creditor's Name and Mailing Address | Amount of Claim | Description and Value of Collateral | Disputed or Undisputed |
|---|---|---|---|
| Brazilian National Bank for Economic and Social Development (BNDES), Agencia Especial de Financiamento Industrial - FINAME  c/o Area de Exportacao  Av. Republica do Chile, 330-22 Torre Oeste Rio de Janeiro - RJ CEP 20031-917 Brasil  Attn: Superintendencia da Area de Exportacao | $1,141,720,937 | Aircraft – Value to be determined | |
| NY Life Insurance and Annuity Corporation,  c/o NY Life Investment Management LLC,  51 Madison Avenue 2nd floor, Room 208  New York, NY  10010-10603,  Attn: Fixed Income Investors Group, Private Finance | $113,552,799 | Aircraft – Value to be determined | |
| Deutsche Bank, AG London Branch Winchester House, 1 Great Winchester Street,  London  Ec2N 2DB  United Kingdom | $92,002,897 | Aircraft and Aircraft parts – Value to be determined | |
| Natixis Transport Finance, BP 4 - 75060  Paris Cedex 02,  France  Attn: Transportation Finance | $89,189,013 | Aircraft – Value to be determined | |
| NY Life Insurance Company,  c/o NYL Investors LLC,  51 Madison Avenue,  2nd Floor, Room 208,  New York, NY  10010-1603,  Attn: Fixed Income Investors - Structured Products Group | $88,905,680 | Aircraft – Value to be determined | |
| PK AirFinance US, Inc.,  601 Merritt Seven, 5th Floor,  Norwalk, CT 06851,  Attn:  Vice President | $87,984,475 | Aircraft – Value to be determined | |

| | | | |
|---|---|---|---|
| RPAK 2015-1 Aircraft Loan Trust, c/o Wells Fargo Delaware Trust Company, N.A.  919 N Market Street  Suite 1600, Wilmington, DE  19801 | $85,441,336 | Aircraft – Value to be determined | |
| Dougherty Funding LLC,  90 South Seventh Street, Suite 4300 Minneapolis, MN  55402,  Attn:  Al Weingart | $84,372,187 | Aircraft and Engines – Value to be determined | |
| Norddeutsche Landesbank Girozentrale,  Attn:  Ship and Aircraft Finance Dept.,  Friedrichswall 10 30159 Hannover Germany | $62,149,459 | Aircraft – Value to be determined | |
| Metropolitan Life Insurance Company, 10 Park Avenue, PO Box 1902 Morristown, NJ  07962,  Attn: Director Leveraged Leases | $50,828,925 | Aircraft – Value to be determined | |

## Schedule 4

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following is a summary of the Debtors' assets and liabilities.

### Consolidated Balance Sheet (unaudited) as of January 31, 2016
### (In millions, except share and per share amounts)

**ASSETS**

Current Assets:

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 132.3 |
| Restricted cash | | 4.8 |
| Receivables - net of allowance for doubtful accounts of $2.2 | | 86.2 |
| Inventories | | 52.4 |
| Prepaid expenses and other current assets | | 12.1 |
| Assets Held for Sale | | 45.8 |
| Total current assets | | 333.6 |
| Aircraft and other equipment, net | | 2,989.6 |
| Maintenance deposits | | 49.1 |
| Intangible and other assets, net | | 189.2 |
| Total assets | $ | 3,561.5 |

**LIABILITIES AND STOCKHOLDERS' EQUITY**

Current Liabilities:

| | | |
|---|---|---:|
| Current portion of long-term debt | $ | 320.4 |
| Accounts payable | | 17.3 |
| Accrued liabilities | | 157.3 |
| Total current liabilities | | 495.0 |
| Long-term debt - less current portion | | 2,103.8 |
| Deferred credits and other non-current liabilities | | 113.1 |
| Deferred income taxes | | 259.6 |
| Total liabilities | | 2,971.5 |
| Commitments and contingencies | | |
| Stockholders' Equity: | | |
| Preferred stock, $.001 par value; 5,000,000 shares authorized; no shares issued or outstanding | | — |
| Common stock, $.001 par value; one vote per share;150,000,000 shares authorized; 60,473,386 shares issued and 50,948,385 shares outstanding | | — |
| Additional paid-in capital | | 434.5 |
| Treasury stock, 9,546,147 shares at cost | | (184.0) |
| Accumulated other comprehensive loss | | (2.2) |
| Accumulated earnings | | 341.7 |
| Total stockholders' equity | | 590.0 |
| Total Liabilities and stockholders' equity | $ | 3,561.5 |

