UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                                              Chapter 11

REPUBLIC AIRWAYS HOLDINGS INC., *et al.*,                           Case No. 16-10429 (SHL)

                                    Debtors.                        (Jointly Administered)

-----------------------------------------------------------------x


**MODIFIED BENCH RULING UNDER SEAL ON DEBTORS' MOTIONS TO (I)
ASSUME CODESHARE AND RELATED AGREEMENTS, AS AMENDED, WITH
DELTA AIR LINES, INC., LEASE CERTAIN PROPERTY OF THE ESTATE, AND
SETTLE CLAIMS BETWEEN DELTA AIR LINES, INC. AND THE DEBTORS, AND
(II) AUTHORIZE DIP FINANCING**


**A P P E A R A N C E S :**


**ZIRINSKY LAW PARTNERS PLLC**
*Attorneys for the Debtors*
375 Park Avenue, Suite 2607
New York, New York 10152
By:     Bruce R. Zirinsky, Esq.
        Sharon J. Richardson, Esq.
        Gary D. Ticoll, Esq.


**HUGHES HUBBARD & REED LLP**
*Attorneys for the Debtors*
One Battery Park Plaza
New York, New York 10004
By:     Christopher K. Kiplok, Esq.
        Meaghan Gragg, Esq.


**SCHULTE ROTH & ZABEL LLP**
*Attorneys for the Ad Hoc Equity Committee*
919 Third Avenue
New York, New York 10022
By:     Adam C. Harris, Esq.
        David M. Hillman, Esq.
        Lawrence V. Gelber, Esq.


**UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE**
201 Varick Street, Suite 1006
New York, New York 10014

By:    Brian S. Masumoto, Esq.

**MORRISON & FOERSTER LLP**
*Attorneys for the Official Creditors' Committee*
250 West 55th Street
New York, New York 10019
By:    Todd M. Goren, Esq.
       Brett Miller, Esq.

**DAVIS POLK & WARDWELL LLP**
*Attorneys for Delta Air Lines, Inc.*
450 Lexington Avenue
New York, New York 10017
By:    Marshall S. Huebner, Esq.
       Darren S. Klein, Esq.
       Michael J. Russano, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two substantive motions filed by the debtors,[1] which the Court shall

also collectively refer to as Republic.  The first is debtors' motion to assume codeshare related

agreements, lease certain property of the estate, and settle claims between debtors and Delta Air

Lines, Inc.  [ECF No. 244].  The Court will refer to this as the "settlement motion."

The second is debtors' motion to authorize debtors to obtain post-petition financing, grant

liens and provide superpriority administrative claims status, modify the automatic stay and

related relief.  [ECF No. 246].  The Court will refer to this as the "financing motion."

Accompanying these two motions were two sealing motions, one by debtors and one by

Delta.  Both of the sealing motions were granted last week in open court without opposition.

Given that the Court's decision includes some of the sensitive commercial information covered

by the sealing motions, this ruling is being delivered under seal and is subject to the terms of

those sealing orders.

---

[1]        This written decision memorializes the Court's bench ruling that was read into the record on April 29,
2016.  Because of its origins as a bench ruling, this decision has a more conversational tone.

2

The Court recognizes the importance of transparency in court proceedings, and is mindful that there are many interested parties in this case beyond the parties who have access to the sealed information.  Therefore, the Court concludes it is appropriate to file a version of today's bench ruling on the public docket, with redactions limited only to the matters that must remain under seal.  Accordingly, the Court requests that the debtors and Delta review the transcript of today's bench ruling and prepare a redacted version that should then be sent to chambers.  The Court contemplates using that redacted transcript, together with any appropriate edits to the transcript for accuracy and readability, as a basis to issue a modified bench ruling on the public docket.

Turning to the merits, some factual background is necessary to understand the two motions.  Republic Airways Holdings Inc. ("RAH") is a holding company that provides scheduled regional passenger services through wholly owned operating air carrier subsidiaries. Republic offers approximately a thousand flights daily through its fixed fee codeshare agreements with United Continental Holdings, Inc., Delta Air Lines, Inc. and American Airlines Group, Inc.  Republic's codeshare agreements and business relationships with United, Delta, and American are substantially all of its sources of operating revenue.

Republic operates as a Delta Connection regional jet carrier through one of its operating companies, Shuttle America Corporation ("Shuttle") and RAH, pursuant to two Delta Connection agreements.  These two agreements are the Single-Class Agreement, governing Shuttle's operation of ERJ-145 aircraft, and the Dual-Class Agreement, governing Shuttle's operation of larger ERJ-170 and ERJ-175 aircraft.

As of February 2015, Republic began to reduce its flying for Delta in violation of its two Delta Connection agreements.  In August 2015, Republic also informed Delta that it would not

place into service additional ERJ-170 aircraft contemplated by amendments to the Dual-Class

Agreement.  Republic blamed its inability to perform on a pilot shortage.  Republic blamed this

pilot shortage, in turn, on federal regulations that increased the minimum qualification for pilots.

Republic's failure to perform according to its agreements with Delta obviously opened

the door to potential liability.  Not surprisingly then, Delta sued Shuttle and RAH in October

2015, seeking, among other things, to recover the lost profits it would have earned if the

defendants had operated all flights as required by the agreements.  *See* Delta Complaint  ¶ 51,

attached as Exhibit 4 to the Russano Declaration [ECF No. 385-4].

Against this background, Delta and Republic began negotiating in late 2015 and

continued through 2016 in an attempt to resolve their differences.  These negotiations continued

after the filing of these bankruptcy cases, and ultimately culminated in a global resolution, which

has two components.  The first is the settlement motion.  The settlement motion includes changes

to the parties' existing business relationship, including the terms of their two agreements, as well

as related issues such as the leasing of gates.  The settlement motion also contemplates a

resolution of actual and potential litigation between the parties, including the pending Delta

litigation and potential claims in this bankruptcy.  The second proponent of the parties' global

resolution is the financing motion, which contemplates an agreement to provide financing by

Delta to the debtors for this case.

