Bruce R. Zirinsky

Sharon J. Richardson

Gary D. Ticoll

ZIRINSKY LAW PARTNERS PLLC

375 Park Avenue, Suite 2607

New York, New York 10152

(212) 763-0192

**Hearing Date & Time: June 20, 2016 at 11:00 a.m. (Eastern Time)**

**Reply Deadline: June 18, 2016 at 1:00 p.m. (Eastern Time)**

Christopher K. Kiplok

Gregory C. Farrell

Lauren A. Lipari

HUGHES HUBBARD & REED LLP

One Battery Park Plaza

New York, New York 10004

(212) 837-6000

*Attorneys for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x

|  |  |  |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **REPUBLIC AIRWAYS HOLDINGS INC.**, *et al.*, | : | **16-10429 (SHL)** |
| **Debtors.[1]** | : | **(Jointly Administered)** |

----------------------------------------------------------------------x

## DEBTORS' REPLY TO UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 503(c) FOR ENTRY OF AN ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND GRANTING RELATED RELIEF

TO THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE:

Republic Airways Holdings Inc. ("RAH"), and certain of its wholly-owned direct

and indirect subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11

---

1. The Debtors in these chapter 11 cases are the following entities: Republic Airways Services, Inc.; Shuttle America Corporation; Republic Airline Inc.; Republic Airways Holdings Inc.; Midwest Air Group, Inc.; Midwest Airlines, Inc.; and Skyway Airlines, Inc. The Debtors' employer tax identification numbers and addresses are set forth in their respective chapter 11 petitions.

cases (collectively with RAH, "Republic" or the "Debtors"), submit this reply (the "Reply") to

the Objection of the United States Trustee to Debtors' Motion Pursuant to 11 U.S.C. §§

363(b)(1) and 503(c) For Entry of an Order Approving the Debtors' Key Employee Incentive

Plan and Key Employee Retention Plan and Granting Related Relief (the "Objection") [ECF No.

645] as it relates to Republic's proposed key employee incentive plan.[2]  In further support of the

Motion[3] and in response to the Objection, Republic submits the Supplemental Declaration of

Matthew J. Koscal, Republic's Chief Administrative Officer and Senior Vice President, attached

hereto as Exhibit A (the "Supplemental Koscal Declaration") and the Supplemental Declaration

of Zachary P. Georgeson, a Consulting Director at Willis Towers Watson PLC ("Willis Towers

Watson"), attached hereto as Exhibit B, and respectfully represents as follows:

### Preliminary Statement

1.       The six members of Republic's Executive Leadership Team are

responsible for steering Republic's operating and financial performance and its prospects for a

successful reorganization to which they are categorically committed.  They have worked

indefatigably toward that goal, and that is reflected in the extraordinary results achieved to date,

including obtaining modified codeshare agreements with two of Republic's three codeshare

partners, the orderly return of dozens of out-of-favor aircraft and engines, and settlements of

aircraft counterparty claims.  The ELT members are, however, significantly undercompensated

relative to the market, receiving base salary alone, leaving their total direct compensation 75

percent below the 25th percentile of the market.

---

2.    On May 25, 2016, the Debtors filed the Motion Pursuant to 11 U.S.C. §§ 363(b)(1) and 503(c) for Entry of an
      Order Approving the Debtors' Key Employee Incentive Plan and Key Employee Retention Plan and Granting
      Related Relief [ECF No. 590] (the "Motion").  On June 17, 2016, the Court entered an order approving
      Republic's key employee retention plan.  [ECF No. 684.]  Accordingly, this Reply addresses only the portion of
      the Objection related to the key employee incentive plan.

3.    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2.      Recognizing that such a significant disparity in compensation can, over time, operate to disincentivize peak performance, Republic's Compensation Committee tasked Willis Towers Watson with assisting Republic in developing a compensation plan that would incentivize the ELT members to continue to achieve Republic's key financial and operational goals in order to maximize value for stakeholders by providing the ELT with opportunities to receive compensation that is closer to market if they are successful.  As detailed in the Georgeson Declaration and the Koscal Declaration, based upon the review and analysis of Republic's prepetition programs and market analyses, a key employee incentive plan for the ELT was developed and proposed.

3.      On May 25, 2016, Republic filed its Motion for approval of the incentive plan and thereafter worked cooperatively with the Creditors' Committee and the U.S. Trustee to provide additional information.  While the Committee recognized the need for a management incentive plan and the propriety of the potential award amounts, it expressed concerns with the structure.  Following extensive discussions with the Committee's professionals, Republic has modified the terms of the proposed incentive plan to even more closely comport with Republic's incentive plans in effect prepetition (as modified, the "KEIP").  As set forth in the Supplemental Koscal Declaration, the KEIP reflects the following modifications:

- Payment of a portion ($500,000 if Threshold is attained, $1 million if Target is attained, $2 million if Maximum is attained) of the aggregate award opportunities that are earned based on performance attainment in 2016 will be deferred and paid as follows:  25% of the deferred earnings pool at the earlier of (i) emergence from chapter 11 or (ii) March 2017, and 75% of the deferred earnings pool at March 2018.

- No award opportunities will be paid under the KEIP if Republic's operating performance during the award period triggers any material breach of the operating performance standards set forth in any of its amended codeshare agreements.

3

- No award opportunities with respect to the operating performance metrics will be paid under the KEIP unless Republic generates revenues related to operating performance under its code share agreements at least equal to the award opportunities to be paid.

4.      The KEIP is entirely a performance-based incentive plan subject to consideration under section 503(c)(3) of the Bankruptcy Code.  There is no legitimate basis for the U.S. Trustee's contention that it is a retention plan subject to scrutiny under the strict standard set forth in section 503(c)(1).  (Objection at 10-11.)  The KEIP metrics were evaluated and approved by Republic's Compensation Committee, which is comprised of three independent members of Republic's Board of Directors.  And consistent with the Compensation Committee's historic practice of conditioning incentive compensation on the achievement of difficult goals, the approved metrics set forth aggressive financial and operational benchmarks designed to provide incentives to the Executive Leadership Team that will align their interests with the interests of Republic's stakeholders.  As shown below and in the Supplemental Koscal Declaration, the goals are stretch goals that require substantial improvements over prior years' performance at Target or Maximum, as well as at Threshold when taking into consideration the evolution of the business.  The U.S. Trustee's Objection, which is premised upon an incorrect analysis of these goals and does not recognize the environment in which the members of the ELT work to achieve them, must be overruled.

### Argument

The KEIP Is an Incentive Plan
Subject to Section 503(c)(3) of the Bankruptcy Code

5.      In evaluating whether proposed compensation plans for senior officers are primarily retentive and thus subject to the strictures of section 503(c)(1) of the Bankruptcy Code, courts consider "the circumstances under which particular proposals are made, along with the structure of the compensation packages."  *In re Velo Holdings Inc.*, 472 B.R. 201, 209 (Bankr.

4

S.D.N.Y. 2012).  Compensation proposals that are primarily incentivizing in nature are analyzed under the more lenient standard of section 503(c)(3).  *See In re Residential Capital, LLC*, 491 B.R. 73, 83 (Bankr. S.D.N.Y. 2013) ("When a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1).") (internal quotation omitted); *In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (*Dana II*) ("section 503(c)(3) gives the court discretion as to bonus and incentive plans, which are not primarily motivated by retention or in the nature of severance").

6.      Because virtually all compensation plans have some retentive effect, courts interpret section 503(c)(1) to apply only to plans that are *primarily* retentive rather than incentivizing.  *See, e.g.*, *Velo*, 472 B.R. at 209-210 ("Although a purported KEIP may contain some retentive effect, that does not mean that the plan, overall, is retentive rather than incentivizing in nature.") (internal quotation omitted); *Dana II*, 358 B.R. at 571 ("merely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing"); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("Any payment to an employee . . . has at least a partial purpose of retaining the employee. . . . Thus, the Court reads section 503(c)(1) to mean 'a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business.'") (quoting 11 U.S.C. § 503(c)(1)).

The KEIP Metrics Are Challenging

7.      To qualify as primarily incentivizing in nature, "the plan must present targets that are difficult to achieve, forcing the executives to work hard to achieve their bonuses." *Residential Capital*, 491 B.R. at 86; *see also Dana II*, 358 B.R. at 584 ("By presenting an executive compensation package that properly incentivizes the [executives] to produce and

increase the value of the estate, the Debtors have established that section 503(c)(1) does not

apply . . . .").  Whether proposed incentive targets are sufficiently difficult to achieve is a factual

question.  *Velo*, 472 B.R. at 207 ("Whether incentive targets require management to 'stretch' to

meet performance goals is fundamentally a factual question."); *see also United Mine Workers of

America 1974 Pension Plan and Trust v. Alpha Natural Resources, Inc. (In re Alpha Natural

Resources, Inc.)*, Case No. 3:16-CV-75-HEH (ECF No. 37) (E.D. Va. Jul. 7, 2016) (attached as

Exhibit C) (affirming bankruptcy court decision approving KEIP where incentive payments were

directly correlated to levels of achievement and performance targets were "aggressive but

achievable").

   8. Republic's primary business, operational, and financial objectives in these

chapter 11 cases are to (i) obtain modified agreements from its codeshare partners to reimburse

increased costs and allow an orderly restoration of service, (ii) agree to an early return of out-of-

favor aircraft and to resolve any related claims, (iii) streamline its operations by operating a

single aircraft type under a single operating certificate, and (iv) secure additional liquidity to

fund future operations and growth.  (Initial Koscal Decl. ¶ 9.)

   9. As demonstrated in the Initial and Supplemental Koscal Declarations, the

proposed KEIP provides incentives for the Executive Leadership Team to achieve challenging

financial and operational goals that will enable Republic to meet its objectives and maximize

value for its stakeholders. (*See generally* Initial and Supplemental Koscal Decls.)

   10. Contrary to the U.S. Trustee's argument, the KEIP Operating Income and

performance metrics are not "lay ups," but rather, represent highly ambitious goals for

Republic's management that are directly tied to Republic's ability to achieve its objectives in

these chapter 11 cases.  The metrics are challenging and will be difficult to attain, in part because

Republic's business has proven to be extremely volatile since the onset of the national pilot

shortage, Republic's pilot labor dispute, and the commencement of the chapter 11 cases.

