**UNITED STATES BANKRUPTCY COURT**  <u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                    Chapter 11

REPUBLIC AIRWAYS HOLDINGS INC., *et al.*,                  Case No. 16-10429 (SHL)

                                    Debtors.               (Jointly Administered)

----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**ZIRINSKY LAW PARTNERS PLLC**
*Attorneys for the Debtors*
375 Park Avenue, Suite 2607
New York, New York 10152
By:    Bruce R. Zirinsky, Esq.
        Sharon J. Richardson, Esq.
        Gary D. Ticoll, Esq.

**HUGHES HUBBARD & REED LLP**
*Attorneys for the Debtors*
One Battery Park Plaza
New York, New York 10004
By:    Christopher K. Kiplok, Esq.
        Gabrielle Glemann, Esq.
        Erin E. Diers, Esq.

**MORRISON & FOERSTER LLP**
*Attorneys for the Official Committee of*
*Unsecured Creditors of Republic Airways Holdings Inc., et al.*
250 West 55th Street
New York, New York 10019
By:    Brett H. Miller, Esq.
        Todd M. Goren, Esq.
        Erica J. Richards, Esq.

**VEDDER PRICE P.C.**
*Attorneys for Wells Fargo Bank Northwest, N.A.,*
*as Owner Trustee, and ALF VI, Inc.*
1633 Broadway, 31st Floor
New York, New York 10019
By:    Michael J. Edelman, Esq.

-and-

222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
By:    Douglas J. Lipke, Esq.

**DAVIS POLK & WARDWELL LLP**
*Attorneys for Delta Airlines, Inc.*
450 Lexington Avenue
New York, New York 10017
By:    Darren S. Klein, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is an objection by Wells Fargo Bank Northwest, N.A. ("Wells Fargo"),

as owner trustee, and ALF VI, Inc. ("ALF VI"), as owner participant (together, "Residco") to the

Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 (the "Plan"). *See*

Objection to Confirmation of Debtors' Plan by Residco ("Residco Objection") [ECF No. 1534].[1]

Residco objects to the substantive consolidation provisions in the Debtors' Plan. As the owner

trustee and owner participant for seven aircraft leases with the Debtors, Residco holds both lease

claims against the operating Debtor, Shuttle America Corporation ("Shuttle"), and guarantee

claims for those lease obligations against the holding company Debtor, Republic Airways

Holdings Inc. ("RAH"). Residco contends that the proposed substantive consolidation

provisions in the Plan are improper because they eliminate the guarantee claims that Residco

asserts are more valuable, while preserving the lease claims that Residco believes are riskier and

thus less valuable. *See* Residco Objection at 1.

---

[1]     Residco filed several pleadings in furtherance of its objection including:  Motion of Residco for Leave to
File in Further Opposition to Debtors' Plan with Respect to New Matters and Theories Raised in Responses Filed by
Debtors and the Creditors' Committee [ECF No. 1568]; Residco (A) Response to Debtors' Proposed Form of
Confirmation Order and (B) Motion to Strike Portions of Declarations Submitted by Debtors in Support of
Confirmation ("Residco Motion to Strike") [ECF No. 1574]; Reply of Residco, in Further Opposition to Debtors'
Plan with Respect to New Matters and Theories Raised in Responses Filed by Debtors and the Creditors' Committee
("Residco Sur-Reply") [ECF No. 1588]; Response of Residco to Revised Alternate Treatment for Residco
Submitted by Debtors and Committee ("Residco Response to Revised Carve-Out") [ECF No. 1623].

The Court held hearings on Residco's Objection on March 8 and 16, 2017.  *See*

Transcript of Hearing Held on March 8, 2017 ("Hr'g Tr.") [ECF No. 1595]; Transcript of

Hearing Held on March 16, 2017 ("March 16th Hr'g Tr.") [ECF No. 1652].  At the hearings, the

Court heard testimony from two of the Debtors' officers:  Joseph P. Allman, the Chief Financial

Officer of the Debtors, and Bryan K. Bedford, the Chief Executive Officer of the Debtors.  In

addition, Residco presented its own witness, Glenn Davis, the president and CEO of ALF VI.

Based on the record and for the reasons set forth below, the Court overrules the Residco

Objection.[2]

## **BACKGROUND**

Between June 2001 and November 2003, Wells Fargo and Mitsui & Co. (U.S.A.)

("Mitsui") entered into a series of seven lease transactions with the Debtors, pursuant to which

Mitsui leased seven ERJ145 aircraft to the Debtors (the "Residco Leases").  *See* Residco

Objection at 4.[3]  In December 2013, the Residco Leases were amended and restated as to each of

the seven aircraft leases.  *See* Debtor's Response to Residco Objection ¶ 17 [ECF No. 1559].

The Residco Leases contained stipulated loss value ("SLV") liquidated damages provisions,

which remained unchanged under the 2013 amendments.  *See* Residco Objection at 5.  These

SLV liquidated damages provisions provided a formula to calculate damages if the lessee under

the Residco Leases (the "Subsidiary-Lessee Debtor") breached its obligations under the leases.

---

[2]      There were other objections to the Plan that were heard by the Court on the second day of the confirmation
hearing on March 16, 2017.  This decision does not cover those objections nor does it address the general
confirmation requirements that are unrelated to the Residco Objection.

[3]      The Residco Leases were originally between Wells Fargo and Mitsui on the one hand and Chautauqua
Airlines, Inc. ("Chautauqua") on the other.  On January 1, 2015, Chautauqua was consolidated into Shuttle, another
Debtor entity.  *See* Declaration of Bryan K. Bedford Pursuant to Local Bankruptcy Rule 1007-2 ("First Day Decl.")
¶ 29 [ECF No. 4].  Thus, Shuttle was the successor to Chautauqua on the Residco Leases and the lessee as of the
petition date.  *See* Residco Objection at 8.  On November 28, 2016, this Court granted the Debtors' request for
approval of the merger of Shuttle into Republic Airline, Inc. ("Republic Airline") and the surrender of the Shuttle air
carrier certificate.  *See* Order [ECF No. 1236].  Shuttle merged with Republic Airline on January 31, 2017.

*See* Residco Objection at 5; *see also* Debtors' Response to Residco Objection ¶ 17 (citing Leases

§ 17.02(c)). The SLV liquidated damages provisions set forth what happens in such an event:

> Lessor . . . may demand that Lessee pay . . . any unpaid Basic Rent for the Aircraft
> . . . plus, as liquidated damages for loss of bargain and not as a penalty (in lieu of
> Basic Rent payable for the period commencing after the date specified for payment
> . . .), whichever of the following amounts Lessor, in its sole discretion, shall specify
> . . .: (i) the amount, if any, by which (x) the Stipulated Loss Value computed as of
> the payment date . . . exceeds (y) the aggregate Fair Market Rental Value . . . of the
> Aircraft for the remainder of the Basic Term . . . after discounting such Fair Market
> Rental Value to present worth . . ., (ii) the amount, if any, by which (x) the
> Stipulated Loss Value computed as of the payment date . . . exceeds (y) the Fair
> Market Sales Value . . . of the Aircraft . . ., or (iii) the amount, if any, by which (x)
> the aggregate Basic Rent for the remainder of the Basic Term . . ., discounted . . .
> to present worth . . ., exceeds (y) the Fair Market Rental Value . . . of the Aircraft
> for the remainder of the Basic Term . . . after discounting such Fair Market Rental
> Value to present worth . . . .

*See* Debtors' Response to Residco Objection ¶ 17 (citing Leases § 17.02(c)). Under this

provision, Residco asserts that the Subsidiary-Lessee Debtor bore the risk that the residual value

of the aircraft might decline. *See* Residco Objection at 5. And the SLV liquidated damages

provisions turn out to be important. According to Residco, the expected residual value for each

of the aircraft was between $7 and $8 million in 2016 and 2017 as of the time the parties first

entered into the Residco Leases. *See id.* at 5–6; *see also* Exh. B attached to the Residco

Objection. But Residco now believes the fair market value for each aircraft now is not more than

$800,000. *See* Residco Objection at 6.

RAH (the "Parent-Guarantor Debtor") guaranteed each of the obligations owed by the

Subsidiary-Lessee Debtor. *See* Guarantee, dated as of October 29, 2012, attached as Exh. A to

Residco Objection; *see also* Debtors' Response to Residco Objection ¶ 17. The parent guarantee

is "an absolute, unconditional and continuing guarantee of payment . . . ." *See* Guarantee at 1;

*see also* Parent Guarantee at 2, attached as Exh. C to Residco Sur-Reply. It states that the

"Guarantor understands and agrees that its obligations hereunder shall be continuing, absolute

4

and unconditional without regard to, and Guarantor hereby waives any defense to, or right to

seek a discharge of, its obligations hereunder with respect to the validity, legality, regularity or

enforceability of any Operative Agreement, any of the Obligations or any collateral security

therefor . . . ." *See* Parent Guarantee at 2; *see also* Residco Objection at 5, 16–17.

