FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

In re:                                                     Chapter 11

REPUBLIC AIRWAYS HOLDINGS INC., *et al.*,     Case No. 16-10429 (SHL)

                            Debtors.          (Jointly Administered)

------------------------------------------------------------x

## <u>MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**ZIRINSKY LAW PARTNERS PLLC**
*Counsel for Reorganized Debtors*
375 Park Avenue, Suite 2607
New York, NY 10152
By:    Bruce R. Zirinsky, Esq.
       Sharon J. Richardson, Esq.
       Gary D. Ticoll, Esq.

**HUGHES HUBBARD & REED LLP**
*Counsel for Reorganized Debtors*
One Battery Park Plaza
New York, NY 10004
By:    Christopher K. Kiplok, Esq.
       Gregory C. Farrell, Esq.
       Erin E. Diers, Esq.

**VEDDER PRICE P.C.**
*Counsel for Wells Fargo Bank Northwest, N.A.,*
    *as Owner Trustee, and ALF VI, Inc.*
1633 Broadway, 31st Floor
New York, NY 10019
By:    Michael J. Edelman, Esq.
       Arlene Gelman, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

      Before the Court is Republic Airways Holdings Inc., *et. al.*'s ("Republic" or the

"Debtors") *Motion for Summary Judgment with Respect to its Objection to Claims Filed by Wells*

*Fargo Bank Northwest, N.A., as Owner Trustee, and ALF VI, Inc., as Owner Participant* (the "SJM") [ECF No. 2029].  The SJM addresses two major issues in the aircraft leases between these parties: (i) whether the liquidated damages provisions in the leases violate Article 2A of the New York Uniform Commercial Code and are therefore unenforceable as against public policy, and (ii) if so, whether the guarantor of the obligations in the leases is nevertheless liable to pay the otherwise unenforceable liquidated damages.  The SJM also encompasses a secondary issue of whether the lessor has a valid administrative priority claim for post-petition rent relating to certain aircraft.  For the reasons set forth below, the Court grants the SJM, finding that the liquidated damages provisions in these leases are unenforceable because they violate Article 2A's requirement that they be reasonable in light of the then anticipated harm from default.  In addition, the Court concludes that the liquidated damages provisions also cannot be enforced as against the guarantor and that the administrative expense claim is barred under the express terms of the stipulation between the parties.

## BACKGROUND

This dispute centers around Amended Leases and corresponding Guarantees—both defined below—that are the operative agreements between the parties.  But there are other agreements—also discussed below—that relate to the Amended Leases and contain provisions that are relevant to the issues before the Court today.

### A.  The Amended Leases and Related Agreements

Between June 2001 and November 2003, Wells Fargo Bank Northwest, N.A. ("Wells Fargo" or the "Lessor"), as owner trustee, on behalf of Mitsui & Co. (U.S.A.), Inc. ("Mitsui"), as the trust beneficiary, purchased seven EMB-145LR aircraft and entered into seven lease

transactions (the "Original Leases")[1] with Chautauqua Airlines, Inc. ("Chautauqua" or the

"Lessee").  Under the Original Leases, the aircraft bearing U.S. registration marks (or tail

numbers) N286SK, N561RP, N562RP, N287SK, N288SK, N563RP, and N259JQ (each

individually an "Aircraft" and collectively, the "Aircraft") were each leased to Chautauqua.  *See

Response to Republic Undisputed Facts . . . and Counter Statement by Residco Parties* ("Residco

Facts") [ECF No. 2049].  Under the terms of each Original Lease, Chautauqua agreed to pay

monthly rent for each Aircraft during the term of the Original Lease as set forth on a schedule

attached to that Original Lease.  *See* Blank Decl., Ex. A (N286SK) § 4.01.  Upon expiration of

each Original Lease, Chautauqua was required to return the Aircraft to Wells Fargo.  *See id.*, Ex.

A (N286SK) § 18.01.

          Around this same time, in connection with the Original Leases, Embraer S.A.

("Embraer"), the manufacturer of the Aircraft, and Mitsui entered into a deficiency agreement

(the "Deficiency Agreements") and a Residual Value Guarantee Agreement (the "RVGs") for

each Aircraft.  Together, these agreements provided Mitsui protection from a decline in the

estimated "residual value" of each Aircraft, *i.e.* the estimated value of the Aircraft at the end of

the applicable Original Lease term.  *See Declaration of Gregory C. Farrell in Support of

Republic's Motion for Summary Judgment . . .* (the "Farrell Decl."), Exs. H, O (N286SK), Exs. I,

P (N287SK), Exs. J, Q (N288SK), Exs. K, R (N561RP), Exs. L, S (N562RP), Exs. M, T

(N563RP), Exs. N, U (N259JQ); Residco Facts ¶¶ 4, 12, 16, 20, 24, 29, 35, 36; *see also* June 28,

2018 Hr'g Tr. [ECF No. 2075] at 36:23–25 (defining "residual value" as the "aircraft['s] worth

at the end of the lease term").  More specifically, the RVGs provided that Embraer would pay

---

[1]          The Original Leases are attached as Exhibits A through G (in order by tail number N286SK, N561RP,
N562RP, N287SK, N288SK, N563RP, and N259JQ) to the *Declaration of Ethan J. Blank Regarding Reorganized
Debtors' Objection to (I) Rejection Damage Claims, (II) Guarantee Claims and (III) Administrative Claim Filed by
Wells Fargo . . .* (the "Blank Decl.") [ECF No. 1854].

Mitsui the difference between the previous month's so-called stipulated loss value and the

Aircraft's fair market value up to a Maximum Amount (as defined in the RVGs) upon the

expiration of the basic term of each Original Lease; the stipulated loss value was established on

schedules affixed to each Original Lease, as described in greater detail below. *See* Residco Facts

¶ 35 (citing Farrell Decl., Exs. O, P, Q, R, S, T, U.).[2]  Notably, Chautauqua never had any

obligation to make any payments due to a decline in the residual value of the Aircraft upon

expiration of the Original Leases. *See generally* Blank Decl., Ex. A (N286SK) Art. IV (Rent),

Art. XVIII (Return of the Aircraft).

In late 2012, Mitsui and Chautauqua agreed to restructure the Original Leases.

Accordingly, they entered into (i) amendments to the Original Leases (the "2012 Amendments"),

(ii) a financial support agreement (the "Financial Support Agreement"), pursuant to which Mitsui

agreed to provide Chautauqua with certain financial support payments,[3] and (iii) a guarantee (the

"Original Guarantee"), pursuant to which Republic Airways Holdings Inc. ("RAH"), one of the

Debtors, guaranteed Chautauqua's obligations under the Original Leases. *See* Blank Decl., Exs.

H–N (the 2012 Amendments), Ex. O (the Financial Support Agreement), Ex. P (the Original

Guarantee).  The 2012 Amendments provided for, among other things, altered return conditions.

*See, e.g.*, *id.*, Ex. H (N286SK 2012 Amendment) Schedule A §§ 2, 5, 6.  Roughly

contemporaneously with the 2012 Amendments and Financial Support Agreement, Mitsui and

---

[2]    Residco disputes the Debtors' Rule 7056-1 Statement Paragraph No. 35 "to the extent that it mischaracterizes and/or paraphrases the operative terms and agreements set forth in the Deficiency Agreements and RVGs."  Residco Facts ¶¶ 35–36.  The Court does not rely on the precise details of those agreements, and any dispute of their characterization is immaterial for this decision.

[3]    Pursuant to the Financial Support Agreement, the monthly rent of each Aircraft was reduced through a reimbursement mechanism whereby Mitsui agreed to pay to Chautauqua "the difference between the basic rent payable by Chautauqua [(the "Basic Rent")] . . . and (x) $60,000 per month with respect to Rent Payment Dates occurring prior to July 1, 2016 and (y) $55,000 per month with respect to Rent Payment Dates occurring on and after July 1, 2016."  Financial Support Agreement § 2.01.

Embraer entered into a Reimbursement Agreement (the "Reimbursement Agreement") under which Embraer agreed to make certain payments to Mitsui with respect to each Aircraft. *See* Amendment No. 1 to Original Guarantee, dated December 12, 2014 (the "Guarantee Amendment"), annexed to the Blank Decl. as Exhibit Q Schedule 2 § 2 (discussing Reimbursement Agreement).

In December 2013, Wells Fargo and Chautauqua entered into amended and restated leases for each Aircraft that superseded the Original Leases (the "Amended Leases"). *See* Blank Decl., Exs. R–X. The Amended Leases eliminated the reimbursement structure implemented through the Financial Support Agreement but preserved the adjustments to the Basic Rent. *See, e.g.*, *id.*, Ex. R (N286SK) § 4.01, Schedule BR; Residco Facts ¶ 42.

In December 2014, ALF VI, Inc. ("ALF," and together with Wells Fargo, "Residco") acquired the owner participation interests held by Mitsui for each of the Amended Leases. *See* Residco Facts ¶ 45. In connection with Mitsui's sale of its owner participant interests, Mitsui, Chautauqua, and Embraer agreed to terminate the Financial Support Agreement, the Reimbursement Agreement, and the Deficiency Agreements. *See* Guarantee Amendment Schedule 2 § 2.

### B. Liquidated Damages and Stipulated Loss Values in the Amended Leases

The parties agree that each of the Amended Leases is identical as to the relevant provisions. *See* Residco Facts ¶ 30; *see also* June 28, 2018 Hr'g Tr. at 49:4–5 ("The parties agree that the same model was used for all these—all seven aircrafts."). Specifically, there is a contractual damages provision in each of the Amended Leases providing that, should the Lessee default, the Lessor may provide the Lessee with fifteen days' written notice and demand that the Lessee pay (i) any unpaid Basic Rent for the Aircraft, plus (ii) liquidated damages "for loss of bargain and not as a penalty (in lieu of Basic Rent payable for the period commencing after the

5

date specified for payment in such notice)[.]"  Residco Facts ¶ 30 (citing Blank Decl., Ex. A §

17.02(c), Ex. B § 17.02(c), Ex. C § 17.02(c), Ex. D § 17.02(c), Ex. E § 17.02(c), Ex. F §

17.02(c), Ex. G §17.02(c)).[4]  The Lessee then has the choice of liquidated damages as measured

in three different ways, which make reference to various calculations of rent and stipulated loss

value:

> (i)    stipulated loss value minus present value of the fair market rental value for
> the remainder of the Amended Lease term;

> (ii)   stipulated loss value minus the fair market sales value of the Aircraft; or

> (iii)  difference between present value of rent reserved for the remainder of the
> Amended Lease term and the fair market rental value for the remainder of
> the term.[5]

---

[4]    While all parties agree that the Original Leases were amended and restated, they often cite to provisions in
the Original Leases (such as the stipulated loss values).  Unless otherwise noted, such provisions are identical to the
corresponding provisions in the Amended Leases.