Notes
1.  All amounts are unaudited, subject to revision, and should not be relied upon.
2.  To be read in conjunction with RAH's existing public filings with the U.S. Securities and Exchange Commission.

## Schedule 5

### Publicly Held Securities

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), the following lists the number and classes of shares of stock, debentures, or other securities of the Debtors that are publicly held as of the dates listed below, including securities held by each of the Debtors' officers and directors.

### Stock

As of December 31, 2015, Republic Airways Holdings Inc. had 60,521,616 shares of common stock issued and 50,948,385 shares of common stock outstanding. As of January 26, 2015, there were 9,396 registered shareholders of record.

### Number of shares owned by officers and directors

The following table lists the beneficial ownership of the common stock of Republic Airways Holdings Inc. as of December 31, 2015 by each of the Debtors' named executive officers and directors and by all directors and executive officers as a group.

| Name of Beneficial Owner | Shares Beneficially Owned | Approximate Percentage of Ownership |
|---|---|---|
| Bryan Bedford | 1,116,441 | 2.2% |
| Lars Erik Arnell | 164,499 | less than 1% |
| Paul Kinstedt | 147,500 | less than 1% |
| Joseph Allman | 43,300 | less than 1% |
| Douglas J. Lambert | 27,732 | less than 1% |
| Lawrence J. Cohen | 27,732 | less than 1% |
| Mark L. Plaumann | 27,732 | less than 1% |
| Neal S. Cohen | 27,732 | less than 1% |
| Ethan Blank | 10,227 | less than 1% |
| Daniel P. Garton | 4,695 | less than 1% |
| Robert L. Colin | 4,695 | less than 1% |
| All directors and executive officers as a group | 1,602,285 | 3.1% |

## Schedule 6

### List of Debtors' Property Not in Debtors' Possession

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledgees, assignees of rents, secured creditors, letter of credit and surety providers, or agents, where the Debtors' ownership interest is not affected.  Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

### Premises Owned and Leased

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under another arrangement from which the Debtors operate their business.

| Debtor | Location | Counterparty |
|---|---|---|
| Republic Airways Holdings Inc. | 8909 Purdue Road Indianapolis, IN 46268 | CRE College Park LLC |
| Republic Airways Holdings Inc. | 853 South Columbia, Suite 191 Plainfield, IN 46168 | Indy 40 Building I, LLC |
| Republic Airways Holdings Inc. | 5151 Exploration Drive Indianapolis, IN 46241 | Exploration Center 1, LLC (d/b/a Holladay Properties) |
| Midwest Airlines, Inc. | 555 Air Cargo Way Milwaukee, WI 53207 | Milwaukee County, Wisconsin |
| Republic Airline Inc. | 4818-C Express Drive Charlotte, NC 28208 | City of Charlotte, North Carolina |
| Republic Airline Inc. | 8500 Peña Boulevard Denver, CO 80249 | City and County of Denver, Colorado |
| Republic Airline Inc. | 7642 Undergrove Drive, Door 16 Denver, CO 80249 | City and County of Denver, Colorado |
| Republic Airline Inc. | 9200 NW 112th Street Kansas City, MO 64153 | Jet Midwest, Inc. |
| Republic Airline Inc. | Kansas City International Airport, Terminal C Kansas City, MO 64153 | Kansas City, Missouri |
| Republic Airline Inc. | 200 Walters Drive, Hangar 2, Building #479 Corapolis, PA 15108 | Allegheny County Airport Authority |
| Republic Airline Inc. | 1000 Airport Boulevard Pittsburgh, PA 15231 | Allegheny County Airport Authority |
| Republic Airline Inc. | Ronald Reagan Washington National Airport Arlington, VA 22202 | American Airlines, Inc. |
| Republic Airline Inc. | Reagan National Airport Hangar 3, Room 110 Washington, DC 20001 | Metropolitan Washington Airports Authority |
| Republic Airline Inc. | Newark Liberty International Airport, 3 Brewster Road, Newark, NJ 07114 | United Airlines, Inc. |
| Republic Airways Services, Inc. | 80 Broad Street, 5th Floor New York, NY 10004 | Regus plc |
| Shuttle America Corporation | 10000 West O'Hare Avenue Chicago, Illinois 60666 | United Airlines, Inc. |