Based on numerous comments from the parties, the debtors and Delta have made a

variety of changes to their motions.  These changes were set forth in detail on the record at the

hearing on April 21, 2016.

There have been several objections filed to the two motions.  As to the settlement motion,

there were three objections filed.  The first was the limited omnibus objection of the Official

Committee of Unsecured Creditors at ECF number 364. That objection has been resolved by the parties, based on the changes set forth on the record. In light of these changes, the Official Committee now affirmatively supports the relief sought by the debtors in both of these motions. Second, there was a short joinder and reservation of rights of the International Brotherhood of Teamsters, Airline Division, to the limited omnibus objection of the Official Committee of Unsecured Creditors to the debtors' motion at ECF number 365. In light of the Official Committee's withdrawal of its objection, this joinder is also resolved. In any event, no one from the Teamsters made any argument at the hearing on these motions. Third, and finally, there was an objection of the Ad Hoc Committee at ECF number 360. That objection remains pending.

As to the financing motion, there were five objections filed. There was a reservation of rights of Banco Nacional de Desenvolvimento Economico e Social BNDES and Agencia Especial de Financiamento Inustrial FINAME to the debtors' motion at ECF number 334. There was an objection of the Ad Hoc Committee of Equity Holders at ECF number 359. There was a limited objection of the Official Committee of Unsecured Creditors at ECF number 364. There was another joinder and reservation of rights by the International Brotherhood of Teamsters at ECF number 365. And there was a corrected objection of the United States of America at ECF number 358. Once again, all of the objections have been resolve but one, and, once again, the remaining objection is by the Ad Hoc Committee.

## I.    The Settlement Motion

The settlement motion is subject to several standards of review. The first is Bankruptcy Rule 9019(a) which provides, in relevant part, that: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

As a general matter, "settlements and compromises are favored in bankruptcy as they

minimize costly litigation and further parties' interests in expediting the administration of the

bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012)

(quoting *In re MF Global Inc.*, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012)); *see*

*also Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*),

478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because

they "help clear a path for the efficient administration of the bankrupt estate"); 10 Collier on

Bankruptcy ¶ 9019.01 (16th ed. rev. 2013) at 9019-2 (highlighting that "compromises are

favored in bankruptcy").

A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable,

and in the best interests of the estate before approving it. *See Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *Air Line*

*Pilots Ass'n v. American Nat'l Bank & Trust Co.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414,

426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *see also MF Global Inc.*, 2012 WL

3242533, at *5.  In so doing, a Court need not decide the numerous issues of law and fact raised

by a compromise or a settlement, "but must only 'canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness.'" *In re Adelphia*

*Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699

F.2d 599, 608 (2d Cir. 1983)).

Rather than conducting a mini-trial, the Court need only to be "apprised of those facts

that are necessary to enable it to evaluate the settlement and to make a considered and

independent judgment[.]" *Adelphia*, 327 B.R. at 159.  As the court in *In re Purified Down*

*Products Corp.*, explained, the "lenient standards concerning approval of settlements and a

limited scope of review reflect the considered judgment that little would be saved by the

6

settlement process if bankruptcy courts could approve settlements only after an exhaustive

investigation and determination of the underlying claims.  The applicable standards encourage

courts to approve settlements in bankruptcy proceedings and related actions."  150 B.R. 519,

522–23 (S.D.N.Y. 1993).

The decision to approve or deny a particular settlement involving a bankruptcy estate lies

within the discretion of the bankruptcy court.  *See Vaughn v. Drexel Burnham Lambert Grp., Inc.*

(*In re Drexel Burnham Lambert Grp., Inc.*), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also*

*Nellis v. Shugrue*, 165 B.R. 115, 122–23 (S.D.N.Y. 1994).  A court may exercise its discretion

"in light of the general public policy favoring settlements."  *In re Hibbard Brown & Co.*, 217

B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citing cases).

In evaluating the necessary facts, a court may rely on the opinion of the debtor, parties to

the settlement, and the professionals.  *See In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr.

S.D.N.Y. 2010); *In re Purofied Down Prods.*, 150 B.R. at 522–23.  "While the bankruptcy court

may consider the objections lodged by parties in interest, such objections are not controlling. . . .

[T]he bankruptcy court must still make informed and independent judgment."  *In re WorldCom,*

*Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).  And "[a]lthough courts have discretion to

approve settlements, the business judgment of the debtor in recommending the settlement should

be factored into the court's analysis."  *MF Global Inc.*, 2012 WL 3242533, at *5 (citing *JP*

*Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419

B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).

In the Second Circuit, the *Iridium* case directs courts to balance seven interrelated factors

in determining whether a settlement is fair and equitable.  Those factors are: "(1) the balance

between the litigation's possibility of success and the settlement's future benefits;  (2) the

likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining." *Iridium*, 478 F.3d at 462 (internal quotations and citation omitted).

The second applicable standard to the settlement motion is Section 365 of the Bankruptcy Code. That section provides that a debtor-in-possession, subject to court approval, "may assume or reject any executory contract or unexpired lease of the debtor." *See* 11 U.S.C. § 365(a). The purpose behind Section 365(a) is "to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *In re Orion Pictures Corp.*, 4 F.3d 1095, 1098 (2d Cir. 1993) (internal quotations and citation omitted). Generally, courts "approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment." *In re MF Global Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that Section 365 is traditionally subject to the "business judgment" standard). Courts generally will not second-guess a debtor's business judgment concerning whether an assumption or rejection benefits the debtor's estate. *See In re MF Global*, 466 B.R. at 242; *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 463 (Bankr. S.D.N.Y. 2014).