(Supplemental Koscal Decl. ¶ 16.)  In order to reach the goals under the KEIP, the ELT must

execute on its current business plan by keeping employees focused on its mission of providing

safe, clean, and reliable flying experiences for its codeshare partners and ensuring its pilot

staffing is adequate to reverse the unsustainable performance levels it experienced in 2015.

(Supplemental Koscal Decl. ¶ 16.)  In addition, the ELT must improve operational performance

on a daily basis, while moving in parallel with Republic's overall strategy to operate under a

single operating certificate by the end of the year, which requires increased focus on optimizing

crew efficiencies during the operating certificate harmonization process and increased resources

for systems, training, and other administrative functions to seamlessly transition all employees to

one operating certificate.  (Supplemental Koscal Decl. ¶ 16.)  The KEIP was specifically

designed to provide incentives to the ELT that will motivate them to work hard to meet these

goals and overcome the challenges they inevitably face on a daily basis.  (Supplemental Koscal

Decl. ¶ 16.)

            11.        With respect to the Operating Income metric, when the pre-DIP business

plan (which ultimately was used to establish the KEIP Operating Income metrics by the

Compensation Committee) was finalized and approved in March 2016, Republic had yet to

obtain an amended codeshare agreement with any codeshare partner and doing so was

considered to be a difficult achievement for Republic, as it had been unsuccessful in the months

leading up to the chapter 11 cases, and is further evidenced by the fact that the third codeshare

agreement remains unresolved to date.  (Supplemental Koscal Decl. ¶ 18.)  As a direct

consequence of the efforts of the ELT in these chapter 11 cases, however, Republic has obtained

and implemented amended agreements with two codeshare partners, which provide significant revenue and operating enhancements for Republic, and in some cases extend the terms of the flying agreements.  (Supplemental Koscal Decl. ¶ 18.)  Achieving the Operating Income goals for the last two quarters of 2016 will continue to prove difficult to attain as amended agreements affecting a significant portion of Republic's operation have not yet been obtained. (Supplemental Koscal Decl. ¶ 18.)  Further, the forecast on which the metrics were based assumed additional aircraft that currently are not flying and are now not expected to fly. (Supplemental Koscal Decl. ¶ 18.)

12.     Moreover, the modifications agreed to with the Creditors' Committee strengthen the incentives in the KEIP for the benefit of Republic's economic stakeholders by providing that no award opportunities will be paid under the KEIP if Republic's performance during the award period triggers a material breach of the operating performance standards set forth in any of its amended codeshare agreements, and no award opportunities with respect to the operating performrance metrics will be paid under the KEIP unless Republic generates revenues related to operating performance under its code share agreements at least equal to the award opportunities to be paid.  (Supplemental Koscal Decl. ¶ 4.)

13.     The U.S. Trustee's Objection is premised upon apples-to-oranges comparisons and a misunderstanding of industry performance measurements.  Specifically, with respect to the Operating Income metric, the U.S. Trustee inaptly compares the KEIP goals to historic operating income that was earned with a substantially larger fleet.  During 2015, Republic's operation was comprised of approximately 213 scheduled aircraft ("Lines-of-Flying").  (Supplemental Koscal Decl. ¶ 21.)  For the 2016 Operating Income goals under the KEIP to be attained, Republic will need to generate approximately the same or greater Operating

8

Income as in 2015 with an operation that is comprised of only approximately 165 aircraft — i.e., with an operation that is approximately 20 percent smaller than in 2015. (Supplemental Koscal Decl. ¶ 21.) To achieve these aggressive goals, the ELT will need to significantly improve efficiency by reducing costs overall, optimizing crew utilization, negotiating agreements that can return additional aircraft to operations, and rejecting idle aircraft that are not part of Republic's long-term business plan, all while continuing to execute on Republic's overall strategy of operating under a single operating certificate by the end of the year. (Supplemental Koscal Decl. ¶ 21.) Comparing operating income per Line-of-Flying, which does not assume that Republic's 2016 business is the same as its 2015 business and takes into consideration a change in the number of pilots and aircraft generating the revenues, demonstrates that the U.S. Trustee's conclusions are incorrect. Thus, contrary to the U.S. Trustee's contentions (Objection at 12-13):

- The Threshold goals for the second and third quarters of 2016 significantly *exceed* actual 2015 performance results for the corresponding quarters by an approximately 9 percent and 24 percent improvement, respectively, per Line-of-Flying (Supplemental Koscal Decl. ¶ 22); and

- The Target goals for the second and third quarters of 2016 represent an even greater improvement of approximately 21 percent and 38 percent, respectively, per Line-of-Flying. (Supplemental Koscal Decl. ¶ 22.)

14. With respect to the performance metrics, each year CCF and A14 become more difficult to achieve due to a variety of factors, including regulatory changes that have limited both pilot availability and utilization, scheduling of increased flying by Republic's codeshare partners to the northeast region, which is a significantly more difficult environment in which to operate, and additional routine maintenance requirements appropriate for Republic's fleet age. (Supplemental Koscal Decl. ¶ 19.) And, as Republic rejects aircraft from its fleet throughout the year, Republic will continue to have fewer spare aircraft, making it more difficult to achieve the results reflected in the performance metrics. (Supplemental Koscal Decl. ¶ 19.)

9

15.    Republic vigorously disputes the U.S. Trustee's assertion that the

Maximum performance goals under the KEIP for 2016 do not exceed 2015 results.  (Objection at

12-13.)  As to CCF, the highest CCF that Republic achieved for any quarter in 2015 was 98.7

percent.  (Supplemental Koscal Decl. ¶ 23.)  The Maximum CCF goals for all three quarters of

2016 are 99.40 percent, 99.50 percent, and 99.50 percent, respectively, and therefore, *do* in fact

exceed the corresponding 2015 actual results.  (Supplemental Koscal Decl. ¶ 20.)  Further, the

99.2 percent Threshold CCF goals for all three quarters of 2016 also exceed the highest

performance that Republic acheived in 2015.  (Supplemental Koscal Decl. ¶ 20.)

16.    CCF is analyzed within a narrow bandwith where an approximate 1

percent change can mean the difference between Republic performing above, or breaching, the

operating performance standards in its codeshare agreements.  (Supplemental Koscal Decl. ¶ 23.)

Accordingly, the 1.2 percent, 0.8 percent, and 0.7 percent increases in CCF required by the KEIP

to attain the Threshold level metrics in the second, third and fourth quarters, respectively, are

quite substantial.

17.    With respect to the U.S. Trustee's assertion regarding A14, the Maximum

goals for the second and third quarters of 2016 are 79.50 percent and 80.00 percent, respectively,

which *do* in fact exceed the corresponding 2015 actual results.  (Supplemental Koscal Decl. ¶

24.)   And the Target A14 goals for the second and third quarters – 78.00 percent and 79.00

percent – exceed 2015 results by 1.71 percent and 0.46 percent, respectively (Supplemental

Koscal Decl. ¶ 24.)  With respect the fourth quarter of 2015, A14 performance was anomalous,

driven in part by highly favorable December weather and availability of additional crews and

aircraft because of reduced flight schedules.  (Supplemental Koscal Decl. ¶ 25.)  The 2013 and

2014 fourth quarter A14 results—approximately 75.80 percent and 77.45 percent—are more

indicative of Republic's fourth quarter performance results.  (Supplemental Koscal Decl. ¶ 25.)

Under the KEIP, the fourth quarter Target goal exceeds the corresponding 2013 and 2014 results

by approximately 2.7 percent and 1.05 percent, respectively. (Supplemental Koscal Decl. ¶ 25.)

As is the case for CCF, A14 performance is measured within a narrow bandwith; the KEIP goals

represent significant improvements over the corresponding results in prior years, which are

difficult to achieve.  (Supplemental Koscal Decl. ¶ 24.)

> The KEIP Provides for
> Appropriate Incentivizing Compensation

18.    Republic operates with a lean executive management team and each

member is critical to Republic's ability to achieve the metrics.  (Supplemental Koscal Decl. ¶ 5.)

As set forth in the Supplemental Koscal Declaration, as a result of these chapter 11 cases, each

member of the ELT has taken on numerous additional duties and responsibilities.  (Supplemental

Koscal Decl. ¶¶ 7-13.)  At the same time, if the members of the ELT continue to receive only

their base salaries for fiscal year 2016, their total compensation will be 75 percent below the 25th

percentile of the market based on a comparison to employees with comparable responsibilities in

the airline industry.  (Initial Georgeson Decl. ¶¶ 16-17).  The KEIP is designed to motivate the

members of the ELT to achieve Republic's operational and performance goals with opportunities

to bring their 2016 fiscal year compensation closer to market.[4]  (Supplemental Koscal Decl. ¶ 5.)

19.    Contrary to the U.S. Trustee's contention that incentive compensation is

not appropriate, section 503 of the Bankruptcy Code "was not intended to foreclose a chapter 11

debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to

---

[4]    Noting that the members of the ELT each deferred payment of their fiscal year 2015 Annual Cash Incentives,
the U.S. Trustee asserts that he has no information concerning to what extent that deferral might have
influenced the current metrics.  (Objection at 11 n. 3).  The award opportunities available to the ELT under the
KEIP are intended to provide reasonable compensation for fiscal year 2016 only and are entirely forward-
looking.  (Supplemental Koscal Decl. ¶ 14 n.3.)   The ELT's deferral of 2015 incentive payments did not affect
the calculation of the award opportunities or the design of the metrics.  (Supplemental Koscal Decl. ¶ 14 n.3.)

the debtors' reorganization." *Dana II*, 358 B.R. at 575; *see also In re Hawker Beechcraft, Inc.*,
479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) (noting that section "503(c)(1) does not prevent a
debtor from adopting a plan that rewards insiders for achieving financial or other targets").
Taking into consideration the increased job responsibilities for each ELT member as a result of
these chapter 11 cases (*See* Supplemental Koscal Decl. ¶¶ 8-13) and that absent the KEIP, the
ELT's 2016 fiscal year compensation is significantly below market (Supplemental Georgeson
Decl. ¶ 9.), the Compensation Committee approved the KEIP to provide incentives for the ELT
to continue to excel and exceed the minimum required to fulfill their fiduciary duties to the
estate.