In December 2014, ALF VI acquired the owner participation interests held by Mitsui for

each of the leases and became the owner participant under the transactions, with Wells Fargo

continuing to serve as the owner trustee. *See* Residco Objection at 6; *see also* Hr'g Tr. 118:1–12

(Davis). In April 2016, the Debtors and Residco entered into a Section 1110 stipulation, which

was subsequently approved by the Court. *See* So-Ordered Stipulation and Order [ECF No. 540].

Pursuant to the stipulation, between April 2016 and October 2016, the Debtors returned the

aircraft to Residco and rejected the leases. *See* Debtors' Response to Residco Objection ¶ 18.

Residco filed proofs of claims asserting rejection damages against Shuttle for $72,323,546.00

and claims against RAH under the guarantees for $75,847,798.00. *See id.* ¶ 19. On March 1,

2017, Residco filed amended proofs of claims reducing the claim amounts. *See* Residco Sur-

Reply at 4–5; *see also* Exh. E, attached to Residco Sur-Reply.

The treatment of such claims, of course, is subject to the provisions of the plan of

reorganization in this case. The Debtors filed their first proposed plan and related disclosure

statement in November 2016. [*See* ECF Nos. 1189, 1190]. Amended versions of the plan and

disclosure statement were filed on December 12, 2016, and December 19, 2016. [*See* ECF Nos.

1277, 1278, 1311, 1312]. The Court approved the second amended disclosure statement on

December 23, 2016. [*See* ECF No. 1358]. Section 2.2 of the Plan now before the Court

provides for substantive consolidation of all the "Consolidated Debtors"[4] assets and liabilities

and the related elimination of guarantee claims:

> Solely for the purposes specified in the Plan (including voting, Confirmation, and distributions) and subject to Section 2.2(b), (i) all assets and liabilities of the Consolidated Debtors shall be consolidated and treated as though they were merged, (ii) all guarantees of any Consolidated Debtor of the obligations of any other Consolidated Debtor shall be eliminated so that any Claim against any Consolidated Debtor, any guarantee thereof executed by any other Consolidated Debtor and any joint or several liability of any of the Consolidated Debtors shall be one obligation of the Consolidated Debtors and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Consolidated Debtors shall be deemed filed against the Consolidated Debtors collectively and shall be one Claim against and, if and to the extent allowed, shall become one obligation of the Consolidated Debtors.

Plan § 2.2(a). Plan consolidation is defined as "the deemed consolidation of the Estates of the

Consolidated Debtors, solely for the purposes associated with the confirmation of the Plan and

the occurrence of the Effective Date, including voting, Confirmation, and distribution." *See id.* §

1.1(105).[5] With the benefit of substantive consolidation, the Plan estimates that unsecured

creditors will receive approximately forty-five cents for every dollar of allowed claims. *See* Plan

at 1; *see id.* § 4.3(d)(ii).

In its objection, Residco contends that the Debtors do not satisfy the test for substantive

consolidation. More specifically, Residco claims that it relied upon the Debtors' corporate

separateness and that the financial affairs of the individual Debtors can be separated. *See*

Residco Objection at 24–30. Residco also argues that it would be prejudiced by substantive

consolidation because its claims against the Subsidiary-Lessee Debtor and the Parent-Guarantor

---

[4]     The Plan defines "Consolidated Debtors" as RAH, Republic Airline, Shuttle, and Republic Airways Services, Inc. ("RASI"). Three other Debtor entities, Skyway Airlines, Inc., Midwest Airlines, Inc., and Midwest Air Group, Inc., are defined as the "Liquidating Debtors." *See* Plan § 1.1(44), (84).

[5]     Section 2.2(b) of the Plan provides that plan consolidation shall not affect "defenses to any Cause of Action." *See* Plan § 2.2(b).

Debtor could potentially be allowed in different amounts. *See id.* at 10–11, 26–27.  On this

point, Residco asserts that its lease claims against the Subsidiary-Lessee Debtor based on the

SLV liquidated damages provisions may be subject to various defenses—thus making them less

valuable—but that its guarantee claims against the Parent-Guarantor Debtor are not subject to

such defenses.  *See id.* at 15–17 (arguing that the guarantee is absolute, unconditional and not

subject to defenses).  Therefore, Residco objects to the elimination of its potentially more

valuable guarantee claims as part of substantive consolidation.  *See id.* at 10–11, 17 (contending

that the difference in potential allowed claims is over $50 million).  Residco proposes that if its

lease and guarantee claims are ultimately allowed in different amounts, Residco's recovery

should be calculated using the average of its allowed lease claim and allowed guarantee claim for

each transaction (the "Average Claims Treatment"), or in the alternative, that its claims should

be allowed in the higher amount for each lease transaction (the "Higher Claims Treatment").  *See
id.* at 18.

The Debtors and the Official Committee of Unsecured Creditors (the "Committee")

disagree.  *See* Debtors' Response to Residco Objection at ¶¶ 7, 31–35, 38, 40–42, 49, 52, 59;

Reply of the Official Committee of Unsecured Creditors in Support of Confirmation of Debtors'

Plan ("Committee Reply") ¶¶ 3, 19–24, 28–32 [ECF No. 1558].  They contend that substantive

consolidation is appropriate given how the Debtors operate and the benefits to creditors in these

cases.  They dispute that Residco relied upon the separateness of the Debtors as corporate

entities.  As to the issue of prejudice, they do not believe that Residco's claims could be allowed

in different amounts against the Subsidiary-Lessee Debtor and the Parent-Guarantor Debtor.  In

any event, they propose to carve out Residco's claims from substantive consolidation to prevent

any prejudice from substantive consolidation.  While the Debtors and the Committee have

revised their initial proposed carve-out for Residco to address comments made by the Court (the

"Carve-Out"),[6] Residco continues to argue that the Carve-Out does not protect its rights.  *See*

Residco Response to Revised Carve-Out ¶¶ 1–3.

## DISCUSSION

### A. Substantive Consolidation Standard

A court's ability to substantively consolidate has been found to be within "the court's

general equitable powers as set forth in [Section] 105" of the Bankruptcy Code.  *Union Sav.*

*Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Baking Co., Ltd.*), 860 F.2d 515, 518

n.1 (2d Cir. 1988); *see also Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am.* (*In re Orfa Corp. of*

*Phila.*), 129 B.R. 404, 413–14 (Bankr. E.D. Pa. 1991). "Substantive consolidation has the effect

of consolidating assets and liabilities of multiple debtors and treating them as if the liabilities

were owed by, and the assets held by, a single legal entity.  In the course of satisfying the

liabilities of the consolidated debtors from the common pool of assets, intercompany claims are

eliminated and guaranties from co-debtors are disregarded." *In re Worldcom, Inc.*, 2003 WL

23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) (citations omitted); *see also Augie/Restivo*,

860 F.2d at 518 (describing effect of substantive consolidation).  As substantive consolidation

may place creditors of one debtor on parity with creditors of a less solvent debtor, "[t]he power

to consolidate should be used sparingly because of the possibility of unfair treatment of creditors

of a corporate debtor who have dealt solely with that debtor without knowledge of its

---

[6]      The Debtors have revised the proposed carve-out in an attempt to resolve the Residco Objection.  *See*
Residco Carve-Out, attached as Exh. 1 to Debtors' Response to Residco Objection; Notice of Revised Proposed
Residco Carve-Out [ECF No. 1622]; Revised Carve-Out Language, attached as Exh. 1 to the Debtors' Reply to
Residco Response to Revised Carve-Out [ECF No. 1646].  References in this decision to the "Carve-Out" are to the
most recently proposed carve-out, attached as Exhibit 1 to the Debtors' Reply to Residco Response to Revised
Carve-Out [ECF No. 1646].

interrelationship with others." *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966).

To determine whether to approve substantive consolidation bankruptcy courts traditionally have considered a variety of factors, including:

> [t]he presence or absence of consolidated financial statements; [t]he unity of interest and ownership among various corporate entities; [t]he degree of difficulty in segregating and ascertaining individual assets and liabilities; [t]he transfers of assets without formal observance of corporate formalities; [t]he commingling of assets and business functions; [t]he profitability of consolidation at a single physical location; and [t]he disregard of legal formalities.

*In re Worldcom*, 2003 WL 23861928, at *35 (citing *Augie/Restivo*, 860 F.2d at 518); *see also In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992) (listing factors courts consider in ascertaining whether the interrelationship between entities warrants consolidation).