[5]    The full text of Section 17.02(c) of the Amended Leases provides that the three measurements of damages
are as follows:

> (i)    the amount if any, by which (x) the Stipulated Loss Value computed as of the payment date specified
> in such notice (plus the amount of the deferred Basic Rent, if any, as of such date as set forth in the
> column headed "Deferred Basis Rent" in Schedule SLV, and minus the amount of prepaid Basic
> Rent, if any, as of such date as set forth in the column headed "Prepaid Basic Rent" in Schedule
> SLV), exceeds (y) the aggregate Fair Market Rental Value (determined in accordance with the
> Appraisal Procedure) of the Aircraft for the remainder of the Basic Term (or if in a Renewal Term,
> then until the scheduled end of the Renewal Term), after discounting such Fair Market Rental Value
> periodically (equal to installment frequency) to present worth as of the payment date specified in
> such notice using the Treasury Rate as of such date;

> (ii)   the amount if any, by which (x) the Stipulated Loss Value computed as of the payment date specified
> in such notice (plus the amount of the deferred Basic Rent, if any, as of such date as set forth in the
> column headed "Deferred Basis Rent" in Schedule SLV, and minus the amount of prepaid Basic
> Rent, if any, as of such date as set forth in the column headed "Prepaid Basic Rent" in Schedule
> SLV), exceeds (y) the Fair Market Sales Value (determined on the basis of an arms-length
> transaction between a willing seller and a willing buyer both with full knowledge of the relevant
> facts, including the actual condition and maintenance status of the Aircraft at such time) of the
> Aircraft as of such date; or

> (iii)  the amount, if any, by which (x) the aggregate Basic Rent for the remainder of the Basic Term (or
> if in a Renewal Term, then until the scheduled end of the Renewal Term), discounted periodically
> (equal to installment frequency) to present worth as of the payment date using the Treasury Rate as
> of such date, exceeds (y) the Fair Market Rental Value (determined in accordance with the Appraisal
> Procedure) of the Aircraft for the remainder of the Basic Term (or if in a Renewal Term, then until
> the scheduled end of the Renewal Term), after discounting such Fair Market Rental Value

*Reorganized Debtors' Objection to (I) Rejection Damage Claims, (II) Guarantee Claims and (III) Administrative Claim . . .* (the "Claims Objection") [ECF No. 1852] ¶ 36; *see also* Residco Facts ¶ 30 (citing Blank Decl., Ex. A § 17.02(c), Ex. B § 17.02(c), Ex. C § 17.02(c), Ex. D § 17.02(c), Ex. E § 17.02(c), Ex. F § 17.02(c), Ex. G §17.02(c)).[6]

Appended to each Amended Lease is a schedule (each, a "Schedule SLV") setting forth stipulated loss values ("SLVs") of the Aircraft for each month of the basic term. *See* Residco Facts ¶ 31. In each Schedule SLV, the SLV for the first month is equal to the purchase costs (price plus transaction expenses) of the Aircraft. *See id.* ¶ 32 (citing Expert Report of Howard K. Weber dated January 8, 2018 (the "Weber Report") at 5, attached to the Farrell Decl. as Ex. W ("[A]t the start of the Lease, the SLV liquidated damage amount is based upon and corresponds to a lessor's Invested Amount for a purchase aircraft[.]"); Transcript of Deposition of Ryoichi Matsuno (the "Matsuno Dep. Tr.") at 66:9–17, attached to the Farrell Decl. as Ex. X (Q: "[S]o you start out with the invested amount or the lessor cost. I think those terms are interchangeable. Is that correct?" A: "Yes. Depending on the delivery timing or subject to delivery timing, yes[.]")).

---

periodically (equal to installment frequency) to present worth as of the payment date specified in such notice using the Treasury Rate as of such date.

[6]     The parties agree that the Amended Leases are "true leases" governed by Article 2A of the of the New York Uniform Commercial Code ("N.Y. U.C.C.") and New York law. *See* June 28, 2018 Hr'g Tr. at 17:25–18:3, 43:3–5; *see also* N.Y. U.C.C. Law § 2-A-102 ("This Article applies to any transaction, regardless of form, that creates a lease."). Article 2A took "effect June 30, 1995 and . . . appl[ies] to all lease contracts that [were] made or that [became] effective between the parties on or after the effective date." UNIFORM COMMERCIAL CODE—LEASES—ARTICLE 2–A, 1994 Sess. Law News of N.Y. Ch. 114 (A. 10481–A). The measure for lessor's damages for breach by the lessee of a true lease under Article 2A of the N.Y. U.C.C. is the present value of the total rent for the remaining lease term minus the present value of the fair market rent for such remaining term (the "Actual Damages Formula"). *See* N.Y. U.C.C. § 2-A-528 (cited in Claims Objection ¶ 35). As Debtors note, the third liquidated damages formula is identical to the Actual Damages Formula; in other words, the liquidated damages clauses in the Amended Leases give Residco the option following a breach by the lessee to elect from two liquidated damages formulas and actual damages. *See* Claims Objection ¶ 36.

Over the term of the Amended Lease, the SLVs adjust on a month-to-month basis such that, after accounting for monthly payments of basic rent and tax benefits, they are always equal to the amount that provides Lessor with a four percent return on the Aircraft purchase. *See* Residco Facts ¶ 33 (citing Matsuno Dep. Tr. at 72:5–15 (Q: "What are the basic components that are included in the SLV calculation?"  A: "First off, most important part of this calculation is that we can maintain the same net IRR of 4 percent.  This is more critical to Mitsui.  So whenever termination event is made—is occurred and the stipulated loss value is paid, we have to maintain the 4 percent."); Weber Report at 5 ("[T]he SLV table will reflect the effect of, among other things, (a) payments of portions of the Invested Amount through the lease rental payments (taking into account the lessor's required interest recovery) and (b) the Tax Attribute Amount[.]")).  Accordingly, in the final month, the SLV equals the residual value that Lessor needs to realize from the Aircraft for its four percent return.  *See id.* ¶ 34 (citing Weber Report at 5 ("[A]t the end of the Lease, the SLV liquidated damage amount will be the Anticipated Residual of such aircraft[.]"); Matsuno Dep. Tr. at 70:13–18 (Q: "And the SLV contains the residual invested amount, which is really the remaining unpaid lesser costs borne by Mitsui at any particular point in time?"  A: "Yes.")).

Significantly, the liquidated damages clauses and the Schedule SLVs in the Amended Leases are identical to those in the Original Leases—notwithstanding the previous rent payments made and the reduction in the residual value of the Aircraft between the Original Leases and the Amended Leases.  *Compare* Blank Decl., Ex. A (N286SK) § 17.02(c) *with id.*, Ex. R (N286SK) § 17.02(c); *compare id.*, Ex. A (N286SK) Schedule SLV *with id.*, Ex. R (N286SK) Schedule SLV.

### C. The Guarantees

As part of Mitsui's sale of its owner participant interests, RAH issued a guarantee of Chautauqua's obligations under each Operative Document (as defined in each Amended Lease) for the benefit of Wells Fargo, as owner trustee of each Aircraft, and ALF, as the beneficiary of each trust (the "Guarantees"). *See* Residco Facts ¶ 46 (citing Blank Decl., Exs. Y, Z, AA, BB, CC, DD, EE). The Guarantees include various provisions which purport to waive all defenses and generally establish the guarantee obligations unassailable under all circumstances. They provide in relevant part:

- WHEREAS, Republic Airways Holdings Inc., a Delaware corporation ("Guarantor"), pursuant to the Guarantee, . . . , has guaranteed the obligations of Chautauqua . . . , as lessee, under certain aircraft lease agreements, including the Aircraft Lease Agreement listed on Schedule 1 hereto . . . , to Mitsui . . . , and Wells Fargo . . . .

- This Guarantee is an absolute, unconditional and continuing guarantee of payment and not of collection. Guarantor waives any right to require that any right to take action against Chautauqua be exhausted or that resort be made to any security prior to action being taken against Guarantor.

- In the event that this Guarantee or any Operative Agreement shall be terminated, rejected or disaffirmed as a result of bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar proceedings with respect to Chautauqua, Guarantor's obligations hereunder to the Guaranteed Parties shall continue to the same extent as if the same had not been so terminated, rejected or disaffirmed. Guarantor hereby waives all rights and benefits that might, in whole or in part, relieve it from the performance of its duties and obligations by reason of any proceeding as specified in the preceding sentence, and Guarantor agrees that it shall be liable for all sums guaranteed, in respect of and without regard to, any modification, limitation or discharge of the liability of Chautauqua that may result from any such proceedings and notwithstanding any stay, injunction or other prohibition issued in any such proceedings.

- Guarantor understands and agrees that its obligations hereunder shall be continuing, absolute and unconditional without regard to, and Guarantor hereby waives any defense to, or right to seek a discharge of, its obligations hereunder with respect to the validity, legality, regularity or enforceability of any Operative Agreement, any of the Obligations or any collateral security therefor or guarantee with respect thereto at any time or from time to time held by any

> Guaranteed Party or any other circumstances whatsoever (with or without notice to or knowledge of Chautauqua or Guarantor) that constitutes, or might be construed to constitute, an equitable or legal discharge of Chautauqua or the Obligations or of Guarantor under this Guarantee (other than payment and performance of the Obligations in full).

Blank Decl., Ex. Y (N286SK Guarantee) at 1–2.

### D. Bankruptcy, Confirmation, and Residco's Claims

On February 25, 2016, RAH and certain other affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. [ECF No. 1]. Two months later, the Debtors and Residco entered into a stipulation pursuant to Section 1110 of the Bankruptcy Code (the "Section 1110 Stipulation") [ECF No. 540, Schedule 2] which contemplated that the Debtors would return the Aircraft to Residco and reject the Amended Leases. The Court approved the Section 1110 Stipulation, *see So-Ordered Stipulation and Order* [ECF No. 540], and the Debtors returned the Aircraft and rejected the Amended Leases between April 2016 and October 2016. *See In re Republic Airways Holdings Inc.*, 565 B.R. 710, 714 (Bankr. S.D.N.Y. 2017), *aff'd*, 582 B.R. 278 (S.D.N.Y. 2018).

Residco filed (i) seven claims against Shuttle America Corporation ("Shuttle")[7] aggregating over $55 million for alleged damages arising from Republic's rejection of the Amended Leases (the "Underlying Claims") and (ii) seven identical corresponding claims against RAH, as guarantor, also aggregating over $55 million (the "Guarantee Claims"). Additionally, Lessor filed a single administrative expense claim seeking a total of $450,000 for post-petition rent for the Aircraft with tail numbers N259JQ, N286SK, N287SK, N563RP, and

---

[7]    Shuttle merged with and into Republic Airline Inc. ("RAI") in late January 2017 following the Court's entry of the *Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 for Approval of (I) Merger of Shuttle America Corporation Into Republic Airline Inc., and (II) Surrender of the Shuttle America Corporation Air Carrier Certificate* [ECF No. 1236].

N561RP (the "Administrative Expense Claim," and, together with the Underlying Claims and the Guarantee Claims, the "Claims").[8]

The Debtors filed their first proposed plan (as amended and restated, the "Plan") and related disclosure statement in November 2016 [ECF Nos. 1189, 1190, 1277, 1278, 1311, 1312]. The Plan provided for substantive consolidation and elimination of the Guarantees. *See In re Republic Airways Holdings Inc.*, 565 B.R. at 715 (citing Plan § 2.2(a)). In the face of an objection from Residco, the Plan was changed to provide that Residco could elect to have its Guarantee Claims "carved out" of substantive consolidation and treated as if the cases were not substantively consolidated if it was determined that its Guarantee Claims against RAH were a higher amount than its Underlying Claims against Shuttle. *See id.* at 726. The Court entered an order confirming the Plan in April 2017 (the "Confirmation Order") [ECF No. 1722].[9]

In July 2017, the Debtors filed the Claims Objection, in which they argue that actual losses arising from rejection of the Amended Leases are readily calculable and total only $5.7 million. *See* Claims Objection ¶ 1.[10] They further argue that "the Administrative Expense Claim should be disallowed and expunged in its entirety" under the express terms of the Section 1110 Stipulation. Claims Objection ¶ 81; *see also* SJM ¶¶ 41–42. The Debtors subsequently filed this SJM. Residco then filed its opposition to the Debtors' SJM (the "Opposition") [ECF No. 2051].

---

[8]    Wells Fargo subsequently acknowledged that the rent it claimed for N561RP was in fact paid and reduced the Administrative Expense Claim to $360,000. *See* Residco Facts ¶ 60.

[9]    Residco appealed the Confirmation Order, arguing that substantive consolidation was improper and unfairly discriminatory. But its appeal was unsuccessful. *See* 582 B.R. 278. Residco has appealed this decision of the District Court to the Second Circuit. *See In re Republic Airways Holdings Inc.*, No. 18-1255 (2d Cir. Apr. 27, 2018).

[10]    The Debtors alternatively assert that on an undiscounted, unmitigated basis, the losses total $12.585 million. *See* SJM ¶ 2 n.2.

Finally, the Debtors filed a reply in further support of their SJM (the "SJ Reply") [ECF No. 2060].