| Debtor | Location | Counterparty |
|---|---|---|
| Shuttle America Corporation | 4330 East 5th Avenue Columbus, OH 43219 | Schottenstein Property Group |
| Shuttle America Corporation | 4600 International Gateway Columbus, OH 43219 | Port of Columbus, Ohio |
| Shuttle America Corporation | 6415 Bryan Boulevard Greensboro, NC 27406 | Piedmont Triad Airport Authority |
| Shuttle America Corporation | 2745 South Hoffman Road Dock 67 Hangar 7A Indianapolis, IN 46241 | Indianapolis Airport Authority |
| Shuttle America Corporation | 7800 Col. H. Weir Cook Memorial Drive, Suite 5 Indianapolis, IN 46241 | Indianapolis Airport Authority |
| Shuttle America Corporation | 5015 Crittenden Drive Louisville, KY 40209 | Louisville Regional Airport Authority |
| Shuttle America Corporation | 600 Terminal Drive Louisville, KY 40209 | Louisville Regional Airport Authority |
| Shuttle America Corporation | 450 Crittenden Drive Louisville, KY 40209 | Airside Commerce, LLC |
| Shuttle America Corporation | LaGuardia Airport New York, NY 11371 | Port Authority of New York and New Jersey |
| Shuttle America Corporation | 7 North Drive Flushing, NY 11371 | Port Authority of New York and New Jersey |
| Skyway Airlines, Inc. | 401 E. Layton Avenue Milwaukee, WI 53207 | Milwaukee County, Wisconsin |

## Schedule 8

### Location of Assets, Books and Records

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following describes the location of the Debtors' substantial assets and its books and records, and the nature, location, and value of any assets held by the Debtors outside the United States.

The Debtors have assets located in each of the many locations from which they operate their business, including the premises listed on Schedule 7 and at numerous airports throughout the country. The principal assets of Republic Airways Holdings Inc. are located in Indiana and New York. The Debtors have no substantial assets outside the United States, other than aircraft that continuously fly between the United States and foreign locations, and the Debtors have no aircraft that fly solely within foreign locations.

The Debtors maintain substantially all of their books and records at the Indiana Headquarters of Republic Airways Holdings Inc., which is located at 8909 Purdue Road, Suite 300, Indianapolis, Indiana 46268.

## Schedule 9

**Actions or Proceedings**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the Debtors' knowledge, there is no action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10

### Senior Management Team

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities.

| Name / Position | Experience / Responsibilities |
| --- | --- |
| **Bryan Bedford**<br>Chairman, President, and Chief Executive Officer | Bryan Bedford joined Republic Airways Holdings Inc. in July 1999 as President and CEO. He has more than 28 years of experience in the airline industry. Before joining the company, he served as President and CEO of Mesaba Holdings, Inc. in Minneapolis, MN, and Business Express Airlines, Inc. in Boston, MA. During his 16 years at the helm of Republic, the airline has grown from $85 million in revenues and 36 turboprop aircraft to more than $1.3 billion in revenues and an operating fleet of 230 aircraft. Mr. Bedford earned his Bachelor's degree in Accounting and Finance from Florida State University and is a certified public accountant. Mr. Bedford also holds a private, multi-engine and instrument pilot rating. |
| **Joe Allman**<br>Senior Vice President and Chief Financial Officer | Joe Allman joined the company in July of 2007 as Director of Finance. In June of 2009, he was promoted to the position of Vice President and Controller. Before joining the company, Mr. Allman gained extensive experience applying his finance, accounting, and auditing expertise to the airline and utilities sectors at managing positions with London Witte Group LLC and Deloitte and Touche LLP. Mr. Allman graduated from the U.S. Coast Guard Academy, where he received a B.S. in management and achieved the rank of Lieutenant. Mr. Allman is a certified public accountant. |