8

The third standard applicable to the settlement motion is Section 363(b). That section provides the standard for approval of the use of estate property outside of the ordinary course of business, and that standard is "the business judgment of the debtor." *See Genco*, 509 B.R. at 464; *see, e.g., In re Borders Grp., Inc.*, 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtors exercised sound business judgment.").

Notably, all three of the applicable standards relating to this motion are deferential. Moreover, nothing in these standards or applicable law mandates discovery on such motions or an evidentiary hearing. Nonetheless, both occurred here.

Discovery was provided to the Ad Hoc Committee on the two motions, including depositions of the debtors' two witnesses. The first of these witnesses was Joseph Allman, the Chief Financial Officer and Senior Vice President of Republic Airways Holdings Inc. and its wholly owned direct and indirect subsidiaries. The second witness was John Luth, the Executive Chairman of Seabury Corporate Advisors LLC and Chairman, President, and Chief Executive Officer of Seabury Securities, LLC, which together with its affiliates will be referred to as "Seabury." Seabury has given investment banking financial services to Republic since July 2015, and was subsequently retained in this case as Republic's financial advisor and investment banker. The parties' pleadings cite liberally to the declarations and depositions of each of these witnesses, and no party has objected to the use of any of this testimony.

An evidentiary hearing was held on the two motions on April 21, 2016, at which time both of the witnesses provided further live testimony. The debtors offered each of the witnesses written declarations that have been filed on the docket as their written direct testimony. *See* [ECF Nos. 382 and 383]. That direct testimony was accepted without objection, and the

witnesses were then subject to cross-examination and other examination by the Ad Hoc Committee and the debtors and other interested parties.

Applying all the relevant standards to the settlement motion, the Court approves that motion and overrules the objection of the Ad Hoc Committee. More specifically, the Court finds that the record here establishes that the settlement is fair and equitable and in the best interests of the estate when considering the seven interrelated factors set forth in *Iridium* and other cases under Rule 9019. More specifically, the Court concludes the settlement should be approved given: the likelihood of success of the Delta litigation and other claims that Delta might pursue in this bankruptcy; the risk, expense, and delay of such litigation; the interest of the creditors and the overall support for the settlement by everyone other than the Ad Hocs; the competency of the parties negotiating the settlement; the releases provided under the agreement and the settlement being the result of arm's length bargaining. The Court also concludes that the debtors have satisfied the standard for assumption and use of estate property under applicable bankruptcy law. In reaching these conclusions, the Court finds both Mr. Allman and Mr. Luth to be credible witnesses who persuasively testified as to the benefits to the estate from approval of the settlement motion. In fact, the Court finds that there are substantial benefits to the debtors in this global settlement. The economic benefits include the following: the Amended Single Class Agreement will generate ██████████ a ████ improvement over current base rates for Republic, and Delta will pay a substantial increase in rates to cover Republic's cost of flying during the wind-down of its operation of smaller ERJ-145s. *See* Allman Declaration ¶ 35 [ECF No. 401]; Luth Declaration ¶ 48 [ECF No. 402].

The benefits also include the increased revenues related to the Amended Dual Class Agreement, which are approximately ██████████ per annum over current rates, and which will

be over ████████ in revenue improvements through the remaining terms of the agreement. *See* Allman Declaration ¶ 36; Luth Declaration ¶ 49.  In addition, the amended rate reset provision in the agreement decreases Republic's exposure to the risk that it will be unable to meet costs over the next five years.  *See* Allman Declaration ¶ 36; Luth Declaration ¶ 49.  The A&R slot lease, when combined with Delta's agreement to continue leasing the four DCA slots under the Amended Dual Class Agreement, will provide enhanced revenues for Republic of approximately ████████ per annum.  *See* Allman Declaration ¶ 38; Luth Declaration ¶ 51.

Another key benefit of this global settlement is the elimination of Delta's right to terminate for convenience under the amended flying agreements, which was a "must have" for debtors.  *See* Allman Declaration ¶ 37; Luth Declaration ¶ 50.  It means that the debtors and Delta are now committed to being long-term partners, rather than having that relationship risk being subject to termination at Delta's request.  This is crucial, given that debtors' business model is based on its relationship with its codeshare partners, including Delta.  *See* Allman Declaration ¶ 6 ("Republic's codeshare agreements and relationships with American, United and Delta are substantially all of its sources of operating revenue.  Republic simply cannot survive without these agreements and relationships.").

Another benefit is that following approval Delta will (1) pay debtors more than ██ ████ in reconciliation of past due engine maintenance; (2) immediately begin leasing 4 DCA slots at over ████████████ and (3) immediately and retroactively increase base rate payments under the Amended Single and Dual Class Agreements.  *See* Allman Declaration ¶ 36.

Without the amended flying agreements, Republic would lose over ████████ per annum in total revenues.  *See* Allman Declaration ¶ 41; Luth Declaration ¶ 55.

Republic can train and transition its pilots off the out-of-favor aircraft and into the new

aircraft, which is another benefit.  *See* Allman Declaration ¶ 35; Luth Declaration ¶ 47.

The record before the Court also establishes that there are benefits with respect to the Delta litigation and resolution of Delta's potential claims in this bankruptcy case.  In reaching that conclusion, the Court is mindful of several facts:



The credible evidence further establishes that after arm's length negotiations, the debtors' board was made aware of the relevant information as to the proposed Delta settlement, and

armed with this information reached a decision to approve the settlement in the exercise of its

business judgment.  *See* Luth Declaration ¶¶ 33–43; Allman Declaration ¶¶ 24–32.  The evidence

also establishes that the debtors' management and board properly solicited the input of their

professional advisors in reaching their decision about the settlement.  *See* Luth Declaration ¶ 43,

Allman Declaration ¶ 32.