20.    The proposed KEIP is an incentive-based plan that resembles other plans
approved by courts in this district. *See, e.g.*, *In re Residential Capital*, 491 B.R. at 86-87
(concluding that the debtors "established by a preponderance of the evidence that the KEIPs are
properly characterized as performance-based incentive compensation plans" because they are
designed to motivate the employees to achieve specific performance goals, enhance production,
and increase the value of the estate); *In re Mesa Air Group, Inc.*, Case No. 10-10018 (MG), 2010
WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that the debtors made out their
*prima facie* case that their incentive plan, which was "tied to certain performance goals of the
Debtors that have been met during the second and third fiscal quarters of 2010, including
maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at
reduced rates and negotiation of reduced rates for aircraft" no longer in service, is not a retention
plan); *In re Borders Group, Inc.*, 453 B.R. 459, 472 (Bankr. S.D.N.Y. 2011) (approving KEIP
that would require the participants to be involved in negotiating and documenting rent

concessions on approximately 400 leases, rejecting approximately 700 contracts, and achieving

greater operational efficiencies in chapter 11 than prepetition).

21.    The KEIP is not a retention plan subject to the strictures of section

503(c)(1) of the Bankruptcy Code.  Under the KEIP, the Executive Leadership Team can earn

awards only by achieving specified financial and performance goals.  *Cf. In re Residential*

*Capital, LLC*, 478 B.R. 154, 171 (Bankr. S.D.N.Y. 2012) (denying KEIP as not being primarily

incentivizing where 63% of KEIP awards were linked solely to closing of asset sales); *In re*

*Hawker Beechcraft, Inc.*, 479 B.R. 308, 315 (Bankr. S.D.N.Y. 2012) ("Because the . . . members

will likely earn some bonus under the KEIP merely by remaining with the Debtors . . . approval

of the KEIP must be denied."); *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006)

(*Dana I*) (finding KEIP payment to not be an "incentive bonus" where payment was not tied "to

anything other than staying with the company").  Clearly, the KEIP is a "pay for value," not a

"pay to stay" plan.  *Cf. Residential Capital*, 491 B.R. at 78-79, 86-88 (approving KEIP where 20

percent of payments under the plan were deferred); *Dana II*, 358 B.R. at 574 (approving debtor's

long-term incentive plan that provided for $11 million in payments for six executives over a

three-year period if certain financial goals are met).

The KEIP Is Justified by the Facts
and Circumstances of Republic's Cases

22.    As set forth in the Motion, the KEIP meets the six factors articulated in

*Dana II* that courts look to in determining whether a compensation program meets the business

judgment test applied to programs governed by section 503(c)(3) of the Code.  *See In re Velo*

*Holdings Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("[T]he 'facts and circumstances'

language of section 503(c)(3) creates a standard no different than the business judgment standard

under section 363(b).").

23.    As explained above, the metrics present challenging targets for the ELT, the achievement of which is not a "lay up."  The payments to the ELT members under the proposed KEIP will be earned only if the metrics are met, and therefore, are directly tied to Republic's operating income and performance.  In fact, the performance metrics, CCF and A14, are of material importance to Republic's codeshare agreements and result in performance payments if achieved, and can result in financial penalties or material breach of those agreements, if missed.  (Supplemental Koscal Decl. ¶ 17.)  Thus, there is a direct connection between the proposed payments under the KEIP and the results sought to be achieved.  *See In re Velo Holdings Inc.*, 472 B.R. at 213 (finding a reasonable relationship between the proposed KEIP and the results to be obtained where KEIP payments were directly tied to a successful sale); *In re Dewey & LeBoeuf LLP*, No. 12-12321 (MG), 2012 WL 3065275, at *6 (Bankr. S.D.N.Y. July 30, 2012) (finding a reasonable relationship between the proposed KEIP and the results to be obtained where payments to be made were directly tied to receivables collected); *In re Borders Group*, 453 B.R. at 474 (recognizing that the use of "financial metrics . . . makes it easier for the Court and parties-in-interest to ascertain the relationship between compensation paid and incentivized performance").

24.    Though the U.S. Trustee also argues that Republic has not shown that the KEIP is fair and reasonable and does not discriminate against non-executive employees, (Objection at 16),  as set forth in the Motion, the six-member Executive Leadership Team represents those employees of Republic that have control over decisionmaking for the company and drive its reorganization.  The KEIP does not unfairly discriminate against non-executives as they do not directly influence or make the strategic decisions that ultimately drive Republic's achievement of the metrics, which are directly tied to the potential KEIP payments.  *See In re*

14

*Borders Group*, 453 B.R. 475-76 (finding the KEIP to not discriminate unfairly because the executives have "the most control over the Debtors" and the most influence over the reorganization, making it reasonable for them to receive additional compensation); *In re Dewey & LeBoeuf*, 2012 WL 3065275, at *7 (finding that the incentive plan, which provides for larger payments to more senior employees, does not discriminate unfairly).  In addition, the metrics are similar to those used historically by Republic in determining incentive metrics for the Executive Leadership Team (Supplemental Koscal Decl. ¶ 15) and thus do not unfairly discriminate.  *See In re Velo Holdings Inc.*, 472 B.R. at 213 (bonus plan similar to plan in place prepetition did not unfairly discriminate).  Moreover, Republic's key non-executive employees are eligible for a retention bonus under the KERP, previously approved by this Court.

25.    The allocation of incentive award opportunities is set forth in the Supplemental Koscal Declaration.  (Supplemental Koscal Decl. ¶ 6.)   These opportunities are designed to bring each individual member's total direct compensation closer to market and are reasonably positioned (by individual and on average) relative to market practice.  (Supplemental Georgeson Decl. ¶ 10.)  In fact, even if Target award opportunities are met, the overall positioning of the ELT as compared to their peers will still be 28 percent below the 25th percentile of market total direct compensation and 43 percent below the 50th percentile of market total direct compensation.  (Supplemental Georgeson Decl.  ¶ 10.)  Accordingly, the allocation of the award opportunities among the ELT members is appropriate.

## Conclusion

26.    Republic submits that in view of the foregoing and the applicable law, the KEIP complies with sections 363(b) and 503(b) of the Bankruptcy Code and should be approved in all respects.

WHEREFORE Republic respectfully requests entry of an order (a) overruling the

Objection, (b) approving the KEIP, and (c) granting to Republic such other and further relief as

is just.

Dated: New York, New York
       July 18, 2016

                                      /s/ Bruce R. Zirinsky
                                 Bruce R. Zirinsky
                                 Sharon J. Richardson
                                 Gary D. Ticoll
                                 **ZIRINSKY LAW PARTNERS PLLC**
                                 375 Park Avenue, Suite 2607
                                 New York, New York 10152
                                 (212) 763-0192
                                 bzirinsky@zirinskylaw.com
                                 srichardson@zirinskylaw.com
                                 gticoll@zirinskylaw.com

                                 Christopher K. Kiplok
                                 Gregory C. Farrell
                                 Lauren A. Lipari
                                 **HUGHES HUBBARD & REED LLP**
                                 One Battery Park Plaza
                                 New York, New York 10004
                                 (212) 837-6000
                                 chris.kiplok@hugheshubbard.com

                                 *Attorneys for the Debtors and*
                                 *Debtors in Possession*

**<u>Exhibit A</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| **REPUBLIC AIRWAYS HOLDINGS INC.,** *et al.*, | : | **16-10429 (SHL)** |
| Debtors.[1] | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF MATTHEW J. KOSCAL IN SUPPORT OF
DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 503(c) FOR ENTRY
OF AN ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

I, Matthew J. Koscal, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Administrative Officer and Senior Vice President of Republic

Airways Holdings Inc.  ("RAH").  On February 25, 2016 (the "Commencement Date"), RAH

and certain of its wholly-owned direct and indirect subsidiaries (collectively with RAH,

"Republic" or the "Debtors"), each commenced a voluntary case under chapter 11 of title 11,

United States Code (the "Bankruptcy Code").

2.      This supplemental declaration is submitted (i) in further support of the Debtors'

motion, dated May 25, 2016 [ECF No. 590] (the "Motion")[2] pursuant to 11 U.S.C. §§ 363(b)(1)

and 503(c) with respect to the entry of an order approving Republic's proposed key employee

incentive plan and (ii) in response to the United States Trustee's objection to the Motion, filed

with the Court on June 9, 2016 [ECF No. 645].

---

1.   The Debtors in these chapter 11 cases are the following entities: Republic Airways Services, Inc.; Shuttle
     America Corporation; Republic Airline Inc.; Republic Airways Holdings Inc.; Midwest Air Group, Inc.;
     Midwest Airlines, Inc.; and Skyway Airlines, Inc.  The Debtors' employer tax identification numbers and
     addresses are set forth in their respective chapter 11 petitions.

2.   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

3.    Among my responsibilities as Republic's Chief Administrative Officer are ensuring that Republic maintains a strong employee workforce capable of executing Republic's business plan and all other human resources functions, including compensation, benefits, recruitment, and talent development.  I am authorized to submit this supplemental declaration.  If called to testify, I would testify competently as to the matters set forth herein.

<u>The Proposed Modifications</u>

4.    Since the filing of the Motion on May 25, 2016, Republic and the Creditors' Committee engaged in productive discussions in an effort to resolve the concerns that were expressed by the Committee with respect to the key employee incentive program described in the Motion.  As a result of this cooperative effort, Republic has agreed to modify the proposed program (as modified, the "<u>KEIP</u>") to ensure the incentive targets keep management focused on the most critical metrics throughout restructuring and to even more closely align the program with Republic's historic practices with respect to long-term incentive compensation. Specifically:

- Payment of a portion ($500,000 if Threshold is attained, $1 million if Target is attained, $2 million if Maximum is attained) of the aggregate award opportunities that are earned based on performance attainment in 2016 will be deferred and paid as follows:  25% of the deferred earnings pool at the earlier of (i) emergence from chapter 11 and (ii) March 2017, and 75% of the deferred earnings pool at March 2018.