In *In re Augie/Restivo Baking Co.*, the Second Circuit distilled these considerations into two critical inquiries: whether (i) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit"; or (ii) "the affairs of the debtors are so entangled consolidation will benefit all creditors." *Augie/Restivo*, 860 F.2d at 518 (internal quotations and citations omitted); *see also, e.g., In re Worldcom*, 2003 WL 23861928, at *35–36. This test is in the disjunctive and the satisfaction of either prong can justify substantive consolidation. *See Official Comm. of Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006). The first prong, whether creditors relied on a separate existence of the debtors, is "applied from the creditors' perspective." *In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996). "The inquiry is whether *creditors* treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers viewed the [debtors] as one enterprise." *Id.* Under the second prong, courts typically

analyze whether the debtors have demonstrated either an operational or a financial entanglement of business affairs. *See In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 780 (Bankr. S.D.N.Y. 1997) (finding "debtors' operations, cash, and decision-making were all shared such that it would be detrimental to the estates to attempt to disentangle those operations."); *see also Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc.* (*In re Source Enters., Inc.*), 392 B.R. 541, 552 (S.D.N.Y. 2008) ("[C]ourts will consider . . . whether the entities share costs or obligations; fail to observe corporate formalities; or, in the case of a subsidiary and parent, fail to act independently."). The burden of proving the appropriateness of substantive consolidation is on the debtor. *See In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011).

Another "key factor" courts have considered is whether substantive consolidation "will yield an equitable treatment of creditors without any undue prejudice to any particular group." *In re Food Fair, Inc.*, 10 B.R. 123, 127 (Bankr. S.D.N.Y. 1981). As an equitable remedy, courts may order substantive consolidation where the benefits to creditors outweigh the harm. *See In re Worldcom*, 2003 WL 23861928, at *35 (citing *Augie/Restivo*, 860 F.2d at 518–19). To that end, courts in the Second Circuit "use a balancing test to determine whether the relief achieves the best results for all creditors." *Id.* at *36 (citing *Fed. Deposit Ins. Corp. v. Colonial Realty Co.*, 966 F.2d 57, 60 (2d Cir. 1992)). Indeed, the substantive consolidation factors should be "evaluated within the larger context of balancing the prejudice resulting from the proposed consolidation against the effect of preserving separate debtor entities." *In re Drexel Burnham Lambert Grp. Inc.*, 138 B.R. at 764–65. As the court in *In re Drexel Burnham Lambert* observed, "substantive consolidation should be ordered where the inequalities of substantive consolidation are outweighed by the practical difficulties of tracing complex transactions between interrelated corporate entities." *Id.* at 765; *see also In re Food Fair*, 10 B.R. at 127

10

("The difficulty and expense of attempting, at this point in time, to reconstruct separate balance sheets for each of the Debtors so as to allocate expenses, assets and liabilities to each of the various entities far outweigh any possible benefit to creditors."). Courts have discretion in determining whether substantive consolidation is appropriate. *See In re Worldcom*, 2003 WL 23861928, at *36 (citing cases).

Courts have applied these principles in a practical manner. For example, the court in *In re Worldcom, Inc.*, concluded that the substantive consolidation provided in the proposed plan of reorganization was appropriate and satisfied both prongs of the *Augie/Restivo* test. *See id.* at *37. The court found that the debtors' operational and financial affairs were so entangled that even if it were possible to identify and allocate the assets and liabilities of the debtors, it "would take so long and be so costly such that creditors as a whole would be substantially harmed by the effort. Thus, disentangling the financial affairs of the [d]ebtors [was] a practical impossibility." *Id.* The court relied on numerous facts to support its conclusion, including:

> common management and control of the Debtors; the substantial operational integration and entanglement of the Debtors' business operations, . . . the existence of centralized administrative functions, such as cash management, purchasing, human resources, and finance, and presentation of products and services to the marketplace on an integrated basis; public financial reporting on a consolidated basis; financial entanglement resulting from internal financial management being conducted on a business line and functional basis, rather than legal entity basis; inability to account accurately and reliably for intercompany claims, resulting from, among other things, a lack of proper internal controls; the Debtors' present inability to create accurate and reliable historical financial statements on a separate legal entity basis . . . .

*Id.* In addition, the court found that the cost of disentangling the estates would not be "simply the out-of-pocket expenses to pay the accountants, lawyers, and other professionals . . . [but would include] enormous employee resources . . . detracting from business operations, as well and the incalculable diminution of enterprise value that likely would result from a protracted

11

chapter 11 case." *Id.*

Moreover, courts can and will fashion substantive consolidation to fit the circumstances of the case. "[I]t is well accepted that substantive consolidation is a flexible concept and that a principal question is whether creditors are adversely affected by consolidation and, if so, whether the adverse effects can be eliminated." *In re Jennifer Convertibles*, 447 B.R. at 723–24. As an equitable doctrine, courts can craft relief in forms appropriate to the unique facts of a particular case. *See Moran v. H.K. & Shanghai Banking Corp.* (*In re Deltacorp, Inc.*), 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995) ("The court is afforded a good deal of discretion in constructing its order of substantive consolidation, and its appropriateness is determined by the court on a *sui generis* basis."); *see also In re Standard Brands Paint Co.*, 154 B.R. 563, 570 (Bankr. C.D. Cal. 1993) (noting bankruptcy courts have "the power to modify substantive consolidation to meet the specific needs of the case.").

**B. The Debtors Satisfy the *Augie/Restivo* Test for Substantive Consolidation**

Applying all these principles here, the Court finds that the Debtors satisfy both prongs for substantive consolidation under *Augie/Restivo*. Given that these prongs are interrelated, the Court will discuss them together.

As a starting point, the Court finds the Consolidated Debtors operate as a single economic unit. They operate a single business under a single business plan. *See* Declaration of Bryan K. Bedford in Support of Confirmation of Debtors' Plan ("Bedford Decl.") ¶ 17 [ECF No. 1553]. None of the Consolidated Debtors has ever received a credit rating independently from another Consolidated Debtor, and analyst reports routinely discuss the Debtors as a unified enterprise. *See id.* The Consolidated Debtors share the same overhead, management, accounting, and other back-office functions; there are significant intercompany obligations; and

12

there are significant overlaps in the creditor pools due to guarantees. *See id.* ¶ 16. Moreover, the Consolidated Debtors issue consolidated financial statements, are jointly controlled from a shared business headquarters at a common business address, have no separate budgets, use the same cash management system, and file a consolidated tax return. *See id.* Only one of the Consolidated Debtors—Republic Airline—has any business operations. *See id.* By contrast, the parent Debtor RAH has almost no outside trade creditors or vendors but has issued multiple guarantees despite having no operations. *See id.* ¶¶ 15, 16.

The Court also concludes that the record supports that the benefits of substantive consolidation outweigh any harm suffered by creditors. Most importantly, the Debtors are concerned about the cost of conducting an intercompany reconciliation and audit. *See* Hr'g Tr. 203:2–9; *see also id.* 104:23–105:13 (Bedford) (testifying that determining which Debtor owns the cash in RAH's account would require a reconciliation). Significant additional time and expense would be necessary to untangle the assets of the Consolidated Debtors, which would result in a longer period of time spent in Chapter 11. *See* Declaration of Joseph P. Allman in Support of Confirmation of Debtors' Plan ("Allman Decl.") ¶ 4 [ECF No. 1554]; *see also* Hr'g Tr. 203:2–7. It is undisputed that each month in bankruptcy costs the Debtors $3 million to $4 million in administrative expenses. *See* Hr'g Tr. 203:6–7; *cf. In re Worldcom*, 2003 WL 23861928, at *36 (citing cases regarding untangling financial affairs of debtors).

There are also potential business risks arising out of a longer stay in Chapter 11, including potential adverse effects as to the Debtors' pilot situation. It is important to remember that the Debtors' Chapter 11 filings were caused in large part by a pilot shortage, which led to the Debtors being unable to honor their flying obligations to their codeshare partners. *See* First Day Decl. ¶¶ 4–8 (explaining that the pilot shortage made it difficult for the Debtors to maintain

performance requirements under their codeshare agreements).  This was critical because the

Debtors' business model is based on their relationship with their codeshare partners, which are

national airlines for whom the Debtors provide regional flying.  *See In re Republic Airways*

*Holdings Inc.*, 2016 WL 2616717, at *1 (Bankr. S.D.N.Y. May 4, 2016) (explaining the crucial

nature of Debtors' relationship with their codeshare partners, which accounts for substantially all

of the Debtors' operating revenue).  More specifically, the Debtors' success is based on their

codeshare agreements, through which the Debtors provide regional passenger service under the

designations of United Express, Delta Connection, and American Eagle.  *See* First Day Decl. ¶ 2.

While the Debtors have been successful in recruiting and retaining pilots in 2016, they have

recently fallen behind their goals for pilot recruitment and retention in 2017.  *See* Hr'g Tr.