### E.  The Parties' Positions

In their SJM, the Debtors argue (i) that the seven Underlying Claims for rejection of the Amended Leases should only be calculated using actual damages because the liquidated damages clauses and SLVs in the Amended Leases violate public policy and are void *ab initio*, (ii) that the seven Guarantee Claims also should be limited to actual damages because, among other reasons, the guarantee of a contract provision found unenforceable for violating public policy is likewise unenforceable, and (iii) that the Administrative Expense Claim is barred under the express terms of the Section 1110 Stipulation.[11]

In its Opposition, Residco argues that the liquidated damages clauses are proper.  It contends that voiding the liquidated damages clauses and SLVs would violate the parties' freedom to contract, and that doing so is especially inappropriate in light of the parties' sophistication and the complex nature of the commercial finance leases involved.  Residco further argues that, under New York state law, the Guarantees are "irrevocable" and "ironclad" and therefore the Debtors and RAH waived their rights to any defense, including ones resting on public policy.  Finally, Residco asserts that previous drafts of the Section 1110 Stipulation evidence the parties' intent that post-petition rent would be paid for certain Aircraft, thereby entitling Lessor to payment of the Administrative Expense Claim.

---

[11]    Residco also filed a motion seeking leave to amend its Claims (the "Amendment Motion") [ECF No. 2011].  The Debtors used their SJM to voice their opposition to Residco's Amendment Motion.  Residco filed a reply in further support of its Amendment Motion (the "Amendment Reply") [ECF No. 2052].  Given the clear distinction between the issues in the SJM and the Amendment Motion, the Court's decision today addresses only the SJM.  The parties should caucus and discuss whether the Amendment Motion can be resolved on a consensual basis in light of today's ruling.  To the extent that there are still unresolved issues, however, parties should notify the Court.

## DISCUSSION

Federal Rule of Civil Procedure 56 governs the granting of summary judgment and is made applicable to this adversary proceeding under Rule 7056 of the Federal Rules of Bankruptcy Procedure. "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the [movant] is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [the movant's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "In deciding whether material factual issues exist, all ambiguities must be resolved and all reasonable inferences must be drawn in favor of the nonmoving party." *In re Ampal-Am. Israel Corp.*, 2015 WL 5176395, at *10 (Bankr. S.D.N.Y. Sept. 2, 2015) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). If the "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). "The Court may also grant some but not all of the relief requested in a summary judgment motion if it finds disputed

issues of fact as to some of the issues presented." *In re Residential Capital, LLC*, 533 B.R. 379, 395 (Bankr. S.D.N.Y. 2015) (citing Fed. R. Civ. P. 56(g)).

## I.    Liquidated Damages Clauses in the Amended Leases Are Unenforceable Penalties

### A. N.Y. U.C.C. Article 2A, Section 504

Article 2A of the N.Y. U.C.C. addresses the liquidation of damages in Section 504, which imposes a requirement of reasonableness at the time of the transaction. It states in relevant part:

> Damages payable by either party for default, or any other act or omission, including indemnity for loss or diminution of anticipated tax benefits or loss or damage to lessor's residual interest, may be liquidated in the lease agreement but *only at an amount or by a formula that is reasonable in light of the then anticipated harm caused by the default* or other act or omission.

N.Y. U.C.C. Law § 2-A-504(1) (emphasis added). "[T]he enforceability of a liquidated damages provision is a legal issue not requiring an evidentiary showing." *Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 350 (S.D.N.Y. 2003) (citing *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169–70 (S.D.N.Y. 1990)).

The N.Y. U.C.C. itself does not define the term "reasonable." *See generally* N.Y. U.C.C. Law § 2-A-103 ("Definitions and Index of Definitions"); N.Y. U.C.C. Law § 1-201 ("General Definitions"); *see also* Edwin E. Huddleson III, *Old Wine in New Bottles: UCC Article 2A-Leases*, 39 ALA. L. REV. 615, 647 (1988) ("The Comments provide little additional guidance, however, on how the 'reasonableness' standard of section 2A-504 should be applied."). While the case law offers some guidance about what is reasonable for a liquidated damages clause in a lease, the parties disagree over whether precedent before the passage of Article 2A in 1995 is still valid. The flashpoint for this disagreement is the Third Circuit's decision in *In re Trans World Airlines, Inc.*, 145 F.3d 124 (3d Cir. 1998) ("*TWA*"). *Compare* SJM ¶ 23 n.13 (relying on *TWA* and citing recent cases which did the same) *with* Opposition at 30 (arguing that "Article 2A

. . . statutorily overturned *TWA* . . . .   In sum, no aspect of the *TWA* case . . . has any bearing upon the instant matters.").

       1.   <u>The Standard Before Article 2A</u>

Prior to Article 2A's enactment, liquidated damages clauses in leases were governed by common law.  The common law provided that—to be enforceable—a liquidated damages clause "must specify a liquidated amount which is reasonable in light of the anticipated probable harm, and actual damages must be difficult to ascertain as of the time the parties entered into the contract."  *Wilmington Tr. Co. v. Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. 215, 218 (S.D.N.Y. 1995) (citing *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977)); *see also PacifiCorp Capital, Inc. v. Tano, Inc.*, 877 F. Supp. 180, 183–84 (S.D.N.Y. 1995) ("It is well-settled that New York courts have upheld liquidated damage provisions so long as the 'amount liquidated bears a reasonable proportion to the probable loss and the amount of the actual loss is incapable or difficult of precise estimation.'") (quoting *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir. 1982)).  Case law further counseled that "[a] clause which provides for an amount plainly disproportionate to actual damages is deemed a penalty and is not enforceable because it compels performance by the very disproportion between liquidated and actual damages."  *Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. at 218 (citing *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425); *see also PacifiCorp Capital, Inc.*, 877 F. Supp. at 184 ("If, however, the amount liquidated is plainly disproportionate to the probable loss, the provision will be deemed an unenforceable penalty.") (citing *Leasing Serv. Corp.*, 673 F.2d at 73).

Continued reference to these elements of common law even after the enactment of Article 2A has somewhat muddied the waters as to whether the statute completely or partially overruled prior common law.  *See, e.g.*, *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, 2014 WL 4184691, at *24–25 (S.D.N.Y. Aug. 22, 2014) (citing *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 424–

26); *Wilmington Tr. Co. v. Glob. Areo [sic] Logistic, Inc.*, 2011 WL 11075177, at *4 (Sup. Ct.

N.Y. Cty. Apr. 11, 2011) (citing *TWA*, 145 F.3d at 135; *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at

423–424, 430; *Gen. Elec. Capital Corp., LLC v. G. Howard Assocs., Inc.*, 2010 WL 2346296, at

*3 (E.D.N.Y. May 18, 2010), *report and recommendation adopted*, 2010 WL 2348640

(E.D.N.Y. June 9, 2010) (citing *Leasing Serv. Corp.*, 673 F.2d at 73; *Rattigan*, 739 F. Supp. at

169); *see also Wells Fargo Equip. Fin., Inc. v. Woods at Newtown, LLC*, 2011 WL 4433108, at

*4 (S.D.N.Y. Sept. 23, 2011) (citing *E.D.S. Const. Co. v. N. End Health Ctr., Inc.*, 412 N.W.2d

783, 786 (Minn. Ct. App. 1987)).

Ultimately, we are guided by the language of Article 2A itself.  That language does not

include certain elements in the common law test—such as difficulty to estimate—but it does

incorporate the element of reasonableness.  *Compare Aerovias de Mexico, S.A. de C.V.*, 893 F.

Supp. at 218 (setting out three part standard for enforceability of liquidated damages) *with* N.Y.

U.C.C. Law § 2-A-504(1) ("reasonable in light of the then anticipated harm caused by the default

. . .").

Indeed, the Official Comments to Article 2A explicitly discuss elimination of other parts

of the common law test but make clear that reasonableness is still a requirement:[12]

> This section does not incorporate two other tests that under sales law determine
> enforceability of liquidated damages, *i.e.*, difficulties of proof of loss and
> inconvenience or nonfeasibility of otherwise obtaining an adequate remedy . . . .

---

[12]    The Official Comments to Article 2A are persuasive authority when interpreting the meaning of the U.C.C.
*See Peaslee v. GMAC, LLC (In re Peaslee)*, 547 F.3d 177, 185 (2d Cir. 2008), *certified question accepted*, 11
N.Y.3d 838 (2008), and *certified question answered*, 13 N.Y.3d 75 (2009) ("[A]lthough the U.C.C. Comments are
not 'given binding effect,' they do 'occupy an unusual position as aids to statutory interpretation' and should be
regarded as 'an indispensable part of the U.C.C. framework'") (quoting *In re Westfall*, 376 B.R. 210, 217–18
(Bankr. N.D. Ohio 2007), *rev'd on other grounds*, 599 F.3d 498 (6th Cir. 2010)); *McCarthy v. BMW Bank of N. Am.*,
509 F.3d 528, 530 n.3 (D.C. Cir. 2007) ("In interpreting the UCC, this court and other courts have found the Official
Comments to the UCC persuasive.") (citing *Goldstein v. Madison Nat'l Bank of Wash., D.C.*, 807 F.2d 1070, 1074
(D.C. Cir. 1986); *Guardian Life Ins. Co. of Am. v. Weisman*, 223 F.3d 229, 231 (3d Cir. 2000); *JOM, Inc. v. Adell
Plastics, Inc.*, 193 F.3d 47, 57 n.6 (1st Cir. 1999)); *Int'l Minerals & Chem. Corp. v. Llano, Inc.*, 770 F.2d 879, 885
n.2 (10th Cir. 1985) ("[W]e regard [the UCC Official Comments] as persuasive authority, even though [they are] not
a part of the statute . . . .").

The impact of local, state and federal tax laws on a leasing transaction can result in an amount payable with respect to the tax indemnity many times greater than the original purchase price of the goods. By deleting the reference to unreasonably large liquidated damages the parties are free to negotiate a formula, *restrained by the rule of reasonableness in this section.*

N.Y. U.C.C. Law § 2-A-504 Off. Cmt. (emphasis added).

In sum, the reasonableness requirement was part of the common law test predating Article 2A and remains part of the test today. Accordingly, the Court sees no reason why it would not consider prior case law on the reasonableness of liquidated damages, including the *TWA* decision, to be relevant and useful precedent, even if ignoring other case law on now discarded elements like the difficulty of estimation. Other courts examining this question have reached the same conclusion. *See, e.g., In re Tidewater Inc., et al.*, No. 17-11132 (Bankr. D. Del. Aug. 31, 2017), Aug. 30, 2017 Hr'g Tr. [ECF No. 497] at 40:8–11, 52:5–54:19, 56:20–57:5, 62:4–67:4, 76:7–16 (hearing argument on continued application of pre-2A law and ruling that "for purposes of this analysis, . . . *TWA* is good law," and noting that it is "not satisfied that 2A-504 operates to reverse or abrogate the *TWA* decision"); *see also TWA*, 145 F.3d at 134.[13] Thus this Court looks to precedent both before and after the enactment of Article 2A for guidance on what is "reasonable" for purposes of the liquidated damages clauses now before the Court.

2. The Current Article 2A Standard

Considering all this precedent, several conclusions can be drawn regarding what is "reasonable in light of the then anticipated harm caused by the default" under Section 504.

First, there is the question of timing. Consistent with the statutory text, reasonableness must be judged at the time of contract formation. *See* N.Y. U.C.C. Law § 2-A-504(1)

---

[13]    Even if the case law on reasonableness before the enactment of Article 2A were not applicable *per se*, it would still be useful to the extent its reasoning was persuasive. *Cf. Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385 (2d Cir. 2016) ("An informal agency interpretation that is neither a formal adjudication nor a promulgated rule may still receive deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Such informal agency guidance receives deference according to its persuasiveness[.]") (internal citation omitted).

("reasonable in light of the *then anticipated* harm . . .") (emphasis added); *see also PacifiCorp Capital, Inc.*, 877 F. Supp. at 184 ("These factors are measured as of the time the parties entered into the contract, not at the time of the breach.") (citing *Rattigan*, 739 F. Supp. at 169); *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (noting that liquidated damages are "'an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement'") (quoting *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 424); *G. Howard Assocs., Inc.*, 2010 WL 2346296, at *3 ("Courts interpret the liquidated damage clause in light of the potential loss discernable at the date of the contract's execution, not at the time of the breach.") (citing *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 430).

Second, "[w]hen analyzing the reasonableness of a liquidated amount, a court must also give due consideration to the nature of the contract and the attendant circumstances." *Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. at 218 (citations omitted); *see also JMD Holding Corp.*, 4 N.Y.3d at 379 (2005) ("Whether the early termination fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances . . . .") (citations omitted); *Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, 2009 WL 1054830, at *6 (S.D.N.Y. Apr. 17, 2009) (same).