| Name / Position | Experience / Responsibilities |
|---|---|
| **Lars-Erik Arnell**<br>Senior Vice President –<br>Corporate Development | Lars-Erik Arnell joined the company in September of 2002 as Vice President of Corporate Development.  Prior to joining the company, he held various financial positions in the transportation industry, including the regional airline, air medical transportation, truckload and global manufacturing industries. Mr. Arnell has deep knowledge and experience from financial management, restructuring, business development and mergers and acquisitions.<br><br>Mr. Arnell has held CFO positions in several large transportation companies including Burlington Motor Carriers, Inc., a large international trucking company based in Indiana and Business Express Airlines, Inc., a large regional airline based in the Northeastern US. He was earlier employed as the financial advisor to the Board of Directors of Rocky Mountain Helicopters, Inc. the largest helicopter air medical transportation company in the US.<br><br>Mr. Arnell also has received invaluable global experience from his employment within ABB and SAAB, where he held various financial management positions in Sweden, England and in the USA. He holds a Bachelor Degree in Finance from Linkoping University combined with an eighteen-month Management Trainee Program within SAAB. |
| **Paul Kinstedt**<br>Interim Senior Vice<br>President and Chief<br>Operating Officer | Paul Kinstedt joined Chautauqua Airlines, one of Republic Airways Holdings' former subsidiaries, in January 2002 as Director of Systems Operations Control.  He was promoted to Vice President of System Operations Control for the three of the company's wholly owned subsidiaries in September 2006 and served in that capacity until January 2013, when he was named Vice President of Flight Operations.  Before joining Chautauqua, Mr. Kinstedt was Vice President of Customer Service and Director of Flight Control for Midway Airlines.<br><br>Mr. Kinstedt received his Bachelor of Science degree in Aviation Science from Parks College of Saint Louis University in St. Louis Missouri and his Masters of Business Administration from Illinois Benedictine College.  He holds an aircraft dispatcher and commercial, multi-engine and instrument pilot rating. |
| **Ethan Blank**<br>Vice President and<br>General Counsel | Ethan Blank joined Republic Airways in February 2012 as Vice President and Corporate Counsel.  Mr. Blank comes to Republic with over 20 years of legal experience.  He has participated in all aspects of complex transactions for major financial institutions, public companies, transportation carriers and international investors.  His background includes a variety of airline industry transactions including loans, leases, and leveraged leases of aircraft; private placements with aircraft and equipment collateral; securitizations of aircraft lease receivables and airline working capital financings. |

## Schedule 11

### Payroll and Fees

Pursuant to Local Bankruptcy Rule 1007-2(b)(1), (b)(2)(A) & (b)(2)(C), the following provides an estimated amount of weekly payroll, on a consolidated basis, to be paid to the Debtors' employees (not including officers, stockholders, and directors), and the estimated amount to be paid to officers, directors, and stockholders for the thirty (30) day period following the Commencement Date.

| | |
|---|---|
| **Payroll for executive officers and directors** | $130,000 |
| **Payroll for all other employees** | $28,270,000 |
| **Total Payroll** | $28,400,000 |

The Debtors will not pay fees to any financial or business consultants during the thirty days following the Commencement Date.

## Schedule 12

### Cash Receipts and Disbursements

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the thirty (30) day period following the Commencement Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees.

| | |
|---|---|
| Cash Receipts | $107,900,000 |
| Cash Disbursements | $70,000,000 |
| Net Cash Gain | $37,900,000 |
| Unpaid Obligations | $56,000,000 |
| Unpaid Receivables | $0 |