The Court now turns to the objections of the Ad Hoc Committee.  As a threshold matter,

the Ad Hoc Committee challenges the benefit of some of these new provisions governing the

parties' ongoing business relationship, ███████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████Thus, it is important and valuable to the debtors that following approval by

the Court of the settlement motion the debtors will be paid more than ████████ in reconciliation

of past due engine maintenance within five days of the order becoming final; Delta will

immediately begin leasing 4 DCA slots at ███████████████ and it will immediately

and retroactively increase the base rate payments of the Amended Single Class and Dual Class

Agreements.  The importance of present or near-term payment is exacerbated by the concern,

under the prior agreements, of Delta's ability to terminate for convenience, meaning that future

benefits might not be realized.

The primary objection of the Ad Hoc Committee to the settlement motion is the $170

million claim being given to Delta as part of the settlement.  The Ad Hocs challenge the

reasonableness of the proposed claim of at least $170 million to Delta.  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████    The Ad Hocs cite to statements

made by the debtors that Delta's litigation claims had no merit, and to defenses asserted by the

debtors in the Delta litigation.  They also provide their own analysis of various components of

the Delta claim, together with their view of what the real exposure is from the litigation.

But all the Ad Hocs' arguments are at odds with the credible evidence.  ████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    No credible evidence was presented to dispute that figure, which alone

would provide a basis for the proposed settlement.

The Ad Hocs' position also ignores the weight of credible evidence on valuation as to

Delta's claim. ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

This also is not surprising, given that the debtors failed to honor their contractual obligation to provide certain flying to Delta under the parties' agreements. This failure started in February 2015 and continued into this bankruptcy case, giving rise to an administrative claim. Notably, this failure is undisputed. Thus, it is exceedingly hard to justify the Ad Hocs' incredible confidence in its position that Delta has no claim against the debtors.

The Ad Hocs' argue that any Delta claim should only be asserted against two debtors, but this is problematic, and by no means certain. Article 12 of the Republic-Delta agreements is a joint and several liability provision that arguably provides a basis for Delta to assert liability against other debtors.

The Ad Hoc Committee's position also completely ignores that the settlement here must be compared against the other, less desirable alternative, namely, to assume or reject the agreements. But to assume them the debtors would need to cure all of their existing defaults, which include the substantial shortfalls in flying. In addition, the debtors would risk a substantial administrative claim by Delta if they continued to be unable to honor their flying commitments under the assumed agreements. This is a real concern, given debtors' inability to perform under these agreements over 2015 and 2016. By contrast, the debtors' renegotiated terms in these settlements, for these agreements, lessens any concern about the debtors' inability to perform.

The second option of rejection is equally unattractive. It would end the debtors' relationship with Delta without any guarantee of being able to replace that business or revenue.

15

Loss of Delta would mean a loss of over twenty percent of Republic's revenue.  That figure is

undisputed.  It would also risk enormous rejection damages against the estate and revive the

Delta litigation.

The Ad Hocs' analysis is based on its position that a claim amount is really the totality of

many settlements combined, and the total amount of $170 million is unjustified when the

settlement is viewed in its component parts.  But the Court rejects that approach.  The credible

evidence shows that the parties exchanged global settlement numbers, with a final number of

$170 million being the result of counteroffers made back and forth by the parties as to a global

resolution.  And the testimony of Mr. Luth at the hearing made clear that the $170 million was

the result of a negotiation with Delta on all issues, rather than each side settling issues one at a

time.

Indeed, this is the only sensible way to view this settlement, which includes changes to so

many terms of the parties' ongoing relationship as well as a resolution of existing litigation and

claims that could be asserted in this bankruptcy.  *See In re NII Holdings, Inc.*, 536 B.R. 61, 99

(Bankr. S.D.N.Y. 2015) ("In complex settlements, it is appropriate for the court to not only

consider each settled claim individually, but also to consider the reasonableness of the agreement

as a whole.").

Nonetheless, the Ad Hocs insist on separately trying to evaluate, in isolation, some of the

disputed issues between the parties.  For example, the Ad Hocs argued that the $170 million

claim is too high, adamantly insisting that Delta had zero chance of success to recover lost

profits relating to the extension period for the single class agreement.  ███████████

████████████████████████████████████████████

████████████      But the Ad Hocs' reliance is misplaced.  ██████████████

16

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

        █████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

    While the debtors did challenge the validity of Delta's five-year extension notice of
February 2016 that was another input in Delta's calculation of the lost profit claim, ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

    The Ad Hocs also mistakenly rely on the debtors' force majeure defense in the Delta
litigation as evidence that any Delta claim had no merit.  But based on the record before the
Court, it is clear that such a defense was far from assured.  The defense was asserted as to the
debtors' lack of flying being caused by a shortage of pilots, which, in turn, was caused by new
government regulations for pilot qualifications.  But even a quick perusal of the law on force
majeure shows that the defense is less than an ideal fit for these set of facts.  As the court stated

in *Macalloy Corp. v. Metallurg, Inc.*, 284 A.D.2d 227 (App. Div. 1st Dep't 2001), "financial considerations brought about by . . . regulations . . . are not circumstances constituting a *force majeure* event, and financial hardship is not grounds for avoiding performance under a contract." *Id.* at 227. As a factual matter, other airlines were able to maintain their flying, which seemed to demonstrate that more was at work than simply the government's new requirements.

And, indeed, there was. Republic was engaged for eight years in contentious labor negotiations with its pilots' union. Over the course of these eight years of bargaining, Republic's pilot labor agreement had fallen behind its peer group within the regional airlines industry. *See* Allman Declaration ¶ 11. It is not surprising, then, that debtors had less than full confidence in the force majeure defense. This is, of course, entirely consistent with the fact that the outcome of any litigation is less than clear and brings with it risk.