  The following charts show the aggregate award opportunities (which are unchanged from the Motion) and the earned portions of the award opportunities to be paid on a deferred basis:

| KEIP Opportunity | Q2 2016 | Q3 2016 | Q4 2016 | Total |
|---|---|---|---|---|
| Threshold | $390,670 | $390,670 | $390,670 | $1,172,009 |
| Target | $781,339 | $781,339 | $781,339 | $2,344,018 |
| Maximum | $1,562,679 | $1,562,679 | $1,562,679 | $4,688,036 |
| **Schedule of Deferred Earned Performance Incentive** | | | | |
| | Q2 2016 | Q3 2016 | Q4 2016 | Total |
| Threshold | $166,667 | $166,667 | $166,667 | $500,000 |
| Target | $333,333 | $333,333 | $333,333 | $1,000,000 |
| Maximum | $666,667 | $666,667 | $666,667 | $2,000,000 |
| - 25% of deferred earnings paid earlier of emergence or March 2017<br>- 75% of deferred earnings paid March 2018 | | | | |

In addition:

- No award opportunities will be paid under the KEIP if Republic's operating performance during the award period triggers any material breach of the operating performance standards set forth in any of its amended codeshare agreements; and

- No award opportunities with respect to the operating performance metrics will be paid under the KEIP unless Republic generates revenues related to operating performance under its code share agreements at least equal to the award opportunities to be paid.

<u>ELT Compensation and Responsibilities</u>

5.        Republic operates with a lean executive management team.  As a result of these chapter 11 cases, each member of the ELT has taken on numerous additional duties and responsibilities.  Since the beginning of 2015, however, the members of the ELT have only received their base salaries in compensation.  As described in the Georgeson Declaration, if the members of the ELT continue to receive just their base salaries for fiscal year 2016, their total compensation will be significantly less than the amounts paid to employees with comparable responsibilities in the airline industry.  (Georgeson Decl. ¶ 18.)  The KEIP is designed to ensure Republic's ELT members are focused on improving both financial and operating performance during pendency of the case and to provide the ELT members with opportunities to bring their 2016 fiscal year compensation closer to market.

3

6.       The base salary for each member of the ELT and his specific award opportunities

for each of the second, third, and fourth quarters of 2016 are as follows:

| Participant's Title | 2016 Base Salary | Threshold Payment | Target Payment | Maximum Payment |
|---|---|---|---|---|
| Chief Executive Officer | $475,000 | $137,305 | $274,609 | $549,218 |
| Chief Financial Officer | $260,000 | $58,500 | $117,000 | $234,000 |
| Chief Restructuring Officer | $250,000 | $53,125 | $106,250 | $212,500 |
| Chief Operating Officer | $240,000 | $51,000 | $102,000 | $204,000 |
| Chief Administrative Officer | $230,000 | $47,438 | $94,875 | $189,750 |
| Vice President, General Counsel | $225,000 | $43,242 | $86,484 | $172,968 |

7.       The ELT members are critical to Republic, as they are the key decision makers

with respect to the strategies that impact Republic's operating income, operational performance,

and its success.  During these chapter 11 cases, each member of the ELT has assumed significant

responsibilities additional to his normal day-to-day obligations.  These added responsibilities

include continuous engagement with vendors to alleviate concerns about the uncertainties of

chapter 11 and ensure Republic's operational integrity; the renegotiation of all codeshare

agreements with each of Republic's codeshare partners in an effort to achieve necessary revenue

enhancements, term extensions, and other operating efficiencies from these partners; the

evaluation and renegotiation of all enterprise-level contracts; attending to ad-hoc requests for

information by the Creditors' Committee, U.S. Trustee, and Republic's DIP lender, including the

intense research and analytics associated with such requests; maintaining compliance with

bankruptcy reporting requirements; completing an accelerated restructuring of Republic's

aircraft fleet, including refinancing of aircraft, renegotiating engine and parts agreements,

removing rejected aircraft from operation, including the permanent wind-down of all Q400 and

4

ERJ aircraft; accelerating work streams associated with achievement of a single operating

certificate to align with Republic's chapter 11 emergence strategy, a process that entails

transitioning all crews (from the rejected fleets and moving qualified EJET pilots and other

employees from the Shuttle Certificate to Republic), systems, aircraft (including significant

interior modifications to aircraft) and other resources to a single airline certificate, and the

harmonization of all operating and safety programs in partnership with the FAA; arranging for

increased maintenance events in order to prepare aircraft for rejection in a manner that reduces

operational disruption and mitigates claims against the Debtors; and participating in a continuous

business modeling and planning process associated with the anticipated plan of reorganization

(POR).

8.      By way of example, the following is a description of some, but not all of the

additional responsibilities each ELT member has assumed directly related to chapter 11.  The

Chief Executive Officer has the increased responsibility for general oversight of the other ELT

members and Republic's professional advisors responsible for the day-to-day administration of

Republic's chapter 11 cases, leading an increased number of meetings with the Board of

Directors and the Executive Committee specifically related to strategic direction and approval of

material settlement agreements in Republic's chapter 11 cases, participation during key

negotiating sessions with certain third parties, participation in the future roadshows in support of

the POR, and participation in the preparation of court documents related to the cases.

9.      The Chief Financial Officer has assumed new responsibilities for Republic's

supply chain, procurement, and materials management functions postpetition and is leading the

redesign of those functions to better serve the restructured airline.  He also leads all financial

planning processes associated with the case and fresh-start accounting, will participate in

roadshows in support of the POR, is leading the renegotiation of Republic's codeshare agreements and other material agreements related to his direct area of responsibility, and participates in the preparation of court documents related to the cases.

10.    The Chief Restructuring Officer has taken the lead role in overseeing the section 1110 and aircraft rejection processes, as well as the accelerated restructuring of Republic's entire fleet of aircraft and the renegotiation of liquidity facilities, engine services agreements, new aircraft purchase agreements, and other key third party agreements.

11.    The Chief Operating Officer has taken on the responsibility of renegotiating key operating agreements and securing the necessary resources to accelerate activities associated with the restructuring, including a rapid expansion of Republic's training capabilities in order to restore idle aircraft into service and improve operating performance; he oversees all technical activities associated with preparing aircraft for rejection or modification and leads the effort to achieve a single operating certificate in partnership with the FAA.

12.    The General Counsel has the expansive responsibility of overseeing all legal professionals and all documentation, contract modifications, and other legal matters relating to the chapter 11 cases in addition to his functions as the general counsel of a public company.

13.    As Chief Administrative Officer, I have assumed new responsibilities for Republic's customer service, corporate administration, contracts, facilities, network planning, and payroll functions postpetition and am leading the redesign of those functions to better serve the restructured airline.  I have direct oversight for the review and renegotiation of related facilities leases and other service agreements.  I am also leading the restructuring of Republic's overall human capital strategy throughout the case and in support of the POR and participate in the preparation of case-related documents for the Court.

The Metrics

14.    Republic has a history of setting legitimate stretch goals that require the Executive

Leadership Team to perform in varying operating environments and that add significant long-

term value to the business when achieved.  This is evidenced by the corresponding varying level

of goal attainment over the previous five years.  For example, in 2011, 2012, and 2015, Republic

did not meet the target levels of performance and no bonuses were paid to the ELT in any of

those years.  Additionally, although some threshold targets set by the Compensation Committee

were achieved in 2011 and 2015, the Executive Leadership Team voluntarily deferred any earned

payments in both 2011 and 2015.[3]  Similarly, for the proposed KEIP, the metrics approved by

the Compensation Committee set aggressive goals for Republic's Executive Leadership Team

that if achieved, will represent significant improvements from 2015 and increase the long-term

value of the estate.

15.    The KEIP metrics are similar to the metrics Republic has traditionally used for its

incentive compensation plans in that they are focused on financial and operating performance

targets that will be accretive to the company if achieved.  For instance, in 2014 and 2015,

Republic used pre-tax income, CASM ex-fuel,[4] and the average fourth-quarter price of shares of

RAH as financial metrics.  For operating metrics in 2014 and 2015, Republic used CCF, A14,

and on-time departure.  The one significant difference between the performance metrics that

Republic has historically used and the KEIP metrics is that Republic chose to use operating

---

3.    The deferred 2015 Annual Cash Incentives for the ELT, which were previously earned, had no bearing upon the design of the KEIP metrics or the calculation of the award opportunities available to each ELT member under the KEIP, which are forward-looking only and were designed not to compensate the members for the deferred payments, but rather to provide reasonable compensation for fiscal year 2016.  Even if the ELT had been paid the cash incentives earned in 2015, the KEIP structure would have been unchanged as it only contemplates 2016 compensation.

4.    CASM ex-fuel is the cost per available seat mile excluding fuel costs.

income, as opposed to pre-tax income, as the financial metric for the KEIP in order to focus the

Executive Leadership Team on efforts that truly optimize the value of the estate through superior

operating performance and achieving ongoing operating cost savings and revenue enhancements.

16.    Each of the financial and performance metrics will be challenging for Republic's

ELT to meet and are not "lay up" performance goals.  Republic's business has been extremely

volatile since the onset of the national pilot shortage, Republic's pilot labor dispute, and the

commencement of the chapter 11 cases.  In order to reach target goals under the KEIP, the ELT

must execute on its current business plan by keeping employees focused on its mission of

providing safe, clean, and reliable flying experiences for our codeshare partners, and ensuring its

pilot staffing is adequate to reverse the unsustainable performance levels experienced in 2015.

In addition, the ELT must improve operational performance on a daily basis, while moving in

parallel with Republic's overall strategy to operate under a single operating certificate by the end

of the year, which requires increased focus on optimizing crew efficiencies during the operating

certificate harmonization process and places an increased resource burden on systems, training,

and other administrative functions to seamlessly transition all employees to one operating

certificate.  The KEIP was specifically designed to provide incentives to the ELT that will

motivate them to work hard to meet these goals and overcome the challenges they will inevitably

face on a daily basis.

17.    The Executive Leadership Team's ability to achieve the metrics is directly related

to the ELT's ability to receive payments under the proposed KEIP.  The payments are directly

tied to Republic's operating income and operating performance.  In fact, the operational metrics,

CCF and A14, are of material importance to Republic's codeshare partners and can lead to

increased operating revenues for Republic if achieved and financial penalties or material breach of those agreements if missed.