27:19–28:2, 28:8–19 (Allman).  The Debtors are justifiably concerned that a delay in emergence

from Chapter 11 could further negatively impact the Debtors' ability to recruit and retain pilots,

particularly in an environment where competition for pilots is fierce.  *See* Allman Decl. ¶ 4; *see*

*also* Hr'g Tr. 202:2–7 (noting concern that the Debtors' competitors are "all over [the Debtors']

employees and pilots.").  The Debtors are also concerned that a longer stay in Chapter 11 will

impact their ability to close on important transactions, thereby negatively affecting their

liquidity.  *See* Hr'g Tr. 35:9–36:6 (Allman) (describing potential sale-leaseback transaction in

which counterparty will not close while the Debtors are in Chapter 11 and that if confirmation

does not occur before end of April the counterparty has no commitment to extend or close on the

transaction); *see also* Debtors' Response to Residco Objection ¶ 63 n.10 (describing the same

sale-leaseback transaction that would give Debtors approximately $21 million in additional

liquidity that can be terminated if the sale has not occurred by April 30, 2017).

14

These findings on substantive consolidation are supported by credible testimony from Mr. Allman and Mr. Bedford on behalf of the Debtors.[7]  Turning first to Mr. Bedford, he explained that the Consolidated Debtors operate as

> one economic entity.   We don't distinguish between holdings in terms of management, overheads, common functions.  We use the holding company as a consolidated treasury account. . . . We don't hold ourselves out as Shuttle America or Chautauqua or Republic, the airline, or Republic Holdings on our website.  We just hold ourselves out as Republic.

Hr'g Tr. 48:17–49:2 (Bedford).  Mr. Bedford further testified that for financial reporting purposes they only have one budget, they make one set of financial reports, and they file a consolidated tax return.  *See id.* 49:4–6 (Bedford).  The operating entities historically hire the pilots under a master contract in the collective bargaining agreement, but RAH is also a party to that agreement.  *See id.* 50:6–12 (Bedford).[8]  Mr. Bedford also testified that after the Debtors went public in 2004, most of the Debtors' operating entities' finance transactions are guaranteed at the parent level.  *See id.* 57:23–58:2 (Bedford).  Turning to whether substantive consolidation would benefit all creditors, Mr. Bedford testified that the potential recovery for creditors in a RAH-only bankruptcy estate would be extremely low, likely one to two cents on the dollar.  *See id.* 83:11–19 (Bedford); *see also* Bedford Decl. ¶¶ 18–19 (stating benefits of substantive consolidation include savings of cost and time, including reduction in administrative costs).[9]

---

[7]    Residco objected to certain statements in the declarations of Mr. Allman and Mr. Bedford.  *See* Residco Motion to Strike ¶ 6; *see also* Exh. B, attached to Residco Motion to Strike (setting forth specific objections to statements in the declarations).  The Court overruled those objections for the reasons stated on the record at the hearing on March 8, 2017.  *See* Hr'g Tr. 16:8–21.

[8]    In its cross-examination of Mr. Bedford, Residco relied heavily upon the 10-K and 10-Q statements of the Debtors.  *See, e.g.*, Hr'g Tr. 51:17–55:22 (Bedford).  But while Residco cites these filings to argue the separateness of the entities, *see* Hr'g Tr. 55:3–5, 55:12–14, the filings refer to the enterprise as a whole.  *See* Hr'g Tr. 55:6–11 (Bedford) (testifying the 10-Q for 2015 stated "Unless contacts indicates otherwise, the terms of the company, we, us, our, refer to Republic Airways Holdings and our Subsidiaries."); *see also* Hr'g Tr. 57:10–13.

[9]    As this testimony admittedly was a "back of the envelope" valuation, *see* H'rg Tr. 83:16–17 (Bedford), the Court does not accord this conclusion the same weight as would be given to a traditional valuation analysis like the liquidation analysis provided by the Debtors in support of the Plan.  As Mr. Bedford is the Debtors' CEO, however,

Mr. Allman's testimony also supports substantive consolidation.  Mr. Allman testified
that "if the Effective Date is further delayed, the pressure will continue on pilot hiring which
could result in substantial underperformance by Republic under the postpetition codeshare
agreements, which may have a material effect on estimated recoveries for creditors." Allman
Decl. ¶ 4.  Mr. Allman explained that this conclusion was based on information and updates he
receives from pilots and union executive leadership, all of which indicates the Chapter 11 case
"is an overhang [and] [c]ertainly, we are aware of pilots that turn offers down and choose to go
to other regional airlines that are not in Chapter 11."  Hr'g Tr. 26:8–25 (Allman).  Mr. Allman
also believes that extending the Chapter 11 process would harm "potential recoveries of
creditors, primarily because we have obligations to our three mainline partners . . . ."  *Id.* 27:2–5
(Allman).  If the Debtors fail to meet the flying requirements in the amended agreements with
their codeshare partners, a breach of those agreements would result in administrative claims for
damages that would consume much of the economic value that unsecured creditors anticipate
receiving under the Plan.  *See id.* 34:16–35:1 (Allman).  Indeed, such a situation would mirror
the unfortunate economic circumstances that lead the Debtors to file Chapter 11 in the first place.
*See Republic Airways Holdings*, 2016 WL 2616717, at *1–2 (explaining the Debtors' business
model and their inability to perform their obligations under the codeshare agreement with Delta
Air Lines, Inc., one of the Debtors' three codeshare partners).

The Court also finds it persuasive that the Committee—of which Residco is a member—
supports the Debtors' request for substantive consolidation.  The Committee agrees that the cost

---

the Court concludes that he would have sufficient knowledge to make such an estimate and, indeed, it is not
surprising that he would have a view on such an issue.  Accordingly, the Court permitted such testimony at the
hearing over the objection of Residco.  *See* Hr'g Tr. 84:1–10, 85:17–86:2.  In any event, the Court would reach the
same conclusion about substantive consolidation even without the benefit of Mr. Bedford's testimony on this issue.

of untangling the assets would outweigh any benefits that creditors could obtain. *See* Committee

Reply ¶ 29. The Committee also agrees that determining the actual value of the assets and

liabilities of individual Debtors like RAH would delay distributions and drain estate resources.

*See id.* Indeed, the unsecured creditors—the parties that the Committee represents—voted

overwhelming in both number (94.12%) and amount (93.8%) to support the Plan, which provides

a recovery of approximately forty-five cents on the dollar based on substantive consolidation.

*See* Tabulation Summary, attached as Exh. A to Certification of Prime Clerk LLC Regarding the

Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Plan [ECF No. 1552]; *see*

*also* Debtors' Response to Residco Objection ¶ 6 n.3 (setting forth percentages that voted in

favor of the Plan).

### C. **The Residco Objection**

Residco makes numerous arguments in opposition to substantive consolidation, none of

which the Court finds persuasive. Residco's first argument is a factual one. Based on the

testimony of Residco's witness, Mr. Davis, Residco contends that it relied on the corporate

separateness of the Debtor entities when entering into the Residco transactions. *See* Hr'g Tr.

108:24–109:1. Mr. Davis testified that, prior to entering into the transactions, ALF VI reviewed

public filings and had the understanding that RAH and Chautauqua were "very separate entities."

*See* Hr'g Tr. 119:1–7 (Davis); *see also id.* 119:13–14 (Davis) (testifying that the public filings

stated "that Republic is the holding company and they are the operating subsidiaries."). When

asked what he meant by "very separate entities," Mr. Davis explained that he "observed . . . that

. . . the company was described as a holding company with operating subsidiaries. The operating

subsidiaries . . . are operating separately, or at least it appeared to be because they each were

required to operate under FAA rules as separate entities." *Id.* 135:5–10 (Davis). Given this

understanding, Mr. Davis insisted that ALF VI would not have entered the transaction without the parent guarantee.  *See id.* 119:7–10 (Davis).

But the Court does not find Mr. Davis's conclusion about corporate separateness to be credible.  As a threshold matter, Mr. Davis' testimony must be discounted given his limited involvement in the underlying transaction with the Debtors.  He has been the president and CEO of ALF VI only since October 2014, just two months before the transaction between ALF VI and the Debtors closed in December 2014.  *See id.* 117:10–14, 118:6–12, 132:4–6 (Davis).  So while Mr. Davis oversaw the investment in the Debtors, it was initiated before he joined ALF VI.  *See id.* 133:18–22 (Davis).  Moreover, Mr. Davis had absolutely no direct communication with Republic during the process.  *See id.* 135:13–18, 136:4–7, 142:22–143:1 (Davis).  Indeed, the only communications for this transaction were the negotiations between Mr. Davis' subordinates and Mitsui; not Republic.  *See id.* 135:13–20, 143:2–16 (Davis) (testifying there was no dialogue between ALF VI and Republic regarding the transaction, specifically as to the guarantee).  Mr. Davis did not provide any detail about those negotiations that would support his conclusion about corporate separateness.