Courts have disagreed on whether the sophistication of the parties should be included as one of the attendant circumstances warranting consideration. On the one hand, multiple courts have cited to the extent of parties' negotiations, the parties' bargaining power, and the presence of counsel as relevant factors in assessing whether to uphold a contract. *See Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. at 218 ("Relevant to this inquiry is the sophistication of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length

18

without the ability to overreach the other side."); *Oscar de la Renta, Ltd.*, 2009 WL 1054830, at

*6 ("Factors to be considered in the analysis include 'whether the parties were sophisticated and

represented by counsel, the contract was negotiated at arms-length between parties of equal

bargaining power, and . . . that [the provision] was freely contracted to.'") (quoting *Edward*

*Andrews Grp., Inc. v. Addressing Servs. Co., Inc.*, 2005 WL 3215190, at *6 n.3 (S.D.N.Y. Nov.

30, 2005)).  On the other hand, some courts have indicated that certain provisions should never

be enforced even if the contracts were freely entered into by sophisticated parties.  *See TWA*, 145

F.3d at 135 ("Interface does not cite any case in which a court enforced an otherwise invalid

liquidated damages provision merely because it was freely negotiated by sophisticated parties.

Contracts that are void as against public policy are unenforceable regardless of how freely and

willingly they were entered into."); *In re Nw. Airlines Corp.*, 393 B.R. 352, 358 (Bankr.

S.D.N.Y. 2008) ("Beyond that, there is no principle that a sophisticated party should be bound by

a patently unreasonable liquidated damages provision."); *Glob. Areo Logistic, Inc.*, 2011 WL

11075177, at *5 (same) (quoting *In re Nw. Airlines Corp.*, 393 B.R. at 358).  The weight of

authority suggests that the nature of the contract and the sophistication of the parties may shed

light as to what harms were actually anticipated when the deal was struck but are not dispositive

on the question of reasonableness.

    Third, a liquidated damages clause cannot be a penalty.  More specifically, a liquidated

damages clause violates New York public policy and is inherently not "reasonable in light of the

then anticipated harm caused by the default" when it is formulated as a penalty.  *See PacifiCorp*

*Capital, Inc.*, 877 F. Supp. at 183–84 ("If, however, the amount liquidated is plainly

disproportionate to the probable loss, the provision will be deemed an unenforceable penalty.")

(citing *Leasing Serv. Corp.*, 673 F.2d at 73); *TWA*, 145 F.3d at 134 ("At the same time, the

19

public policies of New York are 'firmly set against the imposition of penalties or forfeitures for which there is no statutory authority.'") (quoting *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 424); *G. Howard Assocs., Inc.*, 2010 WL 2346296, at *3 ("'New York courts will generally sustain a liquidated damages clause so long as the provision is neither a penalty nor a forfeiture . . . .'") (quoting *Edward Andrews Grp., Inc.*, 2005 WL 3215190, at *6). Although Section 504 of Article 2A does not explicitly incorporate the common law's consideration of "disproportionality to actual damages," many of the cases cited above compare the damages to "probable harm" rather than actual harm; as explained below, this concept is consistent with the instruction in Section 504 to examine reasonableness in light of the "anticipated" harm caused by a default.

Finally, courts have identified certain formulations as inherently unreasonable. For example, static liquidation values—*i.e.*, where the SLV does not decline over the course of the lease term and thus fails to recognize depreciation and the payment of rent over time—have been repeatedly rejected.[14] *See Glob. Areo Logistic, Inc.*, 2011 WL 11075177, at *4 ("Because static SLV's are inherently unreasonable, New York courts or courts applying New York law do not enforce a liquidated damages provision containing a static SLV."). Indeed, purported damages that are "invariant to the gravity of the breach" have been called a "hallmark of an unenforceable penalty rather than a bona fide effort to quantify actual damages, as is permissible for a liquidated damages provision." *In re Montgomery Ward Holding Corp.*, 326 F.3d 383, 390 (3d Cir. 2003); *In re Nw. Airlines Corp.*, 393 B.R. at 356–57 ("Here, however, damages never declined at all. The Minnesota courts have held that this is a clear indication that a liquidated damages clause is an unreasonable penalty—where damages are the same whether the obligor misses the last

---

[14]    These are sometimes referred to as non-declining or flat liquidation values. *See* Opposition at 57 ("In *WTC v. Global Aero*, the court addressed a non-declining/flat Stipulated Loss Value liquidated damages provision that is presumptively a penalty if raised by the lessee.")

installment payment or whether it fails to make any payment on the entire obligation.") (citations

omitted).  Courts have even rejected liquidated damages formulations that do not change with sufficient

frequency over time.  In *Montgomery Ward*, for example, the court criticized the annual amortization

schedule because it contained a multi-million dollar liability cliff that occurred from one day to the next at

year-end.  *See* 326 F.3d at 390 (3d Cir. 2003) (finding that "the excessively large Casualty Value

figures provided powerful in terrorem pressure for [lessee] to perform the leases rather than (for

example) to terminate them voluntarily and pay the price for doing so in real damages," thereby

rendering the Casualty Value figures an unenforceable penalty).

### B.  The Amended Leases Violate Article 2A, Section 504

At the center of the parties' dispute is the fact that the liquidated damages provisions here

allow for the unconditional transfer of residual value risk, or market risk, only upon default,

without a cognizable connection to any anticipated harm caused by the default itself.  As the

Debtors correctly frame it, the question is "whether the parties in a true finance lease transaction

can allocate risk so that the financing is treated as a debt obligation until the end date of the

Leases, and then at the end of the term the Lessor Parties becoming the true economic owners."

Opposition at 3.  Applying the applicable legal principles above to the SLVs in the Amended

Leases, the Court concludes that the parties may *not* allocate risk where—as here—doing so

violates the reasonableness requirement of Article 2A, Section 504.

### 1.  The Stipulated Loss Value Calculations Were Designed to Protect Lessor's Investment on the Aircraft

To understand why the liquidated damages provisions here are unenforceable, one must

first understand the provisions in the context of the Amended Leases.  Upon an event of default

under the Amended Leases, Lessor had the right to request that Lessee return the Aircraft, after

which Lessor could "hold, use, operate or lease [the Aircraft] to others" "in its sole discretion."

21

Blank Decl., Ex. R § 17.02(a)-(b).  "Whether or not" Lessor took such actions, the Amended

Lease provided the lessor three additional optional remedies framed as "liquidated damages" that

Lessor could choose "in its sole discretion."  *Id.*, Ex. R § 17.02(c); *see also* Residco Facts ¶ 30.

As explained in more detail above, the Lessor could demand payment of unpaid Basic Rent (*i.e.*,

overdue monthly rental obligations), *see* Blank Decl., Ex. R § 17.02(c), plus one of the

following:

> (i) the amount . . . by which (x) the [SLV] . . . exceeds (y) the [discounted present
> value of the] aggregate Fair Market Rental Value . . . of the Aircraft for the
> remainder of the [lease term] . . .,
>
> (ii) the amount . . . by which (x) the [SLV] . . . exceeds (y) the Fair Market Sales
> Value . . . of the Aircraft as of such date, or
>
> (iii) the amount . . . by which (x) the [discounted present value of the] aggregate
> Basic Rent for the remainder of the [lease term] . . . exceeds (y) the [discounted
> present value of the] Fair Market Rental Value . . . of the Aircraft for the remainder
> of the [lease term] . . . .

Residco Facts ¶ 30.[15]

As Residco's own expert explained, the SLVs were calculated at the first month as equal

to the purchase costs (price plus transaction expenses) of the Aircraft and adjusted monthly over

the term of the Amended Lease to take into account payments of basic rent and tax benefits so

that they were always equal to an amount that provided Lessor with a four percent return on the

Aircraft purchase.  *See* Residco Facts ¶¶ 31–34; Weber Report at 5 ("[A]t the start of the Lease,

the SLV liquidated damage amount is based upon and corresponds to a lessor's Invested Amount

for a purchased aircraft whereas at the end of the Lease, the SLV liquidated damage amount will

be the Anticipated Residual of such aircraft. In between these points, the SLV table will reflect

the effect of, among other things, (a) payments of portions of the Invested Amount through the

---

[15]    The Court has omitted language referring to details such as appraisal procedures and renewal terms that do
not matter for purposes of this decision.

lease rental payments (taking into account the lessor's required interest recovery) and (b) the Tax Attribute Amount."). In other words, in the event of a default, this remedy formulation effectuated a transfer of all market risk, or residual value, including any risk of idiosyncratic depreciation or damage to a particular Aircraft. This provision granted Lessor the ability to retake possession of the Aircraft and recover not just a dollar value equal to scheduled rental payments, but also any deficit in the value of the Aircraft that fell short of Lessor's desired total gross return.

Thus, the SLVs were calculated to achieve a four percent margin above the original purchase price regardless of where default may have left the parties. *See* Residco Facts ¶ 34; Weber Report at 5. Under that formulation, Lessee bore the risk of any loss of market or rental value of the Aircraft over the course of the Amended Lease, in addition to the fixed margin. Notably, the Amended Leases did not provide for a similar risk transfer at expiration of the lease term: absent an event of default, Lessee was simply obligated to return the Aircraft to Lessor, while ensuring compliance with the condition and maintenance requirements for that particular Aircraft. *See* Blank Decl., Ex. R § 18.01 ("Return"); *id*. § 18.04 ("Condition of the Aircraft").

2. <u>The Residual Value Risk Transfer Executed in the Amended Leases is a Penalty and Violates Article 2A, Section 504</u>

The formulation here is an improper penalty rather than a liquidation of damages that is "reasonable in light of the then anticipated harm caused by the default or other act or omission."

The plain language in Article 2A, Section 504 mandates a causal link between the anticipated harm and the act of default. *See* N.Y. U.C.C. Law § 2-A-504(1) (allowing damages including "indemnity for loss or damages to lessor's residual interest . . . *but only* at an amount or by a formula that is reasonable in light of the then anticipated harm *caused* by the default or other act or omission") (emphasis added). In other words, while the statute may permit some

23

form of indemnification for risk to residual value, such indemnification can only cover damage or loss to the residual value that is linked to default, rather than by uncorrelated market factors.

As Residco and its expert acknowledge, the SLV obligations here do not purport to liquidate the damages stemming from a default or even seek to mimic them. *See* Weber Report at 5. As Residco concedes, "the Lessee agreed upon a default to repay the full amount of the outstanding financing, as adjusted by a 4% after tax interest rate, along with tax costs associated with an early termination of the Leases – the so called Unpaid Lease Financing Amount, less the fair market value of the Aircraft. Hence, this is an ordinary course financing transaction." Opposition at 51; *see also* June 28, 2018 Hr'g Tr. at 42:7–11 ("[Debtors] say, you don't go look for damages of the basic rent. And we're looking at this as, no, the agreement of the parties was the acquisition costs for the aircraft. The basic rent is not—never played into the damage allocation that the parties agree upon.").

The unreasonableness of the liquidated damages clauses here per Article 2A is confirmed by a comparison of the SLVs with the dollar value of the Debtors' remaining rent obligations.[16] Using the rent obligations set forth in the Original Leases, the numbers show a stark difference between the rent obligations that remain unpaid here—near the end of the lease term—as compared with the corresponding SLVs. For example:

---

[16]    The parties disagree whether to compare the SLVs with the remaining rent in the Original Leases (as Residco proposes) or the lower rent obligations in the Amended Leases (as Debtors propose). *Compare* SJM ¶ 21 ("The Court should . . . assess the reasonableness of the formulas from the date the current economic terms of the leases were set in 2013.") *with* Opposition at 37 ("Similar to the Debtors' numerous other unsupportable assertions, the Debtors assert that the time for the assessment of the liquidated damages provision should not be the date of the Original Leases, but should be the date of the Amended Leases"). Residco urges the Court to use the rent in the Original Leases as most accurately reflecting the anticipated harm caused by default at the formation of the parties' original contracts. Perhaps more persuasively, Debtors argue that the amendments established new leases for purposes of evaluating the liquidated damages provisions. But for the reasons explained more fully above, the Court does not need to choose because the liquidated damages clauses are unreasonable using either set of rent obligations. *See* June 28, 2018 Hr'g Tr. at 27:5–8 (Debtors' counsel stating that they "don't think it matters whether you look at this at the time of the lease—so-called lease amendments in 2013 or you go back to the original time in the lease").