The Ad Hoc Committee similarly grasps at straws in relying upon statements by the debtors, including in SEC filings, where the debtors characterized the Delta litigation as meritless. Such bravado is par for the course when a company opines about litigation in public. Thus, such statements have little to no probative value here. The Ad Hoc Committee did not cite to any authority in SEC regulations or securities law that would change this analysis by providing authority that would justify placing reliance on such blanket denials of liability.

The Ad Hocs' arguments on the slot leases also lack merit. On the most obvious level, the debtors benefit from the A&R slot lease because Delta will pay Republic more than ██

████████████████████████████████████████████

████████████████████ Of course the Ad Hocs contend that the slot leases are worth more. But the Ad Hocs' view of the leases takes the slot leases out of the context of the parties' overall relationships and the respective benefits of that overall relationship. The fact is that the

continued use of these slots is important to the parties' continued flying arrangements, and thus

mutually beneficial to the debtors and Delta.  On the slot lease issue,

the Ad Hocs even go so far as to suggest that Delta is not entitled to the protections of Section

363(m) in connection with these slot leases.  But the Court rejects that notion.  On this record

there is simply no basis to find that Delta is not a good faith lessee.

       The thrust of the Ad Hocs' claim is that it is their ox being gored, namely that the money

paid on this Delta claim will improperly dilute or eliminate their recovery as equity holders.  But

even this argument has flaws.  It ignores the U.S. Trustee's recent decision to deny the request

for an official equity committee in this case.  Of course the U.S. Trustee has no vested interest

one way or the other as to the existence of an equity committee.  But based on the submissions

before it, it determined that no equity committee was appropriate at this time.  Thus, the U.S.

Trustee's office appears to agree with the debtors that there is no substantial likelihood of a

meaningful distribution to equity holders at this time.

       Based on the current status of the case, therefore, the party that would have concerns

about the Delta claim reducing their recovery would be the Official Committee of Unsecured

Creditors.  But the Official Committee supports both the settlement motion and the financing

motion.  Indeed, even when the Official Committee filed its objection to the settlement motion—

an objection that was later withdrawn—the Official Committee never objected to the proposed

$170 million claim, and instead concluded that it was reasonable under the facts and

circumstances here.

Indeed, the Ad Hocs' objection repeatedly seeks to micromanage the debtors' business judgment on issues crucial to the debtors' reorganization. This approach is at odds with applicable law. For example, the Ad Hoc Committee's objection ignores the evidence that the debtors have tried for some time, without success, to reach agreement with its codeshare partners but that no party has been willing to be the first to reach an agreement. Delta is now that first party. As the debtors credibly maintain, approval of this agreement with Delta will facilitate the debtors' ability to reach agreement with its remaining codeshare partners. As Mr. Allman testified at the April 21, 2016 hearing, American and United made it very clear that they wanted the debtors to resolve their Delta situation. In addition, the Court credits the debtors' contention that securing this first amended codeshare agreement with Delta will provide stability to the debtors' business and its workforce. This is particularly important when seeking to solve the problem of debtors' pilot hiring and retention, a problem that was one of the main issues that forced the debtors into bankruptcy.

In seeking to replace the debtors' business judgment with its own views, the Ad Hocs' objection improperly seeks to turn both the business judgment rule and the standard for settlement under Rule 9019 on their heads. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."); *see also In re Genco*, 509 B.R. at 464.

The Official Committee and the Ad Hocs both initially were concerned about another issue—the use of an MFN clause (a most favored nation clause)—in the settlement. The MFN clause was drafted to entitle Delta to an increase in the amount of priority of its allowed claim to the extent that the other two codeshare partners strike deals that are more favorable. The Official

Committee originally was concerned that without at least one more codeshare settlement on the table it was impossible to evaluate whether the settlement was favorable, how the assumed Delta contracts fit into the debtors' overall business plan going forward, as well as the size and nature of any claims to be asserted by Delta and the other codeshare partners.  But the Official Committee has now dropped its objection to the MFN clause in light of significant changes to that clause.  All these changes are designed to present more certainty as to when and how the MFN clause might be triggered and to limit the exposure based on that clause.

The Ad Hoc Committee spent some, but not much, time on the MFN clause at the hearing, instead, preferring to focus on the appropriateness of the $170 million claim discussed earlier.  But for the avoidance of doubt, the Court finds that the MFN clause, as revised, is permissible and can be approved here.

As a threshold matter, there was some discussion in the pleadings about the permissibility of MFN clauses generally, but no party cited any binding authority from the Second Circuit on this issue.  In fact, the case law on this issue is generally scarce and inconclusive, with decisions driven by the facts of each case rather than any broad rulings as to the permissibility of MFN clauses.  For example, the parties' pleadings cite *In re Chicken Antitrust Litigation*, 560 F. Supp. 943 (N.D. Ga. 1979), but that case is distinguishable from the present case in several respects.  In that case, two parties objected to the use of the most favored nation clause in all proposed settlement agreements.  *See id.* at 944.  The court found that these objecting parties could not afford to settle at the "most-favored-nations formula price without considerable peril of financial collapse."  *Id.* at 947.  Yet because the settling parties were unwilling to exempt these two parties from the clause, they were forced to either pay the formula price or bear the enormous litigation costs.  *See id.* 947–48.  Additionally, the court found that some "economically weaker early-

settling defendants were 'carried' by some of the stronger early-settling defendants as part of the group settlement arrangements, which suggested predatory intent. *Id*. at 948.