18.    Achievement of the metrics has required, and will continue to require, extraordinary effort and diligence on the part of each member of the ELT in order to meet Republic's goals.  With respect to the Operating Income metric, despite Republic now having reached an agreement with two of its codeshare partners, when the pre-DIP business plan (which ultimately was used to establish the KEIP Operating Income metrics by the Compensation Committee) was finalized and approved in March 2016, Republic had yet to obtain an amended codeshare agreement with any codeshare partner and doing so was considered to be a difficult achievement for Republic, as it was unsuccessful in the months leading up to the chapter 11 cases, and further evidenced by the fact that the third codeshare agreement remains unresolved as of the date of this declaration.  As a direct consequence of the efforts of the ELT in these chapter 11 cases, however, Republic has obtained and implemented amended agreements with two codeshare partners, which provide significant revenue and operating enhancements for Republic, and in some cases extend the terms of the flying agreements.  Looking forward to the last two quarters of 2016, I believe that the KEIP Operating Income metric will continue to prove difficult to attain as amended agreements affecting a significant portion of Republic's operation have not yet been obtained.  Moreover, the forecast on which the metrics were based assumed additional aircraft that currently are not flying and are now not expected to fly.  Republic also continues negotiations with its third codeshare partner.  This delay and its final resolution are also expected to create additional challenges and adversely impact the ELT's ability to achieve its financial goals.

9

19.    With respect to the performance metrics, each year, CCF and A14 become more difficult to achieve because of a variety of factors, including regulatory changes that have limited both pilot availability and utilization, scheduling of increased flying by our codeshare partners in the northeast region (which is a significantly more difficult environment in which to operate), and additional routine maintenance requirements as appropriate for Republic's fleet age.  In addition, as Republic effects the rejection of aircraft from its fleet throughout the year, Republic will continue to have fewer spare aircraft, making it more difficult to achieve the operational results in the KEIP metrics.

20.    The below charts show the historic performance of Republic with regard to the financial and performance metrics, as compared to the current forecast:

**Historic Performance**

|  | Q1 2015 | Q2 2015 | Q3 2015 | Q4 2015 | Q1 2016 |
|---|---|---|---|---|---|
| **Operating Income ("OI")** | $41.2 M | $37.9 M | $38.1 M | ($32.4 M) | $8.3 M |
| **OI per Line of Flying** | $188,128 | $174,654 | $175,576 | ($162,814) | $46,839 |
| **CCF** | 98.7% | 98.0% | 98.4% | 98.5% | 99.5% |
| **A14** | 71.17% | 76.29% | 78.54% | 80.31% | 78.67% |

**KEIP Performance Metrics**

| Operating Income ("OI") | Q2 2016 | Q3 2016 | Q4 2016 |
|---|---|---|---|
| Pre-DIP Forecast | $35,330 | $39,638 | $39,587 |
| Stretch Forecast | $39,559 | $46,268 | $47,665 |
| OI Threshold (90% of Pre-DIP Forecast) | $31,797 | $35,675 | $35,628 |
| OI Target (100% of Pre-DIP Forecast) | $35,330 | $39,638 | $39,587 |
| OI Maximum | $39,559 | $46,268 | $47,665 |

10

| Operating Performance | Q2 2016 | Q3 2016 | Q4 2016 |
|---|---|---|---|
| CCF Plan (75%) | 99.25% | 99.30% | 99.30% |
| A14 Plan (25%) | 78.00% | 79.00% | 78.50% |
| | | | |
| CCF Threshold | 99.20% | 99.20% | 99.20% |
| CCF Target | 99.25% | 99.30% | 99.30% |
| CCF Maximum | 99.40% | 99.50% | 99.50% |
| | | | |
| A14 Threshold | 75.50% | 77.00% | 76.50% |
| A14 Target | 78.00% | 79.00% | 78.50% |
| A14 Maximum | 79.50% | 80.00% | 79.50% |

21.     During 2015, Republic's operation was comprised of approximately 213 scheduled aircraft ("lines-of-flying").  To reach the Operating Income metrics for the second, third and fourth quarters of 2016, the ELT will need to generate approximately the same or greater Operating Income as 2015 with significantly fewer lines-of-flying – approximately 165 aircraft (or put another way, with an operation that is 20% smaller).  To achieve these aggressive goals, the ELT will need to significantly improve efficiency by reducing costs overall, optimizing crew utilization, negotiating agreements that can return additional aircraft to operations, rejecting idle aircraft that are not part of Republic's long-term business plan, all while continuing to execute on Republic's overall strategy of operating under a single operating certificate by the end of the year.

22.     As illustrated in the below chart, with respect to the Operating Income metric, the threshold goals for the second, third and fourth quarters of 2016 represent approximately a 9 percent, 24, percent, and 233 percent improvement per line-of-flying, respectively, compared to the results for the same periods in 2015.   The lines-of-flying comparator helps articulate the stretch nature of these metrics, as the ELT is focused on negotiating agreements and making day-

to-day decisions that ensure the airline can generate more income with a significantly smaller operation.  For the Operating Income metric, a comparison to a prior year's Operating Income is not valid because that comparison assumes that Republic's 2016 business is the same as its 2015 business and does not take into consideration a change in the number of pilots and aircraft generating the revenues.   The target Operating Income goals represent a 21 percent, 38 percent, and 248 percent improvement per line of flying, respectively, compared to the results for the same periods in 2015.  The maximum Operating Income goals represent a 36 percent, 61 percent, and 279 percent improvement per line of flying, respectively, compared to the results for the same periods in 2015.

| Historic OI per Line of Flying | | | OI Metrics per Line of Flying with % Increase over Historic | | |
|---|---|---|---|---|---|
| | | | Threshold | Target | Maximum |
| Q2 2015 | $174,654 | Q2 2016 | $190,401 9% increase | $211,557 21% increase | $236,880 36% increase |
| Q3 2015 | $175,576 | Q3 2016 | $217,530 24% increase | $241,384 38% increase | $282,122 61% increase |
| Q4 2015 | ($162,814) | Q4 2015 | $217,244 233% increase | $241,384 248% increase | $290,640 279% increase |

23.    With respect to the CCF metric, to receive the threshold award opportunities for the second, third, and fourth quarters of 2016, Republic must have a CCF of at least 99.2 percent.  The highest CCF that Republic achieved for any quarter in 2015 was 98.7 percent.  Thus, the threshold, target, and maximum CCF goals exceed and represent a significant improvement over the corresponding actual results from 2015.  A 0.5 percent increase in CCF is a material improvement in Republic's operating performance.  CCF is analyzed within a narrow bandwidth where approximately a 1 percent change can mean the difference between Republic performing above, or breaching, the operating performance standards in its codeshare agreements.

12

24.     With respect to the A14 metric, for the second and third quarters of 2016, the targets that Republic must achieve for the members of the ELT to receive the target award opportunities exceed the corresponding actual 2015 results by 1.71 percent and 0.46 percent, respectively.  Similar to CCF, A14 performance is also measured within a narrow bandwidth and the second and third quarter targets in the KEIP represent significant improvements over the corresponding 2015 results.

25.     With respect to the fourth quarter of 2015, the A14 operating performance was an anomaly driven in part by favorable December weather and the availability of additional crews and aircraft because of reduced flight schedules.  The 2013 and 2014 fourth quarter A14 operating performances of approximately 75.80 percent and 77.45 percent are more indicative of Republic's historic fourth quarter operating results.  The target that Republic must achieve for the members of the ELT to receive the target award opportunity for the fourth quarter of 2016 exceeds the corresponding actual 2013 and 2014 results by 2.7 percent and 1.05 percent, respectively, which are material increases, difficult to achieve.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 18 day of July, 2016.

_____
Matthew J. Koscal

## **Exhibit B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

In re                                                    :    **Chapter 11 Case No.**

**REPUBLIC AIRWAYS HOLDINGS INC.**, *et al.*,           :    **16-10429 (SHL)**

                                          Debtors.[1]   :    **(Jointly Administered)**

-------------------------------------------------------------------x

**SUPPLEMENTAL DECLARATION OF ZACHARY P. GEORGESON IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

I, Zachary P. Georgeson, hereby declare pursuant to 28 U.S.C. § 1746:

1.      I am a Consulting Director at Willis Towers Watson PLC ("Willis Towers Watson"), which provides compensation consulting services to Republic Airways Holdings Inc. and certain of its wholly-owned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, "Republic" or the "Debtors").

2.      This supplemental declaration ("Supplemental Declaration") is submitted (i) in further support of the Debtors' motion, dated May 25, 2016 [ECF No. 590] (the "Motion")[2] pursuant to 11 U.S.C. §§ 363(b)(1) and 503(c) with respect to the entry of an order approving Republic's proposed key employee incentive plan and (ii) in response to the United States Trustee's objection to the Motion, filed with the Court on June 9, 2016 [ECF No. 645].

---

[1]   The Debtors in these chapter 11 cases are the following entities: Republic Airways Holdings Inc.; Republic Airways Services, Inc.; Republic Airline Inc.; Shuttle America Corporation; Midwest Air Group, Inc.; Midwest Airlines, Inc.; and Skyway Airlines, Inc.  The Debtors' employer tax identification numbers and addresses are set forth in their respective chapter 11 petitions.

[2]   Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

3.      This Supplemental Declaration incorporates my original declaration ("Original Declaration") in this matter, including my background and qualifications, Willis Towers Watson's role with the Debtors, information on Republic's pre-petition programs, and my analysis of the design, structure, cost, and award opportunities available under the KEIP (defined below).  For the reasons described in my Original Declaration and expanded on below, it is my opinion that the KEIP is reasonable and generally consistent with market practice for companies in the airline industry, general industry, and companies in chapter 11.  If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

<u>The Proposed Modifications</u>

4.      Since the filing of the Motion on May 25, 2016, Republic and the Creditors' Committee engaged in productive discussions in an effort to resolve the concerns that were expressed by the Committee with respect to the key employee incentive program described in the Motion.  As a result of this cooperative effort, Republic has agreed to modify the proposed program (as modified, the "<u>KEIP</u>") to ensure the incentive targets align with keeping management focused on the most critical metrics throughout restructuring and to even more closely align the program with Republic's historic practices with respect to incentive compensation.