While having no communications with the Debtors, Mr. Davis did oversee work prepared by subordinates who reviewed due diligence documents, and Mr. Davis believes that he reviewed the operative documents such as the lease and the guarantee.  *See id.* 134:5–15 (Davis).  But the materials that Mr. Davis reviewed do not support his conclusion about corporate separateness.  Mr. Davis conceded that ALF VI only reviewed the consolidated financials of the Debtors, not financials on a Debtor by Debtor basis.  *See id.* 160:2–14 (Davis); *see also id.* 138:1–8 (Davis) (stating that he had not done a separate analysis or review of RAH's financials but noting that "other entities that were part of the Republic family of holdings, and those entities

18

had value, and those entities generated cash, and . . . the potential to access that through the

guarantee was a general -- a significant enhancement"); *id.* 136:8–12 (Davis) (testifying that

there were not separate financial statements for the subsidiaries).  Given that ALF VI only

reviewed the Debtors' consolidated financial statements, it is unclear how Mr. Davis could have

relied on the corporate separateness of individual Debtors when entering into the Residco

transaction.  On re-direct, Mr. Davis attempted to explain away this problem.  He testified that

with respect to the parent guarantee, he looked at "equity value of the net worth of" the other

operating entities on a consolidated basis, a value which he says was captured at the parent entity

Debtor RAH.  *See id.* 159:1–9 (Davis); *see also id.* 160:13–16 (Davis) ("[W]e made our

decisions based on consolidated statements which are worth more than . . . Chautauqua at that

point in time.").  But such a statement merely shows that Mr. Davis relied upon the enterprise

value of the Debtors—considering all the assets and liabilities of the Debtor entities as a group—

rather than the corporate separateness of each of the entities.

      Residco's second argument fairs no better.  Pointing to the schedules filed by the Debtors

in this case, Residco contends that the Consolidated Debtors did not operate as a "single

economic unit."  *See* Residco Objection at 25; Residco Sur-Reply at 4.  More specifically,

Residco points to the Debtors' ability to separate the assets and liabilities of each individual

Debtor in the schedules of assets and liabilities filed in these cases.  *See* Residco Objection at 25;

Residco Sur-Reply at 4.  But Residco's argument ignores the limitations to the Debtors'

schedules that are set forth in the Debtors' "Summary of Significant Reporting Policies," which

states:

> The Debtors use a consolidated cash management system through which the
> Debtors collect substantially all receipts and pay liabilities and expenses. As a
> result, *certain payments in the Schedules and Statements may have been made*

> *prepetition by one entity on behalf of another entity through the operation of the consolidated cash management system.*

Schedules of Assets and Liabilities for Republic Airways Holdings Inc. (Case No. 16-10429 (SHL)) ¶ 6 [ECF No. 595] (emphasis added).  It is not surprising, then, that the Debtors' schedules specifically note that, "[n]othing contained in the Schedules and Statements shall constitute a waiver of any of the Debtors' rights with respect to these chapter 11 cases and specifically with respect to any issues involving substantive consolidation . . . ." *Id.* at 1.[10]

These caveats to the Debtors' schedules are consistent with Mr. Bedford's testimony that the Debtors have a "consolidated treasury function for all the operating and parent entities," meaning the parent company operates a "sweep" account, into which the operating entities sweep money.  *See* Hr'g Tr. 60:9–13 (Bedford).  He testified that the sources of RAH's funds would be borrowings and any cash flow generated by the operating businesses.  *See id.* 79:2–5 (Bedford).  This testimony further supports the position of the Debtors and the Committee that the schedules do not accurately reflect the value of RAH because the cash shown for RAH is just a cash concentration.  *See id.* 79:10–21 (Bedford); *see also* Debtors' Response to Residco Objection ¶ 54 (stating schedules reflect cash concentration, including drawdowns by other Debtors on their secured facilities); *cf.* Committee Reply ¶¶ 31–32 (identifying problems with the Debtors' schedules, including that they (i) use net book values, rather than actual fair market values, (ii) exclude the value of avoidance actions or similar claims, (iii) do not account for the value of unliquidated claim amounts).  Given the weight of the evidence, therefore, the Court concludes that the filing of the schedules in these cases does not preclude substantive consolidation.  *See In*

---

[10]    Residco also complains that the Debtors' only justification for substantive consolidation in the disclosure statement was because the codeshare partners "could shuffle claims between Shuttle and Republic Airline." *See* Residco Sur-Reply at 3; Residco Objection at 25, 27–28.  But as Residco did not object to the disclosure statement—which was approved in December 2016—the Court rejects Residco's belated criticism of the disclosure statement now.  *See* Order Approving Disclosure Statement [ECF No. 1358].

*re Murray Indus., Inc.*, 119 B.R. 820, 822, 830, 832 (Bankr. M.D. Fla. 1990) (granting substantive consolidation where debtors filed their own schedule of assets and liabilities and statement of financial affairs, noting "ultimate question is whether or not it is fair to authorize substantive consolidation after having balanced the equities in light of the record"); *cf. In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 218–19 (Bankr. S.D.N.Y. 2007) (court not reaching a decision on substantive consolidation but noting that it "would be a highly unlikely result" given restated financial statements and the filing of amended schedules, "evidencing an ability to generally determine the assets and liabilities of each [d]ebtor" and the debtors' separate corporate identities and given that the records appeared to correctly reflect how money was spent and for which entity's benefit).

Residco's third argument is prejudice. Residco argues that it may be harmed by substantive consolidation if it retains only its lease claims, which Residco contends are potentially worth $50 million less than Residco's guarantee claims. *See* Residco Objection at 26–27. The potential difference in value arises, Residco argues, based on the possibility that certain affirmative defenses will apply to Residco's lease claims but not its guarantee claims. More specifically, the enforceability of Residco's lease claims depends on whether the SLV liquidated damages provisions in the leases are considered an unenforceable penalty. *See id.* at 14–16; *see also E. Air Lines, Inc. v. Brown & Williamson Tobacco Corp.* (*In re Ionosphere Clubs, Inc.*), 262 B.R. 604, 614 (Bankr. S.D.N.Y. 2001) ("Courts will not enforce a liquidated damages provision if it operates as a penalty or forfeiture clause."). But Residco argues that its guarantee claims are not subject to such a defense given the language in the guarantees waiving all defenses. *See* Residco Objection at 16–17.

21

The Debtors and the Committee disagree, arguing that the hypothetical difference in value between the lease and guarantee claims is an "impossibility." *See* Debtors' Response to Residco Objection ¶ 42; *see also* Committee Reply ¶ 3. As to the guarantee claims, the Debtors contend that as a matter of public policy, a party cannot waive defenses to the enforceability of a penalty provision and that bankruptcy courts will not enforce punitive liquidated damages provisions. *See* Debtors' Response to Residco Objection ¶¶ 40–42. If the SLV liquidated damages provisions are unenforceable under the leases, therefore, the Debtors and the Committee contend the SLV liquidated damages provisions are likewise unenforceable under the guarantees. *See id.* ¶¶ 40–42; *see also* Committee Reply ¶ 3. In that event, there can be no difference between Residco's lease and guarantee claims, and thus Residco is not prejudiced by substantive consolidation. *See* Residco Objection at 12 (explaining that the basis for Residco's Objection is that its lease and guarantee claims may be allowed in different amounts); *see also* Debtors' Response to Residco Objection ¶ 42 n.7 (suggesting that even if Residco is successful in arguing the SLV liquidated damages provisions are enforceable, its lease and guarantee claims would be equal and Residco would not be prejudiced).

As a threshold matter, even if Residco is prejudiced, substantive consolidation may still be granted where, as here, the benefits to all creditors greatly outweigh the possible harm to Residco. *See In re Worldcom*, 2003 WL 23861928, at *37 (finding the benefits of substantive consolidation "far outweigh any possible harm to creditors"); *In re Gucci*, 174 B.R. 401, 414 (Bankr. S.D.N.Y. 1994) (granting substantive consolidation over one creditor's objection where that creditor had not made a clear showing of prejudice and noting that "even if it were found that some creditors may be prejudiced, that, in and of itself, would not necessarily defeat the motion because '[a]ny potential prejudice to creditors . . . is greatly outweighed by the much

22

greater for prejudice, harm and waste if substantive consolidation is not ordered.'") (citing *In re Tureaud*, 45 B.R. 658, 663 (Bankr. N.D. Okla. 1985)); *see cf. In re Drexel Burnham Lambert Grp.*, 138 B.R. at 765 n.9 (stating that if an objecting creditor has shown that (a) it has relied on the separateness of the entities and (b) it will be prejudiced, substantive consolidation may be ordered "only if [the court] determines that the demonstrated benefits of consolidation heavily outweigh the harm.") (citing *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991)).