24

- For the Aircraft with the tail number N286SK and related Original Lease, the Schedule SLV shows an SLV of $5,720,768.36 on November 5, 2017, the last month of the lease term, when only $120,275.35 remained in Basic Rent obligations.  *See* Blank Decl., Ex. A Schedule SLV, Schedule BR-1.  That represents a multiple of over 47x.

- For the Aircraft with the tail number N561RP and related Original Lease, the Schedule SLV shows an SLV of $6,358,502.68 on March 23, 2019, the last month of the lease term, when only $115,626.08 remained in Basic Rent obligations.  *See id.*, Ex. B Schedule SLV, Schedule BR-1.  That represents a multiple of over 54x.

- For the Aircraft with the tail number N562RP and related Original Lease, the Schedule SLV shows an SLV of $6,358,502.56 on March 25, 2019, the last month of the lease term, when only $115,626.08 remained in Basic Rent obligations.  *See id.*, Ex. C Schedule SLV, Schedule BR-1.  That represents a multiple of over 54x.

- For the Aircraft with the tail number N287SK and related Original Lease, the Schedule SLV shows an SLV of $5,733,670.67 on November 29, 2017, the last month of the lease term, when only $120,490.47 remained in Basic Rent obligations.  *See id.*, Ex. D Schedule SLV, Schedule BR-1.  That represents a multiple of over 47x.

The remaining Original Leases include similar figures.[17]  These figures are even more dramatic when comparing the SLVs with the unpaid rent obligations set forth in the Amended Leases:

- For the Aircraft with the tail number N286SK and related Amended Lease, the Schedule SLV shows an SLV of $5,720,768.36 on November 5, 2017, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations.  *See* Blank Decl., Ex. R Schedule SLV at SLV-4, Schedule BR at BR-2.  That represents a multiple of over 104x.

- For the Aircraft with the tail number N561RP and related Amended Lease, the Schedule SLV shows an SLV of $6,358,502.68 on March 23, 2019, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations.  *See id.*, Ex. S Schedule SLV at SLV-4, Schedule BR at BR-2.  That represents a multiple of over 115x.

---

[17]      For the Aircraft with the tail number N288SK and related Original Lease, the Schedule SLV shows an SLV of $5,733,670.67 on November 29, 2017, the last month of the lease term, when only $120,490.47 remained in Basic Rent obligations.  *See* Blank Decl., Ex. E Schedule SLV, Schedule BR-1.  For the Aircraft with the tail number N563RP and related Original Lease, the Schedule SLV shows an SLV of $6,333,981.69 on April 22, 2019, the last month of the lease term, when only $115,706.83 remained in Basic Rent obligations.  *See id.*, Ex. F Schedule SLV, Schedule BR-1.  For the Aircraft with the tail number N259JQ and related Original Lease, the Schedule SLV shows an SLV of $5,896,365.07 on April 13, 2020, the last month of the lease term, when only $120,193.59 remained in Basic Rent obligations.  *See id.*, Ex. G Schedule SLV at SLV-5, Schedule BR-1 at BR-1-4.

- For the Aircraft with the tail number N562RP and related Amended Lease, the Schedule SLV shows an SLV of $6,358,502.56 on March 25, 2019, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations. *See id.*, Ex. T Schedule SLV at SLV-3, Schedule BR at BR-2. That represents a multiple of over 104x.

- For the Aircraft with the tail number N287SK and related Amended Lease, the Schedule SLV shows an SLV of $5,733,670.67 on November 29, 2017, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations. *See id.*, Ex. U Schedule SLV at SLV-4, Schedule BR at BR-2. That represents a multiple of over 104x.

The remaining Amended Leases include similar figures.[18]

Thus, under either the Original Leases or the Amended Leases, a very large disparity exists between the cost of the remaining performance and the SLVs. *See* SJM ¶ 2 ("[C]ompare ALF's assertion that the trusts are owed $52.7 million in liquidated damages because of Republic's rejection of the leases with Republic's undiscounted, unmitigated cash cost for the remaining monthly rent for all seven leases of $12.585 million."). No explanation has been provided for these disparities other than the four percent rate of return. Thus, the record does not support the notion that the SLVs are a proxy for liquidated damages; they simply reflect the desired market rate of profit.

Courts have found liquidated damages clauses similar to those in the Amended Leases to be unreasonable. *See In re Nw. Airlines Corp.*, 393 B.R. at 356 ("The unreasonable nature of the clause is well illustrated by [a comparison of] the Debtors' cash cost of performing under the

---

[18]    For the Aircraft with the tail number N288SK and related Amended Lease, the Schedule SLV shows an SLV of $5,733,670.67 on November 29, 2017, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations. *See* Blank Decl., Ex. V Schedule SLV at SLV-4, Schedule BR at BR-2. For the Aircraft with the tail number N563RP and related Amended Lease, the Schedule SLV shows an SLV of $6,333,981.69 on April 22, 2019, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations. *See id.*, Ex. W Schedule SLV at SLV-4, Schedule BR at BR-2. For the Aircraft with the tail number N259JQ and related Amended Lease, the Schedule SLV shows an SLV of $5,896,365.07 on April 13, 2020, the last month of the lease term, when only $55,000.00 remained in Basic Rent obligations. *See id.*, Ex. X Schedule SLV at SLV-5, Schedule BR at BR-2.

Leases" versus the liability under the liquidated damages clause.); *TWA*, 145 F.3d at 135

(comparing the difference owed for final month's rent versus the termination value after default

to "illustrate the effect of the liquidated damages provision"); *c.f. In re Tidewater Inc., et al.*,

*Declaration of Richard Robbins . . .* [ECF No. 453], Ex. A (comparing remaining rent by leased

property against the applicable SLV).

The Court is mindful that damages can sometimes be more explicitly linked to a default

under different scenarios.[19]  But courts have refused to uphold such provisions where—as here—

they lack the required causal link between the anticipated harm and the act of default.  In

particular, courts have rejected formulations that include static margins or profit factors above

and beyond compensation for loss.  *See TWA*, 145 F.3d at 134–35 (rejecting a static "termination

value" as a penalty and finding they "simply have no bearing on Interface's probable loss in the

event of breach"); *Woods at Newtown, LLC*, 2011 WL 4433108, at *4–5 (rejecting as duplicative

and void under Minnesota law a damages provision that granted lessor 35% of the leased

equipment cost *in addition* to remaining lease payments and the right to repossess the

equipment); *CIT Grp./Equip. Fin., Inc. v. Shapiro*, 2013 WL 1285269, at *6–7 (S.D.N.Y. Mar.

29, 2013) (rejecting as duplicative and against Arizona public policy a damages provision that

provided for liquidated damages in addition to unpaid rent and the right to resell the equipment).

---

[19]    As commentators have speculated, causation might be clearer where a default occurs early in a long lease
and the lessor might not yet have a market to re-sell or re-lease what could be large or specialized equipment that it
only purchased at the lessee's behest.  *See* Ian Shrank & Samuel Yim, *Liquidated Damages in Commercial Leases
of Personalty-the Proper Analysis*, 64 BUS. LAW. 757, 764 (2009) ("Being unexpectedly required to remarket the
leased property may impose very real costs or losses on the lessor, as the lessor may not have the staff to handle the
re-leasing or selling, the re-leasing or selling activity may compete with other leasing or selling activities of the
lessor, or the lessor may have believed that the end of the lease term would have been a more optimal time to try to
sell or re-lease the particular property."); *see also* Huddleson, *supra* at 647–48 (arguing for different interpretation
of what is "reasonable" for short-term and long-term leases).  Similarly, in a highly specialized market, one can even
imagine that the actions of the lessee that lead to its default might also disrupt or chill demand for its own products
or services and therefore directly cause damage to the residual value of the leased equipment.

Some commentators have analogized the type of liquidated damages provision found in these Amended Leases to an insurance policy. *See* Shrank & Yim, *supra* at 779–780. Such SLVs or termination values are also "sometimes referred to as a 'make whole amount'" in the industry. *Id*. at 766. Generally speaking, there is nothing wrong with a lessor seeking such clarity regarding the value of the aircraft and, in fact, the Amended Leases use the SLVs for other purposes. For example, these Amended Leases utilize SLV for "(a) insurance protection against Aircraft loss (*see* Leases, at 11.02), (b) value protection under the early termination option (*see* Leases, at Exhibit A, § 2), [and] (c) value protection in the event of any third-party sale (*see* Leases, at Exhibit A-2, §8 ) . . . ." Opposition at 34–35. Similarly, a separate and clearly formulated "Equivalency Payment" is to be charged "[i]f the Lessee does not meet the conditions set forth" for return of the aircraft at the end of a lease. *See* Blank Decl., Ex. R Ex. D-1 § 6. But unlike those instances, these liquidated damages clauses are governed by a statute that requires reasonableness in light of the anticipated harm from default. *See* N.Y. U.C.C. Law § 2-A-504(1).

Residco attempts to minimize the significance of the disparity between the cost of the remaining performance and the SLVs. It argues that

> [t]he so-called 'disproportionality' repeatedly cited by the Debtors in the Debtors' Memorandum of Law has been statutorily rejected in Article 2A. The liquidated damage provision under Article 2A purposely excluded the last sentence of U.C.C. §2-718(1), which provided that a term 'fixing unreasonably large liquidated damages is void as a penalty.' *See* U.C.C. §2A-504(1), Official Comment. 'By deleting the reference to unreasonably large liquidated damages the parties are free to negotiate a formula, restrained by the rule of reasonableness in this section.' *Id.*

Opposition at 39. But Residco's conclusion is misguided. While the "unreasonably large" liquidated damages are not synonymous with "disproportionate" liquidated damages, the surviving reasonableness requirement in Section 504 inherently preserves the concept that a

28

liquidated damages formulation cannot be disproportionately severe when compared to the
anticipated harm caused by the default.  For these reasons, Residco is wrong in claiming that "the
Debtors' reliance upon the allegedly disproportionate actual damages has no bearing upon the
enforceability of the Liquidated Damages Provisions under the Leases."  *Id.* at 26.  On the
contrary, where such large multiples exist one month before the expiration of the rent
obligation—when return of the Aircraft is also required—the size of the disparity confirms that
the loss is untethered from the default itself.