Another case cited by the parties on the MFN issue is *Picard v. JP Morgan Chase & Co.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 2014 Bankr. LEXIS 4348 (Bankr. S.D.N.Y Oct. 10, 2014). It was cited for the proposition that MFN clauses are typically used to set a ceiling rather than a floor on the amount of claims to be settled. But the Court agrees with the debtors that this is a distinction without a difference. Moreover, the court in that case appeared to take no issue with MFN clauses generally. Rather, the decision addressed the ambiguous nature of the clause in that case, particularly its adoption of five non-exclusive factors to be used in determining whether circumstances of the settlements were similar enough to trigger the clause. *See id.* at *9. That issue has not been raised here. Indeed, there is no ambiguity here about the intent of the MFN clause or its use. The clear intent of the clause here is to treat all codeshare partners equitably, regardless of when they reached an agreement with the debtors. In this case, the debtors have had serious difficulty in getting any of its codeshare partners to be the first to sign on to a new agreement, apparently out of concern for what the terms might be in later agreements. It is clear that this MFN clause, even in its revised, less robust form, was important in getting Delta to be the first codeshare partner to reach an agreement with the debtors.

The remaining cases cited in the parties' briefs also do not suggest an absolute bar on MFN clauses. In *Cintech Industrial Coatings, Inc. v. Bennett Industries, Inc.*, 85 F.3d 1198 (6th Cir. 1996), the Sixth Circuit did not enforce the most favored nation clause in the parties' settlement agreement. But the court did so in that case because the clause did not apply by its terms if "present circumstances materially change so that plaintiffs reasonably conclude that the prospect or amount of ultimate recovery from any similarly situated defendant in these cases is

substantially lessened or reduced . . . ." *Id.* at 1202.  The court found a material change in present circumstances, including where plaintiff's knowledge of the facts concerning liability had changed.  *See id.*  While that court noted the disfavored status of such clauses because they inhibit compromise and settlement, the court did not discuss in depth the enforceability of most favored nation clauses generally, given its more specific ruling.  *See id.* at 1203.  So while the Sixth Circuit noted that some courts have refused to recognize such clauses, it stopped short of adopting that approach itself, noting that the "case law involving most favored nation clauses is scarce[.]" *Id.*  While several other decisions mention agreements that include MFN clauses, they provide little analysis as to whether they are generally enforceable.  This includes *In re Enron Creditors Recovery Corp.*, 461 F. App'x 11 (2d Cir. 2012).  In that case, the Second Circuit determined that a most favored nation clause in a stipulation which was approved by the bankruptcy court was simply not triggered by a subsequent settlement.  *Id.* at 12, 15

Given the lack of bright lines about the permissibility of MFN clauses, the question becomes here whether the MFN clause in this case is problematic given the facts of this settlement.  In considering this question, it is relevant that the debtors and Delta made significant revisions to the MFN clause to address the concerns raised by the Official Committee and others.  These changes include the following:

1) The debtors and Delta have agreed that the MFN clause will apply only in the event of a settlement of another codeshare partner's claim, and will not apply in the event of another codeshare partner obtaining a claim through litigation.  This change was no doubt in response to the Committee's statement in its limited objection that "limiting the MFN clause to apply only in the case of settlements of other Code Share Partners' claims would go a long way to resolving" the Committee's concerns.  *See* Official Committee's Limited

Objection at 9 [ECF No. 364].

2) The debtors and Delta have established in writing an agreed upon methodology for the parties to determine whether the MFN clause is triggered and the amount of increase in the Delta claim should that occur. Such a methodology gives the parties a framework for understanding the parameters of any possible revision to the Delta claim.

3) The debtors and Delta have clarified that any adjustment to the Delta claim pursuant to the MFN clause will be subject to a further review and approval process, and a Delta claim will be allowed only as to RAH and Shuttle, who are the two parties to the existing agreement, as opposed to all debtors. That approval process is set forth in paragraph 9 of the revised proposed order, which provides, among other things, for revision of Delta's claim on notice to the Official Committee, which has an opportunity to reject. The methodology for any revision is set forth in Exhibit A to the Luth Declaration.

All of these changes provide significant protections against an undue increase in Delta's claim from the MFN clause and provide guidance to the parties as to when and how the clause may be implicated. At the same time, it provides a needed incentive for Delta to be the first of the code share partners to enter into a settlement and new agreement with Republic. Given these substantial additional protections, the Court finds that the revised MFN clause is appropriate and does not prevent approval of this settlement.

The Court believes it has addressed the sum and substance of essentially all of the Ad Hoc Committee's objections to the settlement motion, but to the extent that there are any remaining objections that have not been specifically discussed, the Court finds that the Ad Hoc Committee has presented no objections that have merit given the factual record before the Court and applicable law.

II.    **The Financing Motion**

Section 364(c) of the Bankruptcy Code provides that if a debtor is "unable to obtain unsecured credit allowed under Section 503(b)(1) . . . as an administrative expense," the court may authorize it to obtain credit or incur debt "with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; . . . secured by a lien on property of the estate that is not otherwise subject to a lien; or . . . secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c).

The debtor is not required to "seek credit from every possible source" but rather must demonstrate "that it has made a reasonable effort to seek other sources of credit available under section 364(a) and (b)." *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see also In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (stating that the court "may not approve any credit transaction under subsection (c) [of Section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under Section 364(a) or (b).").

In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment. *See In re Ames Dep't Stores*, 115 B.R. at 40 ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  Additionally, bankruptcy courts will consider whether (1) the debtor is unable to obtain unsecured credit under Section 364(b), (2) the credit transaction benefits it as necessary to preserve estate assets, and (3) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In*

25

*re L.A. Dodgers*, 457 B.R. at 312.

In addition to Section 364(c), 364(d) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt, "secured by a senior or equal lien on property of the estate that is subject to a lien only if-- (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d). Section 364(d) "does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien." *See In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630–31 (Bankr. S.D.N.Y. 1992). Additionally, Section 364(d)(1) requires the debtor to show that the interests of the holder of the lien that is being primed are adequately protected. *See id.* at 631.