**Additional Information: KEIP Participant Market Benchmarks**

5.      As described more fully in my Original Declaration, in assessing the reasonableness of the KEIP incentive opportunities, I worked with my team to analyze each participant's competitive "target total direct compensation," which is a compensation-industry term that means the sum of base salary, target annual incentives, and long-term incentive grant values.

2

6.      To conduct this analysis with respect to Republic's Chief Executive Officer, Chief Financial Officer, Chief Restructuring Officer, Chief Operating Officer and Chief Administrative Officer, my team and I analyzed publicly available market data from the proxy statements of Republic's Peer Companies (as these organizations operate in comparable businesses, have reasonably comparable financial and operating characteristics, and are Republic's competitors for executive talent, as described in my Original Declaration).  To conduct this analysis with respect to Republic's General Counsel, I analyzed published airline industry survey data that Republic utilized previously as there was an insufficient sample size of data work with from the proxy statements.

7.      To develop Peer Group benchmarks for Republic's Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer, I matched each of these roles to other executives with comparable titles among the Peer Companies, where possible.  Where it was not possible to develop Peer Group benchmarks based on title (specifically, for the Chief Restructuring Officer and Chief Administrative Officer), my team and I developed Peer Group benchmarks based on compensation pay rank.  The pay rank benchmarking approach is a common compensation industry benchmarking practice, and is consistent with both my chapter 11 and ordinary course benchmarking experience in cases where there is insufficient role specific data from proxies.

8.      The matches utilized for each executive are detailed below:

| Republic Role | Benchmark Role / Data Source |
|---|---|
| Chief Executive Officer and Highest Paid Executive | Chief Executive Officer / Airline Proxy Data |
| Chief Financial Officer and 2nd Highest Paid Executive | Chief Financial Officer / Airline Proxy Data |
| Chief Restructuring Officer and 3rd Highest Paid Executive | 3rd Highest Paid Executive / Airline Proxy Data |
| Chief Operating Officer and 4th Highest Paid Executive | Top Operations Executive / Airline Proxy Data |
| Chief Administrative Officer and 5th Highest Paid Executive | 5th Highest Paid Executive / Airline Proxy Data |
| VP General Counsel and 6th Highest Paid Executive | Top Legal Executive / Airline Survey Data |

**Additional Information: KEIP Participant Compensation Analysis**

9.      As described in my Original Declaration, absent Court approval of the KEIP, total direct compensation for the participants will comprise base salary only, and thus, Republic's total direct compensation will be 75 percent below the 25th percentile of the market, on average.

10.      In my Original Declaration, I provided summary information on the overall competitive positioning of the participants' compensation which showed that the allocations provided through the KEIP were reasonable relative to market practice.  In the chart below, I have provided additional detail showing each individual executive's total direct compensation competitive positioning (based on the market benchmarks described above).  This analysis shows that assuming a threshold, target or maximum payout under KEIP, each of the participants (as well as the group in aggregate) would receive KEIP allocations that are reasonably positioned (by individual and on average) relative to market practice (assuming the achievement of specific performance metrics). I also highlight that 5 of 6 executives would still be at or below the 50th percentile with assumed maximum allocations under the KEIP.

4

| Total Direct Compensation (TDC) for Key Employee Incentive Program Participants Compared to Market TDC (% Variance) | | | | | | |
|---|---|---|---|---|---|---|
| **Republic KEIP Participant** | **Threshold TDC in Relation to:** | | **Target TDC in Relation to:** | | **Maximum TDC in Relation to:** | |
| | **25th Percentile of Market TDC** | **50th Percentile of Market TDC** | **25th Percentile of Market TDC** | **50th Percentile of Market TDC** | **25th Percentile of Market TDC** | **50th Percentile of Market TDC** |
| Chief Executive Officer | -47% | -62% | -19% | -42% | 37% | -2% |
| Chief Financial Officer | -48% | -56% | -23% | -36% | 26% | 6% |
| Chief Restructuring Officer | -55% | -60% | -35% | -42% | 6% | -5% |
| Chief Operating Officer | -64% | -69% | -47% | -55% | -13% | -27% |
| Chief Administrative Officer | -51% | -57% | -30% | -38% | 14% | 0% |
| VP General Counsel | -38% | -62% | -11% | -46% | 42% | -13% |
| **Overall Positioning** | **-51%** | **-62%** | **-28%** | **-43%** | **19%** | **-7%** |

11.     Based on the results of these benchmarking analyses, and my experience with incentive compensation plans adopted by other companies, both inside and outside the chapter 11 context, I believe the allocation of KEIP award opportunities is consistent with, and reasonable, in light of competitive market practice.  Critically, the absence of an incentive opportunity for the participants would, in my opinion, significantly undermine the current competitiveness of Republic's compensation structure (as it would be comprised of only base salary, which is significantly below market).

## Conclusion

12.     Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, cost, and award opportunities available under the KEIP are reasonable given the facts and circumstances of these chapter 11 cases.

*[Remainder of page intentionally left blank.]*

5

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this ⅃ 8 day of July, 2016.

Zachary R. Georgeson

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN AND TRUST, *et al.* | ) ) ) ) |
| Appellants, | ) ) |
| v. | ) Civil Action No. 3:16-CV-75–HEH ) |
| ALPHA NATURAL RESOURCES, INC., *et al.* | ) ) ) |
| Appellees. | ) |

## <u>MEMORANDUM OPINION</u>
### (Affirming the Decision of the United States Bankruptcy Court)

THIS MATTER is before the Court on appeal from the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court"). It evolves from a dispute over a proposed revised Key Employee Incentive Plan ("KEIP"). On December 3, 2015, the Debtors moved for entry of an order (1) authorizing payments to executive insiders under the Debtors' 2015 Annual Incentive Bonus Plan and (2) approving the Debtors' Key Employee Incentive Plan. (App. 1.) Only the second request was contested. On January 27, 2016, Judge Huennekens of the Bankruptcy Court entered an Order granting the Debtors' motion to approve the KEIP in its entirety. (App. 76.) Judge Huennekens followed that Order with a Memorandum Opinion on February 24, 2016, setting forth his reasoning. (App. 464.) For the reasons that follow, this Court will affirm the decision of the Bankruptcy Court in its entirety, articulated in its Order of January 27, 2016 and Memorandum Opinion of February 24, 2016.

## I.   BACKGROUND

The Appellants ("Appellants" or "Objectors" or "Creditors") in this case are

creditors that also represent many of the Appellees' employees. (App. 466; Appellants'

Br. 3.) The Appellees ("Appellees" or "Debtors") are debtors who own and operate coal

mines. (App. 466.)

The central dispute before this Court focuses on a ruling by the Bankruptcy Court

pertaining to the approval of the KEIP. The Bankruptcy Court concluded that the

Debtors' proposed KEIP was primarily an incentive program, not a retentive program,

and met the required conditions under 11 U.S.C. § 503(c)(3), thereby granting Debtors'

motion. This appeal followed.

In essence, the Appellants claim that the Bankruptcy Court erred in analyzing the

KEIP under § 503(c)(3), arguing that it should have been analyzed under § 503(c)(1),

because it is not truly an incentive plan, but primarily an effort to retain certain

employees. (Appellants' Br. 20.) Secondly, Appellants argue that even if the KEIP was

an incentive plan, the Bankruptcy Court erred in concluding that it met the requirements

of §§ 503(b)(1)(A) and 503(c)(3), because the payments to Debtors' managers and

officers did not constitute the actual and necessary costs of preserving the estate and were

not justified by the facts and circumstances of the case. (*Id.* at 21.)

Both Appellants and Appellees have filed memoranda supporting their respective

positions. The facts and legal contentions are adequately presented in the materials

before this Court. Since the findings of the Bankruptcy Court stand on sound footing,

oral argument would not aid in the decisional process.

The central question in this appeal is whether the Bankruptcy Court erred in holding that the Debtors met their burden under 11 U.S.C. §§ 503(b) and 503(c), showing adequate grounds to approve the KEIP. Informing the analysis of that central question are several underlying inquiries, examining the Bankruptcy Court's judgment as to whether the KEIP is designed primarily for retentive effect or incentive effect, whether the KEIP is an actual and necessary cost of preserving Debtors' estates, and whether the KEIP was justified by the facts and circumstances.

## II.    LEGAL STANDARDS AND FRAMEWORK

The standard of review applied by this Court is well-settled. The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *In re Harford Sands, Inc.*, 372 F.3d 637, 639 (4th Cir. 2004).

Section 503 of the Bankruptcy Code authorizes a bankruptcy court to allow certain administrative expenses, which are defined as the "actual, necessary costs and expenses of preserving the estate" of the debtor. 11 U.S.C. § 503(b)(1)(A). This Section imposes restrictions on the compensation that a debtor can pay its executives and other employees in bankruptcy, which include a general prohibition on retention payments unless certain strict conditions are met. 11 U.S.C. § 503(c)(1). Section 503(c)(1) limits any "transfer made to, or [any] obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1).

However, this does not mean that because a KEIP contains some retentive effect, it is then primarily a retentive plan. *See In re Borders Grp., Inc.*, 453 B.R. 459, 471

(Bankr. S.D.N.Y. 2011) (internal citations omitted). A legitimate incentive plan may still have some retentive effect. Incentive payments under a KEIP are governed by the more general provisions of 11 U.S.C. § 363(b)(1) and § 503(c)(3). Section 363(b)(1) allows a debtor in possession to transact business outside the ordinary course with court approval. 11 U.S.C. § 363(b)(1). Section 503(c)(3) prohibits transfers to officers "that are outside the ordinary course of business and not justified by the facts and circumstances of the case." A debtor can make payments to officers and insiders that are not retentive in nature *if* they are justified by the facts and circumstances of the case.

While the Court of Appeals for the Fourth Circuit has not elaborated on the "facts and circumstances" standard under § 503(c)(3), other courts outside the Fourth Circuit have noted that this standard equates to the business judgment test under § 363(b)(1). *See, e.g. In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013). Other courts, however, have held that § 503(c)(3) imposes a higher, stricter test. The elevated test requires a court to undertake its own independent analysis, apart from a debtor's sound business reason, to determine if the particular proposal will serve the best interests of the creditors and the debtors' estate. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009).