Moving on to assess the likelihood of prejudice to Residco, the Court must examine whether the SLV liquidated damages provisions would be considered an unenforceable penalty as to either Residco's lease or guarantee claims. This is a matter of state law. *See United Merchs. & Mfrs., Inc. v. Equitable Life Assurance Soc'y of the U.S.* (*In re United Merchs. & Mfrs., Inc.*), 674 F.2d 134, 141 (2d Cir. 1982). In New York, an enforceable liquidated damages clause "must specify a liquidated amount which is reasonable in light of the anticipated probable harm, and actual damages must be difficult to ascertain as of the time the parties entered into the contract." *In re Ionosphere Clubs*, 262 B.R. at 614. The party seeking to avoid the liquidated damages bears the burden of demonstrating that such damages are a penalty. *See JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005). As some courts have stated, "[g]uaranties that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and unconditional,' have been consistently upheld by New York courts." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 493 (2015). But other courts have found that as a matter of public policy, a party cannot waive an objection to a liquidated damages clause. *See Bell v. Ebadat*, 2009 WL 1803835, at *3 (S.D.N.Y. June 16, 2009) (citing *Wells Fargo Bank Nw., N.A. v.*

23

*Energy Ammonia Transp. Corp.*, 2002 WL 31368264, at *2 (S.D.N.Y. Oct. 21, 2002)).

Furthermore, "[i]t is well-established that a bankruptcy court, being essentially a court of equity

will not enforce a liquidated damages clause that is in reality a penalty." *Hassett v. Revlon, Inc.*

(*In re O.P.M. Leasing Servs., Inc.*), 23 B.R. 104, 110–11 (Bankr. S.D.N.Y. 1982).[11]

    The Court lacks the facts necessary to apply these principles to determine the value of

Residco's claims. Residco's claims are not before the Court for adjudication on the merits, or

even for an estimation proceeding. *See* 11 U.S.C. § 502(c) (permitting estimation of a contingent

or unliquidated claim where failure to do so "would unduly delay the administration of the

case."); *see also* Hr'g Tr. 177:19–25. The parties have not presented the factual record necessary

to determine whether the amounts under the SLV liquidated damages provisions were reasonable

in light of the anticipated probable harm or whether damages were difficult to ascertain at the

time the parties entered into the contracts. *See* Debtors' Response to Residco Objection ¶¶ 40–

42; *see* Residco Sur-Reply at 17–18 (contending that the Residco Leases are governed by N.Y.

U.C.C. § 2A-504 and that, therefore, the sole test for determining enforceability of a liquidated

damages provision is whether the formula was "reasonable in light of the then anticipated harm

caused by the default or other act or omission.").[12] Moreover, the parties only presented limited

---

[11]    Residco relies heavily on a summary order in *136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10 (2d Cir. 2016), where the Second Circuit enforced an unconditional guarantee irrespective of whether the obligations in the underlying lease were enforceable. *See id.* at 12–13 (concluding that given the "plain terms, in broad, sweeping and unequivocal language" in the guarantee, the guarantor was bound to the obligations in the lease, regardless of whether the lease or its provisions were enforceable as to the parties to the lease). But as that summary order makes clear that it is not precedential, it cannot be considered dispositive on this issue.

[12]    Indeed, the parties have not even addressed the most basic question of whether we examine these issues at the time Mitsui first entered into the contracts, when the leases were restated in 2013, or when Residco purchased its interests from Mitsui in 2014. The only information provided to the Court are appraisal sheets for Embraer ERJ-145s issued in 2001 to 2003. *See* Exh. B, attached to Residco Objection; *see also* Exh. F, attached to Residco Sur-Reply. The charts state that they provide future base values for years ranging from 2002 through 2023. *See* Exh. B, attached to Residco Objection; Exh. F, attached to Residco Sur-Reply. But there is no foundation for these charts,

24

legal argument on the enforceability of these SLV liquidated damages provisions. Instead, the focus of the present dispute is on the permissibility of substantive consolidation. Under these circumstances, it is inappropriate now to seek to resolve all the issues associated with the merits and value of Residco's claims.

But more importantly, resolution of these issues today is unnecessary. As an alternative to resolving these legal issues, the Debtors and the Committee have proposed the Carve-Out to address any potential prejudice to Residco. The Carve-Out provides that Residco may opt to have its claims treated as if substantive consolidation had not occurred. More specifically, the Carve-Out provides that if Residco's guarantee claims are allowed in an amount greater than its lease claims—the whole basis for Residco's claim of prejudice—Residco's claims could be carved out from the effect of substantive consolidation and treated as if substantive consolidation had not taken place. *See* Debtors' Response to Residco Objection ¶¶ 8–9. Under the Carve-Out, therefore, Resdico could receive exactly the treatment that it is entitled to as a matter of law without substantive consolidation. Thus, Residco could receive two classes of claims—its guarantee claims against Debtor RAH and its lease claims against Debtor Republic Airline— with recovery for each class of claims to be calculated as if the assets and liabilities of Republic Airline and RAH were valued separately as reorganized entities. *See* Carve-Out, attached as Exh. 1 to Debtors' Reply to Residco Response to Revised Carve-Out. Under the Carve-Out, moreover, Residco would be allowed to opt for such non-consolidated treatment after the value of its claims had been determined—that is, Residco could wait until after it knew whether there

---

which were prepared by a third-party, Avitas. As Residco did not acquire its interest from Mitsui until 2014, it is unclear how the charts prepared in years 2001, 2002, 2003, fit into the analysis.

was a difference in the amount of its lease and guarantee claims. *See id.*; *see also* March 16th

Hr'g Tr. 39:4–20. The proposed Carve-Out states in full:

> Notwithstanding anything in the Plan to the contrary, in the event that the claims of Wells Fargo Bank Northwest, N.A., as Owner Trustee, and ALF VI, Inc., as Owner Participant (together, "Residco") against RAH (the "Guarantee Claims") in connection with the rejection of the *Amended and Restated Aircraft Lease Agreement* for each of seven EMB-145LR aircraft bearing U.S. registration marks N288SK, N561RP, N259JQ, N286SK, N287SK, N563RP and N562RP are Allowed in a higher amount than the corresponding claims of Residco against Shuttle (the "Lease Claims," and together with the Guarantee Claims, the "Residco Claims"), Residco may by written notice to the Debtors or Reorganized Debtors (as the case may be) and the Creditors' Committee elect within 14 days of any such determination to treat such claims as not subject to the Plan Consolidation for purposes of determining the amount of any distributions on account of the Residco Claims under the Plan (the "Non-Consolidation Treatment"). Instead, in the event Residco elects the Non-Consolidation Treatment, Residco would be entitled to receive distributions for (i) the allowed amount of the Guarantee Claims, based on an estimated percentage that non-priority general unsecured creditors of RAH would have received in a standalone plan of reorganization for RAH *plus* (ii) the allowed amount of the Lease Claims based on an estimated percentage distributions that nonpriority general unsecured creditors of Shuttle would have received in a standalone plan of reorganization for Republic Airline, in each case following the merger of Shuttle into Republic Airline pursuant to the *Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 for Approval of (I) Merger of Shuttle America Corporation into Republic Airline Inc., and (II) Surrender of the Shuttle America Corporation Air Carrier Certificate* [ECF No. 1236] (the "Merger"). For the avoidance of doubt, the Non-Consolidation Treatment is intended to provide Residco with the amounts they would have recovered if the Plan Consolidation had not taken place. In the event Residco elects the Non-Consolidation Treatment, all rights of the Debtors, Residco and any other party in interest are reserved to ensure that the Non-Consolidation Treatment effectuates such intent; *provided* that the Debtors agree to bear the burden of proof to establish the estimated percentage distributions that would have been received by general unsecured creditors under standalone plans for RAH and Republic Airline (following the Merger). In the event Residco does not timely elect the Non-Consolidation Treatment, the Residco Claims shall be subject to the Plan Consolidation, including (a) the elimination of the Guarantee Claims pursuant to Section 2.2(a) of the Plan and (b) the treatment of the Lease Claims as Class 3(a) Claims.

Carve-Out.