Residco tries to sidestep the reasonableness requirement imposed by Article 2A by
continually suggesting that the parties' agreement of how to allocate risk under the Amended
Leases somehow legitimizes the liquidated damages provisions—irrespective of whether such
provisions reflect the anticipated harm caused by the default.  *See* Opposition at Section III
("Debtors' Summary Judgment Motion Is Fatally Defective as it Fails to Recognize the Express
Agreement of the Parties Regarding Allocation of Risk Set Forth in the Leases").[20]  In so doing,
Residco improperly attempts to have its cake and eat it too: it argues that the Court should
disregard the common law elements no longer found in Section 504 such as "difficulty to
estimate," but it simultaneously wants the Court to ignore the remaining requirement that the

---

[20]    *See also* Opposition at 18 ("Section 2A-528 actually defers to the parties' freedom of contract and any
liquidated damages formula agreed upon by the parties.  In essence, Section 2A-528(1) only applies where a lease
fails to specify the types and formulations for damages . . . .  Here, as the parties have expressly reached agreements
as to the types and methodology of damages [sic]; contrary to the Debtors' apparent wishes, deference must be given
to such agreements of the parties."); *id.* at 34 ("The Debtors, however, ignore the express terms of the Leases and
applicable law that make the Lessee responsible for the Residual Value market risk if it committed a default during
the Lease term.  Only by ignoring the clear and numerous Lease provisions can the Debtors repeatedly make the
unsubstantiated allegation that the 'actual damages' under the Leases only include damages for lost basic rental
value[.]").

formula be "reasonable in light of the then anticipated harm caused by the default or other act or

omission." N.Y. U.C.C. Law § 2-A-504(1).[21]

Residco also points to the Official Comments to Article 2A in support of its argument

that parties' freedom to contract and liquidate damages as befits their needs and circumstances

trumps other considerations: "consistent with the common law emphasis upon freedom to

contract with respect to bailments for hire, this section has created a revised rule that allows

greater flexibility with respect to leases of goods." N.Y. U.C.C. Law § 2-A-504 Off. Cmt. ("The

ability to liquidate damages is critical to modern leasing practice; given the parties' freedom to

contract at common law, the policy behind retaining [the other common law] requirements here

was thought to be outweighed."). Despite seeking to increase parties' ability to freely contract

with each other by deleting certain requirements, however, Article 2A is nonetheless clear that

such freedom remains curbed by the requirement that the liquidated damages be reasonable.[22]

The Court's conclusion that the liquidated damages clauses operate as a penalty dovetails

with the spirit of a traditional liquidated damages clause—*i.e.*, liquidating damages arising out of

a breach of contract, not as a mechanism for generalized risk transfer.[23] While it is true that no

---

[21]     Residco's reliance on the parties' agreement is also undercut by the fact that Mitsui's own counsel flagged
this very issue—*i.e.*, the risk that the liquidated damages provisions might be unenforceable—during the
negotiations for the first three Original Leases in 2001. *See* Residco Facts ¶ 38 (Mitsui's counsel noting that the
inclusion of the Actual Damages Formula in Section 17.02(c) of the Original Leases was "responsive to recent case
law which calls into question the extent to which a bankruptcy court will honor SLV as a measure of damages"); *see
also* SJM ¶ 66 ("Indeed, Mitsui's 30(b)(6) witness testified that Mitsui understood that the enforceability of the
leases would be limited by applicable law.") (citing Matsuno Dep. Tr. at 126:6–19, 127:25–128:11, 167:15–169:7).

[22]     Given the Court's conclusion that the SLVs used in the liquidated damages clauses violate the
reasonableness requirement, the Court need not address the parties' conflicting positions regarding whether the Base
Pricing Model is parol evidence that is barred from use in this Court. *See* SJM ¶ 29; Opposition at 15–16. In short,
the Base Pricing Model would not change the Court's decision.

[23]     Other sections in Article 2A, Part 5(C): "Default by Lessee" similarly emphasize the principle that the
amount of damages awarded should reflect the loss *caused by* a breach. For example, Article 2A, Section 532 reads:
"In addition to any other recovery permitted by this Article or other law, the lessor may recover from the lessee an
amount that will fully compensate the lessor for any loss of or damage to the lessor's residual interest in the goods
*caused by* the default of the lessee." N.Y. U.C.C. Law § 2-A-532 (emphasis added). Section 503 likewise directs
that "*[c]onsequential* damages may be liquidated under Section 2-A-504, or may otherwise be limited, altered, or

court has *per se* rejected inclusion of residual interest liability in a liquidated damages provision,

the language of Article 2A and relevant case law nevertheless directs that any liquidated

damages must be based on reasonable estimates of damages arising out of default as to the

aircraft in question. *See, e.g.*, *G. Howard Assocs., Inc.*, 2010 WL 2346296, at *4–5 (awarding

the stipulated loss value accounting for depreciation and residual value of the aircraft and offset

by actual net sale proceeds).

> 3. <u>Whether the Amended Leases Are Finance Leases Does Not Change the Result Here</u>

Residco argues that the liquidated damages clauses here are permissible because the

Amended Leases are a "special type of true lease which is called a finance lease[.]" June 28,

2018 Hr'g Tr. at 43:5–6. Finance leases are defined in Article 2A as the product of a triangular

set of transactions involving a lessee, a manufacturer, and a third party lessor. *See* N.Y. U.C.C.

Law § 2-A-103(g).[24] Residco further notes that, "[u]nder Article 2A, special protections are

---

excluded unless the limitation, alteration, or exclusion is unconscionable." N.Y. U.C.C. Law § 2-A-503 (emphasis added).

[24]    Article 2A specifically states:

> "Finance lease" means a lease with respect to which: (i) the lessor does not select, manufacture, or supply the goods; (ii) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and (iii) one of the following occurs: (A) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract; (B) the lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract; (C) the lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of any third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or (D) if the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing (a) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person, (b) that the lessee is entitled under this Article to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods, and (c) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete

accorded to lessors under 'finance leases' because such lessors are financers who primarily are just providing financing."  Opposition at 19; *see also id.* at 32–33.  Indeed, Article 2A, Section 407 affords special protections to such leases: "[i]n the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods."  N.Y. U.C.C. Law § 2-A-407(1).  Put another way, Article 2A, Section 407 codifies the enforceability of a lessee's absolute and unconditional promise to perform under a lease—a promise which is often memorialized through language in the lease known as a "hell or high water" clause.  *See Wells Fargo Bank, N.A. v. BrooksAmerica Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005) ("In the context of a finance lease containing a hell or high water clause, the lessee must make payments regardless of defective performance on the part of the lessor, that is, 'come hell or high water.'") (citing 19 Richard A. Lord, Williston on Contracts, § 53:28 (4th ed. 2004)); N.Y. U.C.C. Law § 2-A-407 Off. Cmt. ("Purposes: 1. This section extends the benefits of the classic 'hell or high water' clause to a finance lease that is not a consumer lease . . . .  Thus, upon the lessee's acceptance of the goods the lessee's promises to the lessor under the lease contract become irrevocable and independent.").

Against this backdrop, there are three issues for the Court to address.  As a threshold matter, the Debtors complain that Residco is attempting to shoehorn in standards of treatment for the Amended Leases as if they were *financings*, which are governed by different provisions of the N.Y. U.C.C. than Article 2A.  *See* Opposition at 13 ("In sum, the Base Pricing Model confirms that the sale-leaseback transactions were simple financing transactions entered between

---

statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

N.Y. U.C.C. Law § 2-A-103(g).

the parties."); June 28, 2018 Hr'g Tr. at 80:16–24 ("The fact that the term finance lease or the

term—or the word 'finance' is attached to the word 'lease,' [Residco] would have you believe

that that means Article 2-A can cover a financing.  That a finance lease is a financing.  Well, no,

it's not.  It's a true lease.  And that's expressed definition under the statute.  Indeed the provision

I read to the Court before expressly excludes from the scope of 2-A a financing.  Financings are

governed by Article 9 of the UCC.  They're not governed by Article 2-A."); *see also* N.Y.

U.C.C. Law Art. 9 ("Secured Transactions").

In fact, courts have often struggled in distinguishing a finance lease from a financing.

*See In re Grubbs Const. Co.*, 319 B.R. 698, 709–10 (Bankr. M.D. Fla. 2005) ("'The issue of

whether so-called 'finance leases' are in reality security agreements has vexed the courts for

many years.'") (quoting *Morris v. U.S. Bancorp Leasing & Fin. (In re Charles)*, 278 B.R. 216,

221 (Bankr. D. Kan. 2002)).  Indeed, there is an entire section of the N.Y. U.C.C. titled "Lease

Distinguished from Security Interest" which provides guidance in differentiating one from the

other.  *See* N.Y. U.C.C. Law § 1-203; *see also* N.Y. U.C.C. Law § 1-203 Off. Cmt. ("One of the

reasons it was decided to codify the law with respect to leases was to resolve an issue that

created considerable confusion in the courts: what is a lease?  The confusion existed, in part, due

to the last two sentences of the definition of security interest in the 1978 Official Text of the Act,

Section 1-201(37) . . . .  The answer is important because the definition of lease determines not

only the rights and remedies of the parties to the lease but also those of third parties.").  But

notwithstanding this interesting debate, the Court need not reach this thorny issue today given

that all parties here agree that the Amended Leases are "true leases" governed by Article 2A.

*See* June 28, 2018 Hr'g Tr. at 17:25–18:3, 43:3–5.  As such, they are subject to the requirements

of Article 2A and not Article 9.

The second question involves the application of the "hell or high water" protections

under Section 407.  Residco argues that the liquidated damages provisions should be enforced

under Article 2A, Section 407 and Section 4.05 of the Amended Leases.  *See* Opposition at 20–

21 ("As the Leases are finance leases, the Lessor is protected by any attempt by the Debtors to

modify promises of the Lessee under the Leases . . . .  Because the Lessee accepted each of the

Aircraft, each of the Lessee's promises under the Leases became irrevocable and independent.

*See* U.C.C. §2A-407.  Such promises include the Lessee's obligations to pay the Stipulated Loss

Value damage amounts under the Leases.").

The limited case law discussing finance leases focuses on whether a particular lease is a

finance lease and, consequently, whether the lessee is liable under that lease's hell or high water

clause, notwithstanding the lessor's failure to perform.  *See Siemens Credit Corp. v. Am. Transit

Ins. Co.*, 2001 WL 40775, at *1 (S.D.N.Y. Jan. 17, 2001) ("After an examination of the Lease,

this Court finds that . . . [t]he Lease is a finance lease under Article 2–A of the New York

Uniform Commercial Code, *see* Lease ¶ 7, and obligates ATIC to make all payments due under it

regardless of the condition or performance of the leased equipment."); *Citicorp Leasing, Inc. v.

Kusher Family Ltd. P'ship*, 2006 WL 1982757, at *4 (S.D.N.Y. July 14, 2006) ("Citicorp claims

that because the two leases with Virtual Physical are finance leases, Citicorp is not liable for

defects in the leased equipment, thus rendering the alleged defects in the equipment and

misrepresentations by Philips irrelevant to defendants' obligation to make payments to Citicorp

under the leases. The Court agrees.").

Thus, Section 407 requires Debtors to uphold their contractual obligations under the

Amended Leases, notwithstanding any difficulties in performance by the Lessor.  *See* N.Y.

U.C.C. Law § 2-A-407 Off. Cmt. ("The section requires the lessee to perform even if the lessor's

34

performance after the lessee's acceptance is not in accordance with the lease contract . . . ."). But Debtors here are not seeking to escape their obligation to perform and there is no argument raised about the adequacy of the Lessor's performance here. *See* SJ Reply ¶ 12 n.5 (Residco relies on section 4.05 of the leases and [S]ection 2A-407 "but these provisions have no applicability here because Republic is not seeking to modify its obligations under the leases."); *see BrooksAmerica Mortg. Corp.*, 419 F.3d at 110; *In re O.P.M. Leasing Servs., Inc.*, 21 B.R. 993, 1006-07 (Bankr. S.D.N.Y. 1982) ("[C]ourts have uniformly given full force and effect to 'hell and high water' clauses in the face of various kinds of defaults by the party seeking to enforce them."). Perhaps for that reason, Residco does not explicitly argue that Section 407 by itself absolves the liquidated damages clauses here from having to satisfy the reasonableness requirement of Article 2A. But to the extent that it contends this to be the case, the Court rejects such a position. Residco cites no authority for the notion that the reasonableness requirement of Section 504 is explicitly or implicitly trumped by Section 407. Indeed, such a reading would appear to violate the rules of statutory construction to read statutory provisions in a harmonious manner. *See* N.Y. Stat. Law § 98 (McKinney) ("All parts of a statute must be harmonized with each other as well as with the general intent of the whole statute, and effect and meaning must, if possible, be given to the entire statute and every part and word thereof.").[25]

---

[25]    In construing the scope of Section 407, the Court is mindful of the policy behind such "hell or high water" clauses. As one court explained:

A finance lease is a method to finance the acquisition of goods. Normally, a lender who enables a buyer to acquire the goods is not subject to a refusal by the buyer to repay the loan if the goods are not what the buyer expected. Similarly, a finance lessee cannot refuse to pay a lessor an agreed payment. William D. Hawkland, 3 *Hawkland UCC Series*, § 2A-209:01 (Frederick K. Miller ed., 2006). The parties entered into a financial transaction in which the lessor is lending money and dealing largely in paper, not goods. 2 White & Summers, *Uniform Commercial Code* § 13-3 (4th ed. 2006). The statutory scheme of finance leases benefits both parties. The lessor gains certainty and security for its extension of credit. The lessee forgoes its warranty claims against the lessor but becomes a statutory third party beneficiary of the supply contract between the manufacturer or other supplier and the lessor. Thus, the lessee has a right of action against the supplier and the manufacturer and so is not without a remedy. Fla. Stat. § 680.209; *see also id.* The remedy is simply not a warranty remedy against the lessor.