The Court concludes that the motion here satisfies all the requirements of applicable law. In reaching its conclusion to grant the motion, the Court once again credits the testimony of the debtors' witnesses.

The Court turns to the objections of the Ad Hoc Committee as to the financing motion. The basic thrust of the objection by the Ad Hoc Committee is that it provided better terms for financing than those provided by Delta. Along the way, the Ad Hocs criticize and question various provisions in Delta's proposed financing. But the evidence in the record does not support the Ad Hocs' objection.

As a threshold matter, the terms of the financing appear reasonable. The terms include an interest rate of 5.75%, minimal fees of 1% upfront and an unused commitment fee of 1%, a cap on the lender's professional fees, the ability to make multiple draws and flexibility on whether to draw at all, minimal conditions to borrowing, and no prepayment penalties. *See, e.g.*, DIP Credit

Agreement §§ 1.02, 1.03, 1.06(a), 1.14, 1.15, 2.02, 13.03(e) [ECF No. 308].  Indeed, on redirect

Mr. Luth even testified that the DIP was, in his opinion, below market.

The Official Committee agrees that the terms of the proposed DIP facility are generally

reasonable.  *See* Official Committee's Limited Objection at ¶ 18.  Notably, the Official

Committee does not join with the Ad Hocs to advocate the proposed ad hoc financing, i.e., the

Official Committee does not agree that the Ad Hocs' proposed financing is better.  This makes

this instance different from other cases that this Court has seen, where an Official Committee has

disagreed with the debtor about which financing proposal might be best for the estate.  That

difference of opinion does happen sometimes in cases, and notably it has not happened here.

The Official Committee's views are probative, because the unsecured creditors are

seeking to maximize the value of the estate.  Thus the Official Committee here has a much

broader perspective and interest than the Ad Hocs, who have a much narrower and more

parochial interest as a party seeking to be the DIP lender.

At the hearing on these motions, the Ad Hocs presented, for the first time, the details of

their proposed financing and argued that it contained better terms, including a lower interest rate.

In fact, there is a difference in the interest rate between the Delta DIP and the Ad Hoc proposed

DIP, and that difference is $637,000 if the DIP is fully drawn.  But, as Mr. Luth testified, the

$637,000 would be more than offset by the Ad Hoc DIP's provision requiring the payment of its

professional fees.  *See* Transcript of Sealed Hearing held on April 21, 2016 at 118–119.  Thus,

Mr. Luth concluded that the Ad Hoc DIP proposal would actually cost more.

Moreover, the debtors' financial advisor, Mr. Luth, testified that the Ad Hocs' financing

proposal contained a condition not found in Delta's financing proposal, namely that as a

condition to borrowing the Ad Hocs required Republic to execute and deliver amended

codesharing agreements with at least two of Republic's codesharing partners, substantially in the form of the pre-petition codesharing agreements but with such modifications providing for the respective codeshare partners to increase rate payments payable to Republic by an amount sufficient to compensate Republic for, among other things, increased labor costs. *See* Luth Declaration ¶ 30; Debtors' Omnibus Reply ¶ 11 [ECF No. 379].

Under these circumstances, then, it is unclear whether there is even a concrete financing proposal by the Ad Hocs that the debtors could accept since the debtors do not, in fact, yet have amended codesharing agreements from two codeshare partners.  In any event, the debtors maintain that this condition is a deal breaker.  As Mr. Luth persuasively testified in his written direct testimony and his live testimony at the hearing, the Ad Hocs' condition would subject Republic to undue risk.  It would decrease its bargaining leverage with its codeshare partners on a number of points.  *See* Luth Declaration at ¶ 30 (stating that such a condition to borrowing would have held Republic "hostage by the threat of a liquidity drain while attempting to negotiate for liquidity relief").

Such unusual substantive requirements for financing are frowned upon by the courts.  *See In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *5 (Bankr. S.D.N.Y June 22, 2004) (addressing objections to exit financing motion with respect to conditions to the financing and stating conditions to financing are relevant because: (1) unduly risky conditions can hurt debtors; and (2) conditions can "create a poison pill . . . by subjecting the estate to draconian consequences if the pill is triggered."); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 (holding debtors satisfy the business judgment standard as to their post-petition financing motion).

In sum, the Ad Hocs have not presented evidence to justify overriding the debtors'

business judgment on this question.  But notwithstanding the fact that it sought to impose this onerous condition before providing financing, the Ad Hoc Committee, nonetheless, criticizes a far less onerous condition imposed as part of Delta's financing, namely the budget requirement.

Unlike the condition that the Ad Hocs sought to impose, a budget requirement is a very common requirement for DIP financing.  The debtors in Delta cite to numerous cases with such budgets, including *In re Great Atlantic & Pacific Tea Company*, *In re Chassix Holdings, Inc.*, *In re LightSquared*, *In re Hostess Brands*, and *In re Flat Out Crazy, LLC*.  And the Court could cite many other such cases based simply on its own docket.  Similarly, the thirteen-week period of the budget is comparable to other DIP proposals presented to the Court in other cases.  Such budgets are designed to provide a lender with a breakdown of how its money is being used. For similar reasons, the Court rejects the Ad Hocs' argument that the Delta DIP financing should be rejected because of other alleged "troublesome provisions."  The Court will not go through each one of these provisions in the interest of brevity, but suffice it to say that nothing has been identified that provides a basis to reject the proposed financing.  *See, e.g.*, Debtors' Omnibus Reply at ¶ 17.