## III.  FACTUAL FINDINGS AND LEGAL CONCLUSIONS OF THE BANKRUPTCY JUDGE

The following narrative represents the underlying facts, as found and described in Judge Huenneken's Memorandum Opinion. Alpha Natural Resources and 149 of its direct and indirect subsidiaries initiated bankruptcy proceedings under Chapter 11 of the

4

Bankruptcy Code in August of 2015. (App. 464; Mem. Op., Judge Huennekens, Feb. 24, 2016 at 1.) The Debtors moved for entry of an order (1) authorizing payments to executive insiders under the Debtors' 2015 Annual Incentive Bonus Plan and (2) approving the Debtors' Key Employee Incentive Plan. (Mem Op. at 1.) While the first part of this motion was uncontested, the second part was contested. (*Id.* at 2.)

The KEIP sought to incentivize the Debtor's senior management team to meet and exceed certain performance goals. (*Id.* at 7.) Eight Executive Insiders and seven Non-Executive Insiders constitute the fifteen KEIP participants. (*Id.* at 5.) The KEIP was designed and approved by the Debtors' Compensation Committee, who retained Meridian Compensation Partners ("Meridian") to provide independent advice. (*Id.* at 5–6.) In developing the KEIP, Meridian looked for companies with a similar profile to that of the Debtors. (*Id.* at 6.) Meridian focused on other KEIPs that had been approved by bankruptcy courts, then identified and suggested four key metrics/categories of performance goals: (1) cost savings; (2) EBITDA/liquidity; (3) safety; and (4) environmental compliance. (*Id.*) McKinsey Services ("McKinsey") then operationalized the savings and EBITDA/liquidity benchmarks to determine key targets the company would need to achieve in order to earn an incentive award. (*Id.* at 6–7.) Each metric was assigned a particular weight under the KEIP: 30%, 55%, 7.5%, and 7.5%, respectively. (*Id.* at 7.) The KEIP is designed to encourage participants to devise an effective exit strategy to successfully emerge from the Chapter 11 proceeding. (*Id.* at 8.)

The primary claim of those objecting to the KEIP was that the KEIP is actually a retention plan, disguised as an incentive plan. (*Id.* at 9.) They asserted that the KEIP's

performance goals were too low and easily achieved, thereby encouraging retention, not incentivizing performance. (*Id.*) Further, the Objectors contended that even if the KEIP was not primarily retentive, it was still not justified by the facts and circumstances of this Chapter 11 proceeding under § 503(c)(3). (*Id.*) Lastly, they insisted that the Debtors did not use their business judgment under § 363(b)(1) in formulating the KEIP. (*Id.*) The objections are primarily related to the cost saving and liquidity performance metrics, along with the overall size of the KEIP payout. (*Id.*)

Judge Huennekens found that the proposed KEIP is not a retention plan, but an incentive plan, designed to incentivize KEIP participants to maintain liquidity and maximize the value of the Debtor's business. (*Id.* at 14–15.) He found that the KEIP contains challenging goals, which will be difficult to achieve in the current economic environment. (*Id.*) The Bankruptcy Judge relied on the testimony of Kevin Carmody ("Mr. Carmody"), the Debtor's restructuring advisor and a well-recognized restructuring expert. Mr. Carmody emphasized the difficulty of reaching the KEIP's goals, especially in light of the pressures on the coal industry. (*Id.*) Judge Huennekens noted that with this KEIP, the Debtors have a realistic chance of successfully emerging from bankruptcy, but prospects will be bleak if the goals set forth in the KEIP are not met. (*Id.* at 15.)

In his Memorandum Opinion, Judge Huennekens fully acknowledged the objections from other parties. (*Id.*) He also distinguished this KEIP from others that were found to be primarily retentive in nature, noting that this KEIP more closely resembles those that have been approved by other courts. (*Id.* at 16–17.) In the end, he found that the KEIP is not a retentive plan in disguise because the goals pose a significant

6

challenge and the sale of substantially all of the Debtors' assets is not certain to occur by particular deadlines. (*Id.* at 17.)

If a KEIP is truly meant to incentivize results, the court can approve it under § 503(c)(3) as long as it is justified by the facts and circumstances. (*Id.*) Judge Huennekens found that whether the simple business judgment test or the higher scrutiny of *Pilgrim's Pride* is applied, the KEIP is justified. (*Id.* at 18.) He noted that each of the fifteen KEIP participants is instrumental to the restructuring efforts and achieving the set goals. (*Id.*) The KEIP was approved by the independent Compensation Committee, with input and development by Meridian and McKinsey. (*Id.* at 18–19.) No member of the independent Compensation Committee is a KEIP participant. (*Id.*)

In sum, Judge Huennekens found that "(i) the scope of the KEIP is reasonable, (ii) suitable due diligence was undertaken for adoption of the KEIP by the independent compensation committee, (iii) the targeted management team of the KEIP is appropriate, (iv) the cost of the KEIP is reasonable in the context of the Debtors' assets, liabilities, and earnings potential, (v) the plan is properly designed to achieve the performance desired, and (vi) the KEIP is consistent with industry standards." (*Id.* at 21.) KEIP participants are incentivized "to preserve the value of Debtors' estates and thereby maximize the return to creditors[,]" and are "not merely being rewarded for closing a sale." (*Id.*) The Judge pointed out that if the KEIP goals are met, the financial benefits will far exceed the costs of the program. (*Id.* at 22.) Determining from its own independent analysis that the KEIP will serve the best interests of the creditors and the bankruptcy estates, the Bankruptcy Court found that the KEIP satisfied the business judgment rule, and the

7

heightened-scrutiny standard set forth in *Pilgrim's Pride*, and is justified by the relevant
facts and circumstances. (*Id.*)

## IV.  SUMMARY OF ARGUMENTS

### a. Argument of Appellants

In short, Appellants wage a two-tiered argument in opposition. First, they claim
that the Bankruptcy Court wrongly decided that the KEIP was an incentive plan, rather
than a retention plan, and erred by evaluating the KEIP under 11 U.S.C. § 503(c)(3),
instead of § 503(c)(1). (Appellants' Br. 20.) Second, they claim that even if the KEIP
was an incentive plan, the Bankruptcy Court failed to apply the "entire fairness" standard,
which they assert is more appropriate. (*Id.* at 21.) Along with that assertion, they claim
that even under a lower standard, the Bankruptcy Court erred in finding that the KEIP
was justified by the facts and circumstances, the costs were actual and necessary, and the
KEIP was properly considered under the business judgment rule. (*Id.*)

To bolster the first line of argument, Appellants question the Bankruptcy Court's
findings with respect to the development of the plan, asserting that McKinsey actually
crafted the plan under the influence of management. (*Id.* at 27–28.) They also claim that
the metrics were designed to be easily achieved. (*Id.* at 29–30.) They further argue that
under the plan, performance can be manipulated to achieve the desired metrics, and
therefore the metrics do not truly incentivize, but simply encourage retention. (*Id.* at
31–33.) Finally, the Appellants insist that the factual findings were flawed as related to
the EBITDA/liquidity distinction and the KEIP's similarity to other comparable KEIPs.
(*Id.* at 34–37.)

8

In support of their second line of argument, Appellants insist that the KEIP "should have been reviewed under the 'entire fairness' standard, or at least subjected to some form of scrutiny more stringent than the business judgment standard, such as that articulated in *Pilgrim's Pride*." (*Id.* at 38.) Distilled, Appellants argue that because management allegedly rejected Meridian's draft plan and worked to revise the KEIP with McKinsey, a conflicted decision was made. (*Id.* at 40.)

Additionally, Appellants argue that the facts and circumstances of this case do not justify the KEIP, because it lacks a coherent business rationale and will actually impede performance, not reward it. (*Id.* at 42.) They also dispute the necessity of the cash savings benefits. (*Id.* at 44–45.) Finally, Appellants state that the market of comparable KEIPs is actually illusory, and Debtors' attempt to justify the KEIP by comparing it to other plans is vacuous. (*Id.* at 45–47.)

### b. Argument of Appellees

Appellees appear to dispute Appellants' argument in its entirety. Appellees believe the KEIP is an incentive plan, offering as evidence the KEIP's metrics, the performance goals, and the potential effect of success. (Appellees' Br. 31.) Appellees cite the testimony of Robert Romanchek ("Mr. Romanchek") and Mr. Carmody to demonstrate that the KEIP's targets would be difficult to achieve and are directly related to the prospects of a successful outcome in the bankruptcy proceedings. (*Id.* at 31–32.)

Appellees recount the developmental process of the KEIP, stating that the independent Compensation Committee was the ultimate decision maker. (*Id.* at 34.) They claim that Appellants rely only on innuendo, not facts, in their insistence that

management orchestrated the process and pushed for metrics that were primarily

retentive. (*Id.* at 35.)  In short, Appellees contend that Meridian first gathered pertinent

data and metrics, then McKinsey took that information and crafted the KEIP using

generally accepted methodology, and it was ultimately approved by the independent

Compensation Committee. (*Id.* at 12–14.)

Appellees maintain that Judge Huennekens directly addressed the issue of cash

balance, costs savings, and EBITDA metrics, and that Appellants are unable to identify

any flaw in the Court's logic. (*Id.* at 36–40.)  Appellees argue that it is neither true nor

relevant that Judge Huennekens conflated the EBITDA metric and liquidity. (*Id.* at 41.)

As to the point of whether the KEIP was consistent with other previously approved

KEIPs, they say Appellants' argument lacks merit because: (1) the only dispute is

whether other KEIPs employed a cash balance metric; and (2) it was never demonstrated

how using such a metric would be inappropriate. (*Id.* at 41–42.)

Appellees contend that the KEIP should be analyzed using the business judgment

rule and that it easily passes muster under that standard. (*Id.* at 44–45.)  They claim that

the entire fairness standard does not apply, and indeed, that Appellants have not cited a

single case where it has been applied to a proposed KEIP under 11 U.S.C. § 503(c). (*Id.*

at 49.)  They note that the entire fairness standard typically applies only when a plan is

shown to be a product of a corporate conflict of interest. (*Id.*)  Appellees emphasize that

the Bankruptcy Court rejected this argument and concluded that there was no "conflicted

corporate decision" made in this case. (*Id.* at 50.)  Furthermore, they contend that even if

the *Pilgrim's Pride* standard applied, it is irrelevant, since Judge Huennekens explicitly

decided that the *Pilgrim's Pride* standard was satisfied in this instance. (*Id.* at 51–52.)