26

Notwithstanding these robust protections, Residco objects to the Carve-Out.  Among other things, Residco contends that it is being singled out for different treatment from other similarly situated creditors.  *See* Residco Sur-Reply at 6 (arguing the Carve-Out will cause Residco to be treated worse than other similarly situated creditors); Hr'g Tr. 186:1–18 (arguing Residco will be treated worse because all other creditors without a guarantee will receive forty-five cents on the dollar); *id.* 188:9–10 (arguing that it would be unfair discrimination under Section 1129 if Residco's claims are in a class by themselves).  But Residco is incorrect.  In fact, Residco's situation is far from unique.  More than 90% of the claims against the Debtors who are airline subsidiaries are guaranteed by RAH.  *See* Hr'g Tr. 76:15–77:7, 98:12–17 (Bedford).  All of the airline subsidiaries' operating leases—not just Residco's—have similar stipulated loss value provisions.  *See id.* 75:2–8 (Bedford).  The Plan's consolidation provisions apply to all these creditors, each of whom are giving up their guarantee claims under the Plan.  *See* Plan § 2.2; Hr'g Tr. 43:17–23 (Bedford); *see, e.g., In re Standard Brands Paint*, 154 B.R. at 566 (noting it is typical in substantive consolidation to eliminate claims, including guarantees, between debtors for plan purposes).[13]

---

[13]    Residco is unique in one thing: it is the only claimant who has objected to substantive consolidation.  It appears that Residco is also the only aircraft lessor who has not reached a settlement with the Debtors on its claims, including guarantee claims.  *See* Hr'g Tr. 222:9–11.  But that fact is irrelevant to any claim of unfair discrimination.  "[T]he fact that some claimants have settled while others have not does not, by itself, indicate unequal treatment.  The key inquiry under [Section] 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."  *Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp.* (*In re Dana Corp.*), 412 B.R. 53, 62 (S.D.N.Y. 2008).  "[C]reditors frequently enter into settlements with co-obligors, and, in the end, may receive more than similarly situated creditors under a plan.  Absent bad faith, vote manipulation, or similar wrongful conduct, these settlements do not violate the confirmation requirements."  *In re Quigley Co., Inc.*, 437 B.R. 102, 147 n.59 (Bankr. S.D.N.Y. 2010); *see cf. Del. Trust Co. v. Energy Future Intermediate Holdings, LLC* (*In re Energy Future Holding Corp.*), 527 B.R. 157, 168 (D. Del. 2015) ("Parties settle claims for various reasons, such as to avoid litigation risk and expense, and the fact that similar claimants decide to settle claims for different amounts does not indicate unequal treatment."); *In re Dow Corning Corp.*, 244 B.R. 634, 669 (Bankr. E.D. Mich. 1999) (concluding plan satisfied "same treatment" requirement where certain classes had the option of pursuing litigation or settlement, noting "any claimant who selects settlement will have done so in a manner that complies with the second clause of § 1123(a)(4)," which permits a holder of a claim to agree to "less favorable treatment").

27

Residco nonetheless maintains that it would not receive the same recovery as other unsecured creditors in Class 3(a) if the Parent-Guarantor Debtor, RAH, winds up having assets that lead Residco's claim to be valued at less than forty-five cents on the dollar. *See* Residco Sur-Reply at 5; *see also* Residco Response to Revised Carve-Out ¶ 2; *cf.* Hr'g Tr. 168:8–12 (complaining of cost and discrimination in that every other creditor in Class 3A would receive forty-five cents on the dollar). But there are several problems with Residco's position. In making this argument, Residco mistakenly assumes that it might be forced to receive less than forty-five cents on the dollar, which is the amount that unsecured creditors are to receive under the substantive consolidation provisions of Plan. To the extent that Residco thinks that the forty-five cent recovery offered as part of substantive consolidation is a good deal, however, it is free to take it. *See* Carve-Out (permitting Residco to elect that its claims be treated on a consolidated or unconsolidated basis after the amount of Residco's claims are determined in the claims adjudication process). Indeed, the only reason Residco has not opted for such a recovery is because it chooses not to do so. Stated more directly, Residco wants the ability to opt out of substantive consolidation but only if it can be guaranteed of a recovery that will be greater than what it would receive under substantive consolidation and not if it will receive less. In that sense, Residco very much wants to "have [its] cake and eat it too."[14] *See* March 16th Hr'g Tr.

---

[14]     The Carve-Out comes as close as possible to giving Residco the best of both worlds: the right to consider its recovery on a consolidated and unconsolidated basis. Specifically, the Carve-Out provides that in the event Residco's guarantee claims are allowed in a higher amount than its lease claims Residco has the right to elect which treatment it prefers. *See* Carve-Out. The provision allowing for Residco to elect its treatment after a claim adjudication was not offered in the Debtors' initial carve-out. It was subsequently added by the Debtors in an attempt to ensure that Residco be given broad protection from any unfair discrimination. The Debtors and the Committee suggested this additional language at the continued confirmation hearing held on March 16, 2017. *See* March 16th Hr'g Tr. 33:16–23, 39:4–20. Additionally, the Debtors and the Committee continued to improve the Carve-Out after the hearing, including addressing objections raised in Residco's second sur-reply, which was filed without Court permission after the confirmation hearing was closed. *See* Residco Response to Revised Carve-Out ¶ 3 (complaining for first time that the Carve-Out improperly deprives Residco of its appellate rights); Debtors' Reply to Residco Response to Revised Carve-Out ¶ 6 (Debtors' complaining that Residco improperly filed pleading with a new argument but nonetheless further revising the Carve-Out to reflect that Residco's appeal rights are not affected).

43:11–12; *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Machine Corp.*), 517 F.2d 997,

1001 (2d Cir. 1975) (concluding that under plan in which unsecured claims were consolidated

and secured claims were not, secured creditor "will obtain under the . . . plan exactly what it

bargained" with each debtor entity); *see also* Ben Zimmer, '*Have Your Cake and Eat It Too*',

N.Y. Times, Feb. 18, 2011, http://www.nytimes.com/2011/02/20/magazine/20FOB-onlanguage-

t.html (tracing the derivation of the phrase and observing that "[t]he point of the aphorism is that

sometimes you have to make a choice between two options that cannot be reconciled.").[15]

    In rejecting Residco's position on the Carve-Out, the Court follows the lead of courts that

have recognized that substantive consolidation can be tailored to fit the circumstances of the case

and ensure that a claimant receives the recovery to which it is entitled.  *See In re Cont'l Vending

Machine Corp.*, 517 F.2d at 1001; *In re Jennifer Convertibles*, 447 B.R. at 723–24 ("[I]t is well

accepted that substantive consolidation is a flexible concept and that a principal question is

whether creditors are adversely affected by consolidation and, if so, whether the adverse effects

can be eliminated."); *In re Deltacorp*, 179 B.R. at 777 ("The court is afforded a good deal of

discretion in constructing its order of substantive consolidation, and its appropriateness is

determined by the court on a *sui generis* basis.").  For example, the Second Circuit in *In re

Cont'l Vending Machine Corp.*, 517 F.2d 997 (2d Cir. 1975), concluded that in the exercise of its

equitable powers, a bankruptcy court can permit substantive consolidation as to some claims and

not as to others.  *See* 517 F.2d at 1001–02 (upholding plan that treated unsecured claims as

consolidated and secured claims as unconsolidated).  Similarly, the court in *In re Jennifer*

---

[15]    The Debtors contend that it is impossible for Residco to receive worse treatment under the Carve-Out
because the enterprise value of the Debtors is $450 million, a valuation which will not increase if the entities are
separately valued; thus, Residco will get the same distribution because of the nature of the two claims.  *See* Hr'g Tr.
204:5–19. The Debtors argue that under the Carve-Out, therefore, Residco could get a greater recovery but it could
never get less.  *See id.* 205:1–2; *see also id.* 217:24–218:11 (Committee agreeing with the Debtors' conclusion).
Residco's rebuttal to this point was unpersuasive.  *See id.* 220:5–15, 221:2–17.

*Convertibles* fashioned a remedy specifically as to affected creditors when it found that the record was deficient regarding the appropriateness of substantive consolidation as to a small number of creditors. *See In re Jennifer Convertibles*, 447 B.R. at 723, 726 (court offered option to pay creditors in full or to supplement the record on substantive consolidation with separate liquidation analysis for the one debtor entity for which separate schedules and a separate statement of financial affairs were prepared); *see also In re Parkway Calabasas Ltd.*, 89 B.R. 832, 837–38 (Bankr. C.D. Cal. 1988) (citing cases in which courts ordered less than complete substantive consolidation or placed conditions thereon).[16]

Rather than agree to the option of being carved out of substantive consolidation, Residco proposes two ways to treat its claims: a so-called Average Claims Treatment and a Higher Claims Treatment. *See* Residco Objection at 18; Residco Sur-Reply at 1. If Residco's lease and guarantee claims are allowed in different amounts, Residco's Average Claims Treatment provides that it receive the average of its allowed lease claims and allowed guarantee claims for each transaction. *See* Residco Objection at 18; *see also* Residco's Proposed Confirmation Order ¶ 7, attached as Exh. A to Residco Motion to Strike. Under its proposed Higher Claims Treatment, Residco would receive the higher of the lease or guarantee claim for each transaction. *See* Residco Objection at 18 n.8.