35

This leaves us with a third issue. Residco asserts that the unique circumstances underpinning finance leases such as this one alter the parties' expectations and therefore affect what is "reasonable" within the meaning of Section 504. *See* June 28, 2018 Hr'g Tr. at 43:22–44:3. There is some precedent to support this argument. *See Aerovias de Mexico, S.A. de C.V.*, 893 F. Supp. at 218–19 ("[T]he transaction is not simply a lease arrangement, but rather a loan made by the Series A and B Holders to allow Wilmington to purchase a plane and lease it to Aeromexico on their behalf. *Viewed from this perspective*, the amounts sought by Wilmington pursuant to § 15(h) of the Lease are reasonably proportionate to the actual damages suffered by Wilmington and the Certificate Holders.") (emphasis added). But Residco goes too far in suggesting that allocation of risk effectuated through liquidated damages provisions is *always* reasonable in finance leases so long as the parties agreed to it. *See* June 28, 2018 Hr'g Tr. at 45:20–25 ("So let me see if I understand this correctly. So your view is that this special kind of true lease, a finance lease, is recognized under 2-A. And therefore, it is properly done [sic], it will never run afoul of [Section 504]?" "That is correct."). Such a view improperly reads Section 504 out of the statute, something the Court declines to do. And simply put, the Court cannot square the particular liquidated damages clauses here with the requirements of Section 504—even considering the Amended Leases as finance leases—given that the pricing structure and risk allocations detailed above are untethered from the damages arising out of default.

---

*Wells Fargo Fin. Leasing, Inc. v. Mountain Rentals of Gatlinburg, Inc.*, 2008 WL 199855, at *5 (Tenn. Ct. App. 2008); *see* N.Y. U.C.C. Law § 2-A-508 Off. Cmt. ("There is no special treatment of the finance lease in this section. Absent supplemental principles of law and equity to the contrary, in the case of most finance leases, following the lessee's acceptance of the goods the lessee will have no rights or remedies against the lessor, because the lessor's obligations to the lessee are minimal."). These kinds of concerns are not implicated in this case.

## II.    Liquidated Damages That Constitute Unenforceable Penalties May Not Be Recovered Under Guarantees

Having found the underlying liquidated damages provisions violate Article 2A, Section 504, the Court next turns to the validity of the Guarantees.  Enforceability of the Guarantees, like the liquidated damages provisions, is a question of law, not fact, and is therefore fully determinable by this Court on summary judgment.  *See In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 192 B.R. 342, 349 (Bankr. S.D.N.Y. 1994) ("Summary judgment is appropriate only to resolve disputed questions of law, or the application of the law to the undisputed facts.").

### A.  The Bankruptcy Court's Equitable Powers Cannot Be Used to Void the Guarantees

As a threshold matter, the Debtors argue that this Court should use its equitable powers under Section 105 of the Bankruptcy Code to invalidate the Guarantee Claims.  Specifically, they argue that "permitting a lessor to enforce a penalty in an underlying lease against debtor parent guarantors would vitiate a debtor's right to reject burdensome agreements under section 365 of the Bankruptcy Code."  SJ Reply ¶ 20.  The Debtors' argument relies on three related but distinct propositions:

1. Bankruptcy courts are empowered to adjust debtor-creditor relationships to the extent necessary to prevent inequitable results that harm a debtor's estate or creditor;

2. Courts may disregard provisions in rejected contracts that would vitiate a debtor's rights under section 365 of the Bankruptcy Code; and

3. Enforcement would inequitably confer a windfall approximately 5 times greater than ALF's unmitigated damages and would improperly dilute the recovery to Republic's other creditors.

*See id.*; *see also* SJM ¶¶ 37, 38.

Of course, "[i]t is axiomatic that bankruptcy courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.'" *In re Target Two Assocs., L.P.*, 2006 WL 3068668, at *5 (S.D.N.Y. Oct. 27, 2006), *aff'd*, 282 Fed. App'x 914 (2d Cir. 2008) (quoting *Schwartz v. Aquatic Dev. Grp., Inc. (In re Aquatic Dev. Grp., Inc.)*, 352 F.3d 671, 680 (2d Cir. 2003)). "Nevertheless, the equitable powers of the bankruptcy courts derive from the statutory grant of such authority by Congress, and are limited thereby." *Id.* (citing *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003)). "Thus, the equitable powers of the bankruptcy court cannot be used to contravene the provisions of the Bankruptcy Code." *Id.* (citing *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir. 2005)). "The Supreme Court has also ruled that a bankruptcy court may not invoke equity to modify rights or interests created by state law, except to 'the extent of actual conflict with the system provided by the Bankruptcy [Code].'" *Id.* (quoting *Butner v. United States*, 440 U.S. 48, 54 (1979)).

Applying these principles here, the Court rejects Debtors' equity argument. The Debtors do not provide any specific Bankruptcy Code section that supports the requested relief. Instead, the Debtors primarily cite precedent in which bankruptcy courts have refused to enforce prepetition contract waivers of rights granted by the Bankruptcy Code itself. While the cases relied upon by the Debtors demonstrate use of bankruptcy courts' equitable authority, they all involve waivers of rights that violate explicit protections granted under the Code, such as waivers of the automatic stay. *See In re S. E. Fin. Assocs., Inc.*, 212 B.R. 1003, 1005 (Bankr. M.D. Fla. 1997) ("[I]f a waiver adversely affects other creditors, it is unlikely that the waiver will be enforced."); *In re Pease*, 195 B.R. 431, 434 (Bankr. D. Neb. 1996) ("The judicial

enforcement of a contractual waiver of the automatic stay would permit a single creditor to opt

out of the collective process mandated by the Bankruptcy Code to the potential detriment of the

debtor and other creditors. This should not be permitted."); *see also In re Sky Grp. Int'l, Inc.*, 108

B.R. 86, 89 (Bankr. W.D. Pa. 1989).  But Debtors do not cite to any such Bankruptcy Code

section here other than Section 365, and they fail to establish how enforcement of these

Guarantees would violate the provisions of Section 365.  Indeed, it is hard to imagine that it

would, given that guarantees are a common instrument addressed in bankruptcy cases.  *See In re*

*Kiln Creek Golf & Country Club, L.P.*, 1996 WL 910909 (Bankr. E.D. Va. Sept. 6, 1996)

(addressing whether debtor was liable to creditor based on a written guarantee); *In re Jubelt*,

2012 WL 4738631 (Bankr. S.D.N.Y. Oct. 3, 2012) (addressing guarantees in context of

nondischargeability action); *c.f. In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169 (Bankr.

S.D.N.Y. 2017) (Chapter 15 case where debtors' obligations included intercompany guarantees).

The mere fact that the Guarantees would harm other creditors is not justification for the Court to

alter otherwise legitimate contractual rights.  By definition, any allowed claim hurts the interests

of all other creditors by reducing the pool of available assets for distribution.  *See In re United*

*Merchs. & Mfrs., Inc.*, 674 F.2d 134, 143–44 (2d Cir. 1982) (rejecting request to invalidate

liquidated damages clauses on various asserted policy grounds in a Bankruptcy Act Chapter XI

case after finding the clauses and claims valid under applicable state law).

### B.  The Guarantees Violate Public Policy and Therefore Cannot Be Enforced

The question of whether the Guarantees are unenforceable as against public policy

requires weighing the different aspects of New York law.  *See* Blank Decl., Ex. Y (N286SK

Guarantee) at 5 (Guarantees are governed by New York law).  It is true, as Residco claims, that

New York law provides for stringent enforcement of unconditional guarantees.  *See* Opposition

at 54 (arguing that guarantee obligations cannot be challenged "through the assertion of

39

affirmative defenses (other than payment and lack of consideration)" and "the assertion that a

liquidated damages clause is a penalty is such an affirmative defense") (citing *Bell v. Ramirez*,

2014 WL 7178344, at *3 (S.D.N.Y. Dec. 9, 2014)).  "[B]road, sweeping and unequivocal

language in an absolute and unconditional guaranty generally forecloses any challenge to the

enforceability and validity of the documents which establish defendant's liability for payments

arising under the [underlying] agreement, as well as to any other possible defense to his liability

for the obligations."  *In re Nissan Litig.*, 2018 WL 2113228, at *5 (S.D.N.Y. May 8, 2018)

(internal quotations omitted); *see also GSO Re Onshore LLC v. Sapir*, 2010 WL 5071785, at *5

(Sup. Ct. N.Y. Cty. Nov. 24, 2010) (A "waiver-of-defenses provision . . . in a guaranty is valid

and enforceable, and bars, as a matter of law, any defenses a guarantor might otherwise assert in

an action to recover under its guaranty.") (citing *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90

(1985); *Red Tulip LLC v. Neiva*, 842 N.Y.S.2d 1, 5–6 (1st Dep't 2007)).  "It is not against public

policy to enforce a waiver of the right to interpose counterclaims . . . [and s]uch a waiver

constitutes an insurmountable obstacle to defendants' attempt to assert these defenses and

counterclaims."  *VNB New York Corp. v. M. Lichtenstein LLC*, 2011 WL 4024664, at *9 (Sup.

Ct. Kings Cty. Sept. 8, 2011) (citations omitted).  This is even the case for claims of fraudulent

inducement of the guarantee itself.  *See Plapinger*, 66 N.Y.2d at 95 ("[T]he substance of

defendants' guarantee forecloses their reliance on the claim that they were fraudulently induced

to sign the guarantee . . . ."); *VNB New York Corp.*, 2011 WL 4024664, at *10–11; *Cooperatieve

Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 493 (2015).  "To permit

that [defense] would in effect condone defendants' own fraud in deliberately misrepresenting

their true intention when putting their signatures to their absolute and unconditional guarantee."

*Plapinger*, 66 N.Y.2d at 95 (quotations omitted).

Notwithstanding this case law, courts have recognized limits to the enforcement of such guarantees under New York law. For example, courts have refused to enforce them where a "creditor's wrongful post-execution conduct triggered the event that accelerates or causes the guarantor's liability." *Navarro*, 25 N.Y.3d at 496; *see id.* at 496–97 ("[T]here is federal case law that suggests that there may be certain fraudulent conduct that falls outside the scope of an unconditional and absolute guaranty.") (citing *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 37–38 (2d Cir. 1999)); *MCC Funding LLC v. Diamond Point Enters., LLC*, 2012 WL 2537893, at *5 (Sup. Ct. Kings Cty. June 25, 2012) ("[A] waiver of counterclaims . . . will only be enforced in the absence of fraud . . . . Indeed, where the mortgagee is alleged to have wrongfully caused the mortgagor's default or some other condition that led to the foreclosure action, this constitutes a viable defense and/or counterclaim . . . ."). Moreover, federal courts in this jurisdiction have concluded that "[i]f [an] Agreement cannot be enforced, then clearly the guaranty would likewise be unenforceable." *Becker v. Rosenberg*, 711 F. Supp. 173, 174 (S.D.N.Y. 1989).

Over the last hundred years, in fact, courts in New York and elsewhere have repeatedly refused to uphold contracts that violate public policy and have held that parties may not waive illegality as a defense. *See In re MG Ref. & Mktg., Inc. Litig.*, 1997 WL 23177, at *8 (S.D.N.Y. Jan. 22, 1997) ("[A]n agreement to waive a claim of illegality is ineffective. It is not for the parties to an agreement to excuse the fact that their contract is illegal. Public policy dictates that the Court refrain from enforcing such agreements."); *Nyhus v. Travel Mgmt. Corp.*, 466 F.2d 440, 447 (D.C. Cir. 1972) ("Invalidity of a contract offensive to public policy cannot be waived by the parties; it is a barrier which the court itself [is] bound to raise in the interests of the due administration of justice."); *Rathke v. Yakima Valley Grape Growers Ass'n*, 30 Wash. 2d 486,

41

499 (1948) ("The nonenforcement of illegal contracts is a matter of common public interest, and

a party to such contract cannot waive his right to set up the defense of illegality in an action

thereon by the other party.") (quotations omitted); *Noonan v. Gilbert*, 68 F.2d 775, 776 (D.C.