But one example worth pointing out is what the Ad Hocs identify as a "milestone" contained in the DIP agreement.  That milestone, however, simply provides for a repayment or refinancing of the DIP financing at least sixty days prior to its maturity.  Such a provision does not, as the Ad Hocs allege, improperly leverage this case for the purpose of Delta, at the expense of other constituencies.  Indeed, as Delta correctly points out, this term is nothing like the more stringent and case determinative milestones that do cause concern for courts in the context of DIP financing.

Other concerns with the proposed DIP financing have been mooted by changes to the

proposed DIP agreement. For example, the Official Committee had raised a concern about

debtors' inability to finance the delivery of new aircraft, which is an important part of the debtors'

restructuring. However, Delta has agreed to permit debtors to grant liens senior to the DIP liens

on Section 1110 assets on account of debt incurred to finance the acquisition of new aircraft. *See*

Delta's Response to Objections ¶ 39 [ECF No. 384]. Delta has also agreed to permit debtors to

grant superpriority administrative claims junior to Delta's superpriority administrative claims in

accordance with the terms of the DIP credit agreement on account of such indebtedness. *See id.*

Thus, the debtors appear to have sufficient financial flexibility to accomplish their goal of

financing new aircraft. Relatedly, the Court notes that there is a lack of objections from any

Section 1110 parties to the proposed financing.

Simply put, the Ad Hocs have not demonstrated any basis on this record to reject the

debtors' business judgment in entering into this financing agreement with Delta, and the Court

finds that the provisions are reasonable, in the best interests of the estate, and are not

problematic.

## III.    Stay Pending Appeal

The Ad Hoc Committee requested a stay pending appeal. That request was opposed by

the Debtors and Delta.

Rule 8005 of the Federal Rules of Bankruptcy Procedure authorizes a bankruptcy judge

to stay a judgment or order pending appeal. The same standards that govern a stay pending an

appeal from a District Court order to the Court of Appeals apply in the case of an appeal from

the Bankruptcy Court to the District Court. *See In re Savage & Assocs., P.C.*, 2005 WL 488643,

at *1 (S.D.N.Y. Feb. 28, 2005). The decision to grant or deny a stay pending appeal is

committed to the discretion of the bankruptcy court. *See Nken v. Holder*, 556 U.S. 418, 433

(2009). "The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *accord Nken*, 556 U.S. at 426.

The first two factors are the most critical. *Nken*, 556 U.S. at 434. "It is not enough that the chance of success on the merits be 'better than negligible.'" *Id.* (quoting *Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999)). "By the same token, simply showing some 'possibility of irreparable injury' fails to satisfy the second factor." *Nken*, 556 U.S. at 434–35 (citation omitted). "'The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer absent the stay. Simply stated, more of one excuses less of the other.'" *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991)); *accord Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006).

The Court concludes that the Ad Hocs have not satisfied the applicable standard on balance. The Court is sensitive to parties' appellate rights and that is why, notwithstanding the obvious business exigencies here, the Court set a seven-day stay under Bankruptcy Rule 6004.[2] For the reasons set forth above, the Court finds problematic the arguments that have been made by the Ad Hoc Committee on the merits. These arguments are, charitably speaking, very thin.

While the Ad Hoc cites public interest, this argument assumes, again, a fact not in evidence: that there is value that is going to the equity holders here and that this decision

---

[2]    The Ad Hoc Committee opposed the Debtors' request for a waiver under Bankruptcy Rule 6004 of the 14-day period of a stay. The Court suggested, and the Ad Hocs agreed, to a seven-day period instead.

improperly dilutes that value. Nothing in the record, other than the Ad Hocs' conclusory statements, support that. The record in fact goes the other way.

The Court turns to the factor of irreparable harm. While the Ad Hocs cite the possibility of extensions in the debtors and Delta's agreements, this does not mean that the debtors face no potential harm from a stay. The debtors came into bankruptcy, like all debtors, in bad shape. And their business is centered around their codeshare partners. If they do not get those partnerships fixed, they have no business. The debtors filed for bankruptcy, seemingly in large part because they could not get agreements with their codeshare partners. And if they do not get it fixed, they will have problems with their existing flying—that is, the flying they are doing right now—and serious problems with their business model going forward. They do not have any other sources of revenue or other business.

It is clear from the evidence before the Court that Delta is the first domino to fall. The other two codeshare partners actually have told the debtors to get its situation with Delta squared away. Through these two motions, Delta is primed and ready to go. The Court understands that these agreements contemplate a deadline for approval of May 14, 2016; that is why the Court has set May 6, 2016, as the time for the stay to expire. But the Court rejects the notion that approval of these agreements could be indefinitely extended. Simply put, there is no credible evidence in support of that position. So while the agreements could be extended, the agreements could also simply be terminated. The debtors are not the only regional carrier out there; they are a regional carrier that has had problems, and they need to strike deals to keep their partners, lest those partners go elsewhere.

The Ad Hocs' view is consistent with its view expressed at the hearing that there are sometimes hard times for regional airlines but that this instance does not reflect that situation.

The Ad Hocs essentially have the view that the debtors have Delta over a barrel.  But the Court disagrees.  In fact, it seems to be exactly the opposite; that is, Delta has the debtors over a barrel. That does not mean that Delta doesn't have an interest in trying to make this relationship work; they obviously do, or they wouldn't have entered into this agreement.  But there is nothing in the record to suggest that a leisurely pace in addressing these issues is sensible, preferable, wise, or really even possible, if the debtors want to survive in bankruptcy and come out of bankruptcy with a revised business model.  Given that fact and the obvious business exigencies of getting the agreement done, the Court finds that the irreparable harm factors essentially cancel each other out.

Given an analysis of all the factors then, including the Court's concerns about the likelihood of success on the merits based on its bench ruling, the Court denies the motion for a stay pending appeal.


Dated: New York, New York
       May 3, 2016


                              _/s/ Sean H. Lane_____
                              UNITED STATES BANKRUPTCY JUDGE