The Debtors refute the assertion that the KEIP was not justified under the facts and

circumstances, claiming that the Bankruptcy Court performed the necessary analysis and

concluded that it was justified. (*Id.* at 53–54.) Next, Appellees state that the Bankruptcy

Court's consideration of market factors and peer companies was entirely appropriate. (*Id.*

at 55.) Lastly, Appellees dispute the contention that the Bankruptcy Court was wrong to

find that the KEIP was an actual and necessary expense of preserving the Debtors'

estates, noting the following: (1) all fifteen KEIP participants are necessary for

reorganization; and (2) the Debtors were not required to disprove every possible

contingency in order to demonstrate necessity. (*Id.* at 56–58.)

## V.   ANALYSIS

### a. Factual Findings

Looking first to Appellant's contention that Judge Huennekens erred in his factual

findings, the Court reviews the Bankruptcy Court's factual determinations for clear error.

*In re Harford Sands, Inc.* at 639. Hearing the evidence first hand, Judge Huennekens was

in the best position to critically examine the weight to be assigned to the facts of this

matter. The factual findings centered on the true primary purpose of the KEIP, the

development of the KEIP, and whether or not the KEIP was justified by the facts and

circumstances when considering cost, industry standards, and a variety of other factors.

While there is room for debate, this Court cannot find on the record at hand that any of

the Bankruptcy Judge's factual conclusions were clearly erroneous.

### 1. Primary Purpose of the KEIP

Whether the KEIP is an incentive plan or a retentive plan primarily depends on the difficulty of the goals and whether they relate to a successful outcome in bankruptcy. The Judge had no serious reason to doubt the testimony of Mr. Carmody and Mr. Romanchek, who both emphasized the difficulty of reaching the KEIP's goals. Mr. Carmody even described achieving the goals as a "stretch" and explained that the Debtors are constantly "playing catch-up" in a falling market. (*See* App. 419–20, 431.) The objectives set forth in the KEIP are challenging, yet achievable, and incentives are linked to the goals being reached. (*See* App. 54, 60, 74, 423–441, 477–78, 483–84, 796–98.)

The KEIP has three levels for each metric: threshold, target, and maximum. (*See* App. 60.) The amount of the payout is proportionate to achievement of assigned goods, showing that it's meant to incentivize performance. (*See* App. 60, 84–86.) Further, a quarter of any bonus will be withheld pending confirmation of a Chapter 11 plan by the end of 2016. (App. 471, Mem. Op. at 8.)

The KEIP's targets are far-reaching. The cost-saving goals represent "specific performance improvement initiatives," and the liquidity targets, described as "aggressive but achievable," are based on cash flow forecasts. (*See* App. 74.) With regard to the safety and environmental metrics, the KEIP targets represent an improvement from the 2015 performance. (*See* App. 15–16, 58, 74–75.) The goals incentivize critical levels of cost savings, specified levels of adjusted ending book cash, along with high safety and environmental goals. (*See* App. 48, 60.) And again, the amounts of incentive payments are directly correlated with the levels of achievement. (*See* App. 48, 60.)

The fact that Appellants can identify some obvious steps that the Debtors could take to save costs is not enough to render the entire KEIP retentive. Judge Huennekens rightly noted that this KEIP differs from others that were rejected as retentive, because in those situations, the goals were almost certain to be met regardless of the KEIP participants' actions, a vast distinction from this case. (App. 479, Mem. Op. at 16.) Here, much needs to be accomplished by the Debtors in order to succeed: selling assets, confirming a Chapter 11 plan, saving costs, and improving safety and environmental performance, among other things. (*See* App. 56–61.)

Also, there are no grounds to support Appellant's contention that Judge Huennekens conflated the distinction between the liquidity and EBITDA metrics, especially given that he specifically distinguished them. (*See* App. 424–25, 471, 478, 479 n.18, 482 n.23.) All of the preceding facts point to the inference that the KEIP is primarily an incentive program. The Bankruptcy Court's conclusion concerning the KEIP's primary purpose is not in error. To the contrary, it is well-supported by the record.

### 2. Formation of the KEIP

Though Appellants seek to question the integrity of the KEIP's formation, the facts show that it was substantially developed by Meridian and McKinsey, and ultimately approved by the independent Compensation Committee. Meridian was retained to conduct research and analysis on the possible components and structure of the KEIP that may be appropriate, given the state of the Debtors and the coal industry. (*See* App. 40–41, 53.) To maintain independence from management, Meridian only provided

13

services to the Compensation Committee on executive and director compensation issues, nothing else. (*See* App. 40, 53.) Further, the Compensation Committee itself has found Meridian to be independent of management. (*See* App. 40, 53.)

Meridian analyzed KEIPs from twenty companies in detail. (*See* App. 61, 217–21.) Even after others worked to build and operationalize the KEIP, Meridian reviewed all aspects of the plan, determining them to be comparable with peer companies. (*See* App. 61–63.) Finally, the independent Compensation Committee, which included no KEIP participants, ultimately approved the KEIP, which is a testament to its independent nature. (*See* App. 47–49, 61–63, 657–58, 766–67.) The Judge's findings regarding the development of the KEIP were well-founded.

### 3. Justified by the Facts and Circumstances

The Judge's ultimate conclusion that the KEIP was justified by the facts and circumstances was also well-supported. At a time when they are highly needed, the KEIP promotes critical costs savings to maximize the value of the Debtors' estates. (*See* App. 14, 56–57.) The liquidity metric incentivizes particular cash levels, while the safety and environmental metrics encourage high standards. (*See* App. 14–16, 57–59.) No one has disputed the need to cut expenses, nor the need to stabilize cash flows. In fact, the Appellants offered *no* expert testimony of their own in support of their positions, they simply argued that Debtors failed to meet their burden.

Patrick Hassey, the chairman of the Compensation Committee, made clear that the employees included in the KEIP were all integral to the Debtors' operations and efforts to complete restructuring, particularly due to their experience with comprehensive

14

restructuring and creditors. (*See* App. 41, 48.) Further, given the regulatory burdens, industry uncertainty, and diminished equity that management is dealing with, these incentives are critical to improve the Debtors' station. (*See* App. 41–42.)

Another factor demonstrating that the KEIP is justifiable is its similarity to the KEIPs of peer companies. When Meridian analyzed twenty peer companies, they took note of the number of participants, number and duration of performance periods, types of metrics, target payout as a percentage of participants' base salaries, payout timing, and cost of the program as a percentage of prepetition assets. (*See* App. 48, 61–62.) This KEIP used metrics shared by many other peer companies; 55% of peer companies used EBITDA (or a variant), 10% used liquidity, 25% used a safety or environmental metrics, and 15% used a cost reduction metric. (App. 482, Mem. Op. at 19.) The total cost of the KEIP is also comparable to other peer companies.

Depending on what the KEIP participants achieve, they could earn 60% to 175% of their base salary. (App. 483, Mem. Op. at 20.) Meridian found that the payout level for other KEIPs at the target level was between 81% and 129% of the base salary, with the CEO excluded. (*Id.*) At the target level, the KEIP payout would be roughly $6.8 million, representing 0.073% of the book value of Debtors' assets, which is akin to other KEIPs. (*See* App. 13, 56, 470, 483.) Increased pay as an incentive makes sense in this context, when considering that historically, 46% of the KEIP participants' compensation has been equity awards, which are now basically worthless. (App. 483, Mem. Op. at 20; *see* App. 47.) While the KEIP's fairly short performance periods are less common among peer companies, they are appropriate here because the Debtors need to quickly

15

improve their declining financial situation. (*See* App. 62.) Mr. Hassey agreed that the

key terms and overall cost of the KEIP are consistent with industry standards. (*See* App.

48.) All in all, the cost of the KEIP is reasonable and justifiable, given the huge potential

benefit. (*See* App. 15–16, 58, 62–63, 74–75.)

### b. Legal Conclusions

Turning next to Appellant's argument that the Bankruptcy Court applied the

wrong legal standards, the Court reviews those determinations *de novo*. *In re Harford*

*Sands, Inc.* at 639. Judge Huennekens properly articulated the legal framework under

which he was analyzing this matter. He decided that the KEIP should be analyzed under

11 U.S.C. § 503(c)(3) and § 363(b)(1), not § 503(c)(1). This was proper, given his

justifiable factual finding that the KEIP was not primarily retentive.

The Judge then discussed different approaches courts have taken in evaluating

whether a plan is justified by the facts and circumstances. He noted that many courts

view this test as essentially the same as the business judgment test, citing a variety of

cases. He also acknowledged that other courts have adopted an elevated standard, which

includes a court undertaking its own independent analysis to determine whether a

particular proposal will serve the best interests of the creditors and debtor's estate. *See,*

*e.g. Pilgrim's Pride* at 229. The parties disagree about which is appropriate. Instead of

deciding between these approaches, Judge Huennekens evaluated this KEIP under both

standards, and found that it satisfied each. (App. 481, Mem. Op. at 18.) Given that the

Bankruptcy Court did undertake its own independent analysis, and did not err in finding

the KEIP in the best interests of the creditors and the Debtors' estate, it properly satisfied both standards.

Additionally, finding that there had been no "conflicted corporate decision" in this case, the Judge declined to apply the "entire fairness" standard. Given that Meridian was independent, the Compensation Committee was independent, and no member of that Committee was a KEIP participant with a direct financial interest, it is clear that there was no conflicted corporate decision. (*See* App. 39–41, 47–49, 53, 61–63, 115, 205–06.) Therefore, the Judge's decision to not apply the entire fairness standard was proper.

## VI.    CONCLUSION

While the Court is mindful that disagreement over characterizations will always exist, it is also mindful of the limited role it has in this appeal. As discussed above, there is an abundance of evidence justifying the decision of the Bankruptcy Court. This Court finds no clear error in any of the Bankruptcy Court's factual findings. Further, this Court finds all legal conclusions of the Bankruptcy Court to be based on sound reasoning.

For the reasons stated herein, this Court will affirm the judgment of the Bankruptcy Court in its entirety. An appropriate Order will accompany this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

/s/
Henry E. Hudson
United States District Judge

Date: July 7, 2016
Richmond, Virginia

17