But Residco provides no mathematical or legal basis for its proposed Average Claims Treatment. In fact it concedes that the Bankruptcy Code does not provide for such treatment. *See* Hr'g Tr. 170:15–17 (Residco conceding that the Bankruptcy Code does not provide for the averaging method it suggests). Residco instead states that other creditors that hold both primary

---

[16]    The Court finds that there is no need to establish a separate reserve provision for Residco's claims as the Plan currently protects parties whose claims have not yet been allowed. *See, e.g.*, Hr'g Tr. 213:13–214:16 (explaining the Plan already provides for a reserve and interim true-ups so that there will be enough stock held back under the Plan to distribute once disputed claims become allowed claims).

and guaranty claims "(other than holders who consensually agreed to different treatments) . . .
are receiving a treatment equal to the average of their two claims." *See* Residco Objection at 32.
Residco cites no evidence for this contention. Residco presumably refers to settlements that the
Debtors have worked out with other creditors holding dual claims. But such settlements are not
a basis for imposing Residco's proposed Average Claims Treatment. *See* Fed. R. Evid. 408; *cf.*
*In re Dana Corp.*, 412 B.R. at 62 ("[T]he fact that some claimants have settled while others have
not does not, by itself, indicate unequal treatment."). Residco argues the Higher Claims
Treatment is supported by the Bankruptcy Code because the Debtors have not yet objected to its
claims. But the Debtors have made clear that they intend to do so. Under these circumstances
then, Residco's proposed Higher Claims Treatment veers close to a request to adjudicate its
claims on the merits, an approach that is inappropriate for reasons previously explained. *See,*
*e.g.,* Hr'g Tr. 193:2–6.

Residco cites one case to support its proposed alternative treatments, *In re F.W.D.C.,*
*Inc.*, 158 B.R. 523 (Bankr. S.D. Fla. 1993). But the Court finds that case to be far different from
the one before this Court. The central issue in that case was whether the claim of Chase
Manhattan Bank ("Chase") against a debtor-guarantor had to be reduced by its receipt of a third-
party debtor's collateral securing the indebtedness. *See F.W.D.C.*, 158 B.R. at 526. To that end,
the court in *F.W.D.C.* approved substantive consolidation subject to the condition that Chase's
claim against previously consolidated debtors be preserved and otherwise unaffected. *See id.* at
526, 528 (holding that Chase "was allowed to prove the full amount of its indebtedness, without
reduction of its claim to reflect its receipt of [a third-party's] collateral securing such
indebtedness against the newly consolidated debtors."). Additionally, it was undisputed in
*F.W.D.C.* that the movants' primary purpose for substantive consolidation was to reduce the

31

amount of Chase's claim. *See id.* at 524.  By contrast, there is no suggestion that substantive

consolidation here was directed at any one creditor.  Rather, the record supports that it was

proposed for the benefit of the estate given, among other things, the frequent use of guarantees

by RAH and the efficiency and related cost savings under the Plan. *See* Debtors' Memorandum

of Law in Support of Confirmation of Debtors' Plan and in Reply to Responses to the Plan at 16–

17 [ECF No. 1557].  Indeed, the result in *F.W.D.C.* lends support to the Carve-Out proposed

here, as the Carve-Out's purpose is to prevent any possible prejudice to the affected creditor.[17]

Residco also complains that it has not been given adequate disclosure in advance of what

the Carve-Out would mean for Residco. *See* Residco Sur-Reply at 5–6; *see also* Residco

Response to Revised Carve-Out ¶ 2.   But the Carve-Out was proposed specifically to address

Residco's Objection, and to provide it with the non-consolidated treatment that it purports to

seek.  Thus, there was no reason to propose the Carve-Out earlier because no other creditors have

objected to substantive consolidation.  Moreover, the fault for any delay in discussing any issues

with substantive consolidation appears to rest with Residco.  As the Debtors point out, Residco

did not voice a concern about substantive consolidation until February 2017, even though

substantive consolidation has been on the table in these cases for many months.  Indeed, the issue

of substantive consolidation goes back to before the Court approved the Debtors' settlement with

United Airlines in June 2016, the same month when Residco became a member of the

---

[17]    Residco claims that its recovery will be reduced under the Carve-Out because it will have borne the cost of
separately valuing the relevant Debtors.  But such a cost will be borne by the estate and will only be necessary
because Residco has requested it. *See* Carve-Out (as to cost, the Carve-Out requires the Debtors to conduct a
separate analysis of the values of RAH and Republic Airline); Hr'g Tr. 176:24–177:2.  Such a cost also would be
exactly what a creditor would expect when substantive consolidation has not occurred. In any event, the Court has
made clear that, if such a separate valuation is necessary, all parties reserve their right to argue about the
methodology of such a calculation. *See* March 16th Hr'g Tr. 28:6–24, 29:13–17, 31:11–16.

Committee.[18]  *See* Hr'g Tr. 200:16–201:7; *see also* Order Granting Authorization to (I) Assume

Codeshare and Related Agreements, as amended, with United Airlines, Inc., and (II) Settle

Claims Between United Airlines, Inc. and the Debtors ("United Settlement Order") ¶ 12 [ECF

No. 678] (stating provisions and effect of the order, any actions taken pursuant thereto, and the

codeshare partner's and Debtors' respective rights, obligations, remedies, and protections

provided therein and under related agreements shall survive substantive consolidation of the

cases); Hr'g Tr. 219:10–19 (Delta arguing Residco saw operating entities get de facto substantive

consolidation through settlements and the merger and Residco did not object).  A subsequent

settlement between the Debtors and American Airlines, Inc., proposed in September 2016 also

contained a similar provision contemplating substantive consolidation.  *See* Proposed Order ¶ 15,

attached as Exh. 1 to Debtors' Motion for Authorization to (I) Assume Codeshare Agreement, as

amended, with American Airlines, Inc., (II) Enter Into or Assume Related Agreements, and (III)

Settle Claims Between American Airlines, Inc. and the Debtors [ECF No. 957].  The Debtors

actively negotiated that settlement in consultation with the Committee.  The Debtors also

negotiated the Plan, including its substantive consolidation provisions, with the Committee.  As a

member of the Committee, Residco was thus well aware of the Debtors' intent to pursue

substantive consolidation many months before the filing of the Plan but nonetheless did not raise

its concerns.  *See* Debtors' Response to Residco Objection ¶¶ 4–5; Hr'g Tr. 200:24–201:7.  Such

a delay in raising its concerns prevented the parties from taking steps to address these issues,

perhaps even by seeking an adjudication of the merits and value of Residco's claims in advance

---

[18]    ALF VI replaced a member of the original Committee on June 3, 2016.  *See* Amended Notice of
Appointment of Official Committee of Unsecured Creditors at 2 [ECF No. 630].

of confirmation.[19]  Such a proactive approach is often taken by parties in large Chapter 11 cases

when a particular claim presents issues that are best resolved prior to confirmation.  But as the

Debtors had no idea that Residco objected to substantive consolidation, the Debtors had no

reason to take such a course and, therefore, cannot be fairly criticized for delay in proposing the

Carve-Out here.[20]

## CONCLUSION

For the reasons stated above, the Court finds that the Debtors have satisfied the standard

for substantive consolidation and overrules the Residco Objection.  The Court directs that the

Plan be amended to include the Carve-Out for Residco's claims, using the language set forth in

Exhibit 1 to the Debtors' Reply to the Residco Response to Revised Carve-Out.  Having resolved

the Residco Objection, the Debtors shall contact the Court as to when it is appropriate to rule on

the remaining matters related to confirmation of the Debtors' Plan.[21]

Dated: New York, New York
       April 10, 2017

                                        */s/ Sean H. Lane*                    
                                        UNITED STATES BANKRUPTCY JUDGE

---

[19]    For these reasons, the Debtors view the Residco Objection as an "eleventh hour ambush" where Residco is using the threat of delaying confirmation to force the Debtors, the Committee, and other creditors to agree to a preferential settlement with Residco.  *See* Hr'g Tr. 201:8–12; Debtors' Response to Residco Objection ¶ 5; Committee Reply ¶ 5.

[20]    There are two arguments raised by the Debtors that the Court does not address in this decision.  First, the Debtors argue that Residco should be equitably estopped from objecting to substantive consolidation because it was a member of the Committee that was consulted regarding the Plan and that voted in favor of the Plan.  *See* Debtors' Response to Residco Objection ¶¶ 61–64.  It is unnecessary to address this argument given the Court's ruling on substantive consolidation.  Second, the Debtors state that they intend to seek to modify the Plan so that the release and exculpation provisions of the Plan do not apply to Residco given Residco's Objection to the Plan.  *See id.* ¶¶ 65–66.  As this argument does not relate to the merits of Residco's Objection to substantive consolidation, the Court does not address this issue here.

[21]    For the reasons set forth at the hearing on March 16, 2017, it is premature for the Court to address whether the Plan satisfies the request for confirmation under the Bankruptcy Code until such time as the votes on the Plan are finalized.  *See* March 16th Hr'g Tr. 15:12–14, 73:7–17, 77:8–11, 81:9–18; [*see also* ECF Nos. 1530, 1531, 1532].