Cir. 1934) ("[A] court in the due administration of justice is bound to refuse its aid to enforce a

contract that offends public policy. The invalidity of the contract may not be waived by any

system of pleading, or even by the express stipulation of the parties.") (quotations omitted);

*Miller v. Ahrens*, 163 F. 870, 875 (C.C. N.D.W. Va. 1908) ("[W]e must constantly bear in mind

the distinction between contracts void for reasons of state, declared so by its laws or by its

policy, as defined by its courts as being against the public interests, and contracts not inherently

vicious, but void or voidable by reason of the infirmity of the parties, their fraudulent acts,

misrepresentations, or misconduct, or by reason of defects in the execution thereof. . . .  There

never can be by the parties either ratification or confirmation of a contract that is expressly

prohibited by law to be made, or which contravenes public policy."). This Court has likewise

held that public policy defenses may not be waived under a guarantee. *See In re Dreier LLP*,

421 B.R. 60, 64 n.1 (Bankr. S.D.N.Y. 2009) ("Elisa could not have waived the statute of

limitations defense in the Guaranty, because such a waiver would have been contrary to public

policy and unenforceable.") (citations omitted).

Given the weight of authority, this Court concludes that the Guarantees here are not

enforceable for the same reason as the underlying obligations: the liquidated damages clauses in

the Amended Leases violate public policy. Such a conclusion is consistent with case law from

this Circuit holding that, as a matter of public policy, parties may not waive defenses to

liquidated damages clauses. *See Bell v. Ebadat*, 2009 WL 1803835, at *3–5 (S.D.N.Y. June 16,

2009) (refusing to enforce a liquidated damages clause that was not reasonable in proportion to

42

the probable loss, notwithstanding the fact that the defendant had not objected to such clause)

(citing *Wells Fargo Bank Nw., N.A. v. Energy Ammonia Transp. Corp.*, 2002 WL 31368264, at

*2 (S.D.N.Y. Oct. 21, 2002) (noting that "the invalidity of a contract offensive to public policy

cannot be waived by the parties as it is a barrier which the court itself is bound to raise in the

interests of the due administration of justice")).

Residco urges a different result, relying on an unpublished Second Circuit case *136 Field*

*Point Circle Holding Co., LLC*, 644 Fed. App'x 10 (2d Cir. 2016).  In that unpublished decision,

the Second Circuit upheld the guarantee notwithstanding a claim that it constituted an

unenforceable penalty.  The Court found that even if the liquidated damages provision

constituted an unenforceable penalty, such "broad, sweeping and unequivocal language in an

absolute and unconditional guaranty generally forecloses any challenge to the enforceability and

validity of the documents which establish defendant's liability for payments arising under the

underlying agreement, as well as to any other possible defense to his liability for the

obligations."  *Id.* at 12.

While ostensibly on point, *136 Field Point* is an unpublished, non-binding precedent.  *See*

*Stone v. Theatrical Inv. Corp.*, 80 F. Supp. 3d 505, 506 (S.D.N.Y. 2015) ("First, although New

York law permits citation to unpublished opinions, such decisions are not binding legal

authority.") (internal citations omitted); *Hanig v. Yorktown Cent. School Dist.*, 384 F. Supp. 2d

710, 717 n.8 (S.D.N.Y. 2005) ("[A]ccording to the Second Circuit rules, [*Scaglione v.*

*Mamaroneck Union Free Sch. Dist.*, 47 Fed. App'x 17 (2d Cir. 2002)], as well as the other

unpublished decisions that defendant cites, 'may not be cited as precedential authority to this or

any other court.'") (citing U.S. Ct. of App. 2d Cir. R. 0.23); *see also In re Republic Airways*

*Holdings Inc.*, 565 B.R. at 725 n.11 ("Residco relies heavily on a summary order in [*136 Field*

43

*Point*], where the Second Circuit enforced an unconditional guarantee irrespective of whether the obligations in the underlying lease were enforceable . . . . But as that summary order makes clear that it is not precedential, it cannot be considered dispositive on this issue.").

Moreover, the *136 Field Point* court does not address any argument based on public policy or relying upon statute. *See* 644 Fed. App'x 10. This is also true of the underlying District Court decision. *See 136 Field Point Holding Co. LLC v. Invar Int'l Holding, Inc.*, 2015 WL 1254846 (S.D.N.Y. Mar. 19, 2015). Perhaps not surprisingly then, the cases relied upon by the *136 Field Point* court are all distinguishable from the facts here. None of the guarantees in those cases related to provisions that had been invalidated on grounds of public policy. *See Navarro*, 25 N.Y.3d at 487 (defendant argued that guarantee could not be upheld because underlying judgment was obtained by collusion); *Compagnie*, 188 F.3d at 37 (upholding a guarantee even though underlying obligation of debtor had been discharged); *Plapinger*, 66 N.Y.2d at 92 (upholding a guarantee where guarantor claimed that guarantee had been fraudulently induced by corporate officers). Subsequent cases that cite to *136 Field Point* in upholding guarantees are distinguishable for the same reason. *See In re Nissan Litig.*, 2018 WL 2113228, at *6 (enforcing terms of unambiguous guarantees where there was no material question of fact as to underlying breach); *Torin Assocs., Inc. v. Perez*, 2016 WL 6662271, at *5 (S.D.N.Y. Nov. 10, 2016) (upholding unconditional and absolute guarantee upon determining that underlying debt existed and guarantee sufficiently encompassed such debt).

Ultimately, the Court must balance the conflict between two significant and conflicting legal precepts: the validity of unconditional guarantees and the interest of public policy. While the Court acknowledges the importance guarantees play in the realm of leasing and equipment

financing, these values cannot overcome the long-expressed mandate that precludes parties from contracting to something privately that is disallowed by public policy and explicit statute.[26]

### III. Residco's Miscellaneous Arguments

Residco raises a host of other miscellaneous arguments, two of which warrant attention.

#### A. The Section 1110 Stipulation Is Unambiguous and Bars Payment of the Administrative Expense Claim

The parties disagree over whether Lessor is entitled to payment of the post-petition rent as an Administrative Expense Claim. Debtors argue that such payment is explicitly barred under the terms of the Section 1110 Stipulation. *See* SJM ¶¶ 41–42. On the other hand, Residco contends that it is not barred and that the Section 1110 Stipulation provides for payment of $360,000 for post-petition rent relating to the Aircraft with registration marks N259JQ, N286SK, N287SK, and N563RP ($90,000 per Aircraft). *See* Opposition at 60–65.

Pursuant to the Section 1110 Stipulation:

> The Parties agree that the *only* postpetition rent due for *any of the Aircraft* shall be (a) for the N561RP Aircraft, the N561RP Rent and (b) for each of the Remaining Aircraft, *the Retention Term Rent and any Reconciliation Payments made by Shuttle*, which payments shall be made at the times provided for herein. The Parties agree that ALF shall have an allowed administrative expense claim entitled to priority pursuant to Section 507(a) of the Bankruptcy Code with respect to such N561RP Rent, *Retention Term Rent and Reconciliation Payments* . . . , all of which shall be paid on the times specified herein.

Section 1110 Stipulation at 9 (emphasis added). It is undisputed that the N561RP Rent referenced above has been paid. *See* Residco Facts ¶ 60; *see also* Opposition at 65 n.24. The "Remaining Aircraft" alluded to in the Section 1110 Stipulation refer to the five Aircraft with registration marks N259JQ, N286SK, N287SK, N563RP, and N562RP and their respective

---

[26] *See In re Republic Airways Holdings Inc.*, 582 B.R. at 283 n.2 (noting that "Residco's entire theory that it has some $50 million in guarantee claims arising from just $7 million in underlying lease claims is premised on a legal argument that this Court considers dubious: namely, that a liquidated damages provision in a lease agreement that is determined to be unenforceable—as against public policy—is nevertheless enforceable under a parent company's guarantee where the guarantee waives affirmative defenses").

Leased Equipment.  *See* Section 1110 Stipulation at 2.  The Section 1110 Stipulation

contemplates that "one or more of the Remaining Aircraft[] may be needed for flight operations

after April 24, 2016" and that such Remaining Aircraft are "Retained Aircraft."  *Id.*  However,

on or around April 22, 2016, the Debtors informed Residco that they had decided to reject six of

the seven Aircraft, only keeping the N562RP Aircraft as a "Retained Aircraft."  *See* Residco

Facts ¶ 148.

It is clear that the terms "Retention Term Rent" and "Reconciliation Payments"—that,

per the above definition, are the only payments other than the N561RP Rent entitled to

administrative priority—only apply to Retained Aircraft, or the N562RP Aircraft.  *See* Section

1110 Stipulation at 5–6.  Lessor's Administrative Expense Claim, however, seeks rent for four

additional Aircraft: Aircraft N259JQ, N286SK, N287SK, and N563RP.  *See* Claims Objection at

Schedule 4.  Because none of these Aircraft are Retained Aircraft, Debtors are correct that

Lessor's Administrative Expense Claim for these four Aircraft is clearly barred by the terms of

the Section 1110 Stipulation.  Debtors are likewise correct that the parol evidence rule prohibits

Residco from introducing prior iterations of the Section 1110 Stipulation in support of its

argument because the terms of the current Section 1110 Stipulation are clear and unambiguous.

*See* SJM Reply ¶ 22 (citing *Grant & Eisenhofer, P.A. v. Bernstein Liebhard, LLP*, 2016 WL

5416502, at *1 (S.D.N.Y. Sept. 28, 2016) (rejecting plaintiff's attempt to bring in an earlier draft

of its contract with the defendant because the contract's text is unambiguous so there is "no basis

to look beyond the language of the contract, including to earlier drafts of the contract") (internal

quotation marks omitted); *Blum v. Spaha Capital Mgmt., LLC*, 44 F. Supp. 3d 482, 493

(S.D.N.Y. 2014) (extrinsic evidence includes earlier drafts of agreement)).

46

## B. Summary Judgment Is Appropriate Because There Are No Material Disputed Facts

In somewhat conclusory fashion, Residco argues that summary judgment is not appropriate for any of the issues raised by Debtors in their SJM because there are numerous material disputed facts. *See* Opposition at 65–66. In particular, the Opposition singles out thirteen such facts. *See id.* The Court concludes, however, that these issues are either not issues for a factfinder or not material facts in genuine dispute.

Several of the purported "material-disputed facts" cited by Residco are, in actuality, the very legal issues that have been discussed and decided in this Opinion. These include, but are not limited to: "[w]hether the Liquidated Damages Provisions formula is reasonable in light of the anticipated harm that would be caused upon a default;" "[w]hether the Lessee's contractual hell or high water provisions in the Leases protect the Lessor Parties['] claims from attack;" "[w]hether the waiver and absolute and unconditional defense provisions of the Parent Guarantees are enforceable;" "[w]hether the Section 1110(b) Stipulation require[s] that the Debtors pay Retention Rent for each of the Remaining Aircraft;" and "[w]hether the Residco Parties waived the right to receive administrative rent under their Section 1110 Stipulation." Opposition at 65. To the extent that Residco's other examples constitute disputed facts—for example, "[w]hether the Base Pricing Model constitutes the Net Economic Return pricing formula set forth in the Lease[]" and "[w]hat components are embodie[d] in the Stipulated Loss Values[,]" *id.*,—such facts are not material to the resolution of the legal issues addressed in this decision. Accordingly, there are no material issues of fact in dispute that preclude summary judgment on the issues above.[27]

---

[27] To the extent that an argument made by Residco has not been specifically addressed by the Court in this decision, it is rejected as being insufficient to survive summary judgment.

## **CONCLUSION**

For the reasons stated above, the Court grants the Debtors' SJM, concluding that (i) the liquidated damages provisions of the Amended Leases violate public policy and constitute unenforceable penalties in violation of Article 2A, Section 504 of the N.Y. U.C.C., (ii) the waiver of defenses provision of the Guarantees may not be invoked to uphold such unenforceable provisions, and (iii) the Administrative Expense Claim is barred under the Section 1110 Stipulation.

The Debtors should settle an order on three days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to Residco.

Dated: New York, New York
       February 14, 2019


                                              */s/ Sean H. Lane*_____
                                              UNITED STATES BANKRUPTCY JUDGE